# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| MICHAEL WAYNE EGGERS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | 2:13-cv-1460-LSC |
| | ) | |
| | ) | |
| STATE OF ALABAMA, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OF OPINION

This is a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by Petitioner Michael Wayne Eggers ("Eggers"), a death row inmate at Donaldson Correctional Facility in Bessemer, Alabama. Eggers challenges the validity of his 2002 conviction for capital murder and sentence of death in the Circuit Court of Walker County, Alabama. Upon thorough consideration of the entire record and the briefs submitted by the parties, the Court finds that Eggers's petition for habeas relief is due to be denied.

## I.    FACTS OF THE CRIME

In its opinion on direct appeal affirming Eggers's conviction and death sentence, the Alabama Court of Criminal Appeals (hereinafter, the "ACCA"), stated the facts of the crime as follows:

The evidence adduced at trial indicated the following. Bennie Francis Murray ("Francis") and her husband, Frank, owned and operated a concession business that traveled around the southeast with a carnival. Francis hired Eggers to work concessions; he traveled with the carnival until September 2000, when the carnival arrived in Jasper, where Eggers met a woman. When the carnival left Jasper, Eggers stayed behind and found a job, but apparently lost the job at some point and was unable to find another one. On December 26, 2000, Eggers telephoned Francis, who, along with her husband, lived in Talladega when they were not traveling with the carnival, and asked for a job. Francis explained that the carnival would not begin traveling again until mid-March and that the Murrays' "bunkhouse," a trailer that had been converted into rooms for their employees, would not be available until mid-February. (R. 416.) On December 28, 2000, Eggers telephoned Francis again. He told Francis that he and his 15–year–old son were at the bus station in Birmingham, and asked Francis to come pick them up. Francis picked up Eggers and his son and brought them back to Talladega, where she tried to help Eggers find a temporary job, but was unable to do so. On December 30, 2000, Eggers asked Francis to take him and his son back to Jasper; she agreed.

According to Eggers's statements to police, on their way to Jasper, Eggers asked Francis to take him to his car, which was outside Jasper; he had driven it off the road in inclement weather the week before Christmas and had gotten stuck in a ditch. Francis agreed and, after dropping off Eggers's son at Eggers's apartment in Jasper, Francis and Eggers left in search of Eggers's car. After driving for some time in a rural area of Walker County, Francis stopped her pickup truck on the side of the road and indicated that she was unwilling to go any further and was going to turn around. Eggers then asked her if she was "joining everyone else on the fuck Mike bandwagon." (C. 404.) At that point, Eggers said, Francis "backhanded" him and he "let go . . . [and] just started hitting her." (C. 404.) Eggers beat Francis with his fists until she was unconscious, at which point he pushed her as far against the driver's side door of the pickup truck as he could, and drove down a nearby dirt road. When Francis started to regain consciousness—"[s]he was making noises and stuff like that" (C. 406)—Eggers stopped the truck and

pushed her out of the cab of the truck onto the road. Eggers got out of the truck and started cursing at Francis and kicked her several times in the head with the steel-toed boots he was wearing. Eggers then got back in the truck, drove toward the end of the road and turned around, but decided to stop where he had left Francis because he wanted to make sure she was dead and "wasn't going to stay out there suffering." (C. 406.) When Eggers stopped, Francis was starting to regain consciousness so he kicked her again and choked her with his hands "to make sure she was dead." (R. 406.) Eggers again said that he "didn't want to leave her out there suffering." (C. 406.) Eggers then dragged Francis into nearby woods where she could not be seen from the road and, because he believed she was still alive at that point, he put a tree limb on her throat and stood on it in an effort to kill her. Eggers then took Francis's truck to a car wash and washed Francis's blood out of the cab of the truck.FN1 He also went through Francis's purse, which was in the truck, and found cash and a debit card. Eggers said that the killing was not premeditated, but was spontaneous.

> FN1. Eggers said that when he hit Francis "blood just . . . went everywhere" and that there was blood all over the cab of the truck as a result of the attack. (C. 409.)

Following the murder, Eggers picked up his son in Francis's pickup truck and the two drove to Campbellsville, Kentucky, where Eggers's son stayed with a friend. While in Campbellsville, Eggers met a man named Scott Mason, and the two went to the Caesar's Riverboat Casino, docked at New Albany, Indiana, on January 1, 2001. According to Mason, Eggers insisted that they take the red Nissan pickup truck Mason was driving, and they used Francis's debit card to obtain $300 for use at the casino.FN2 On their way back to Campbellsville, while they were driving through Bardstown, Kentucky, the police stopped them. After determining that the red Nissan was stolen, the police searched the vehicle and found marijuana in the ashtray. Both Mason and Eggers were arrested. Francis's debit card was found under the passenger seat of the truck a few days later. Eggers posted bond the next day and took a cab back to Campbellsville, where he stayed for a couple of days. Eggers left Campbellsville on January 4, 2001, drove to Bowling Green,

Kentucky, where he left Francis's truck at a truck stop near the interstate, and then hitchhiked to Kissimmee, Florida, where he was eventually arrested and admitted to law enforcement that he had murdered Francis.

> FN2. Mason testified that Eggers gave him a debit card with the name "Francis Murray" on it, along with the personal identification number necessary to use the card, and asked him to get the money from the automatic teller machine. According to Mason, when he asked about the name on the card, Eggers said that the card belonged to one of his relatives who had given it to him to help him out. The State introduced into evidence bank records indicating that a withdrawal was made from Francis's account at an automatic teller machine located in New Albany, Indiana, on January 1, 2001.

Following his arrest in Florida, Eggers waived extradition; he was brought back to Alabama and took law-enforcement officers to the area where he had left Francis's body. Francis was found in the woods with a tree limb, approximately four feet long and two inches in diameter, over her neck. Dr. Stephen Pustilnik, who in 2001 was a medical examiner for the State of Alabama and who performed the autopsy on Francis, testified that Francis died from multiple blunt-force trauma and strangulation. Dr. Pustilnik stated that Francis had been "beaten very severely" (R. 778); that she had multiple facial fractures and a "tremendous amount" of swelling of her face (R. 778); that she had trauma to both sides of her head; and that she had hemorrhaging in her scalp and in her brain. Dr. Pustilnik also testified that Francis's hyoid bone, thyroid bone, and two laryngeal bones in her neck were fractured and had a small amount of hemorrhaging. Based on the amount of swelling in the face and hemorrhaging in the head, Dr. Pustilnik concluded that the blows to the face and head occurred first during the attack and that the injuries to the neck, which had little hemorrhaging, occurred toward the end of the attack. Dr. Pustilnik testified that the injuries to Francis's face would have been very painful but were not fatal, and that Francis lived for at least

several minutes, but probably less than 20 minutes, after those injuries were inflicted.

Eggers's defense at trial was that the crime he committed was not capital murder. Although Eggers pleaded not guilty and not guilty by reason of mental disease or defect, and although the jury was charged on the defense of insanity, Eggers never claimed, or presented evidence indicating, that he did not kill Francis or that he was insane at the time of the crime. Rather, Eggers claimed that he suffered from intermittent explosive disorder and personality disorder, that the initial attack on Francis in the truck was the result of blind rage precipitated by Francis slapping him, and that, therefore, the kidnapping and robbery were mere afterthoughts unrelated to Francis's murder.

*Eggers v. State*, 914 So. 2d 883, 888-90 (Ala. Crim. App. 2004).

## II.    PROCEDURAL HISTORY

### A.    Trial and Direct Appeal

After a suppression hearing failed to convince the judge that Eggers's three confessions to law enforcement were inadmissible, Eggers's trial began on August 20, 2002. On the fourth day of trial, Eggers's appointed counsel had him evaluated by a psychologist in an effort to prove the defense that he was not guilty by reason of insanity. The insanity defense failed, and the jury convicted Eggers of two counts of capital murder in connection with the murder of Bennie Francis Murray.[1]

---

[1]    The murder was made capital because it was committed during the course of a kidnaping, *see* Ala. Code § 13A-5-40(a)(1) (1975), and because it was committed during the course of a robbery, *see id.* § 13A-5-40(a)(2).

The jury recommended a death sentence by an 11-1 margin. The trial court accepted the jury's recommendation, thus sentencing Eggers to death.

Eggers appealed, through different appointed counsel, and the ACCA initially affirmed the conviction and sentence on October 1, 2004. *Eggers v. State*, CR-02-0170, 2004 WL 2200853 (Ala. Crim. App. Oct. 1, 2004). Following Eggers's application for rehearing, the ACCA withdrew its October 1 opinion and substituted another on November 24, 2004, also affirming the conviction and sentence. *Eggers*, 914 So. 2d 883. The ACCA overruled a second application for rehearing. The Alabama Supreme Court initially granted Eggers's petition for a writ of certiorari, but later quashed the petition. The ACCA issued its certificate of judgment on May 20, 2005. Eggers subsequently filed two petitions for certiorari to the United States Supreme Court—a *pro se* petition and an attorney-authored one—which were both denied on January 17, 2006. *Eggers v. Alabama*, 546 U.S. 1140 (2006).

### B.    State Post Conviction Proceedings

Eggers timely filed a *pro se* petition pursuant to Rule 32 of the Alabama Rules of Criminal Procedure in the Circuit Court of Walker County, Alabama, on April 20, 2006. The State had some difficulty deciphering it and moved the circuit court to appoint counsel to represent Eggers in his Rule 32 proceedings. The circuit court

conducted a hearing concerning that motion. During the hearing, Eggers stated that he desired to proceed without appointed counsel. Accordingly, the circuit court denied the State's motion to appoint counsel. Eggers amended the petition five times and also filed several procedural and discovery motions. In many of those pleadings, Eggers asserted that his capital crime was the result of a conspiracy against him by the San Bernardino County, California, Sheriff's Department, the Federal Bureau of Investigation, and elements of organized crime. On August 23, 2007, Eggers filed his final amended Rule 32 petition in which he set forth 98 "legal claims." On several occasions throughout the Rule 32 proceedings, Eggers also petitioned the ACCA or the Alabama Supreme Court for a writ of mandamus. All of those petitions were dismissed or denied. On October 1, 2010, the State moved the circuit court to dismiss Eggers's Rule 32 petition on grounds that the claims raised therein were either precluded or without merit. On October 4, 2010, the circuit court issued a lengthy dismissal order, opining that Eggers's claims lacked merit, lacked specificity, or were procedurally defaulted.

Eggers appealed the circuit court's dismissal order on November 8, 2010. On appeal, the ACCA appointed counsel to represent Eggers. Some months later, appointed counsel moved to withdraw, citing conflicts with Eggers. Eggers also sent pleadings to the ACCA, saying that he had "discharged" appellate counsel

because, in part, counsel could not sign Eggers's "attorney/client objective agreement" to litigate the appeal the way Eggers wanted. When the ACCA denied the motion to withdraw, Eggers's appointed counsel filed a "no merits" brief, citing *Anders v. California*, 386 U.S. 738, 87 S. Ct. 1396 (1967). The ACCA twice issued orders to Eggers directing him to file a pleading stating each and every issue he wanted considered by the court on appeal. Although Eggers filed numerous *pro se* pleadings, he failed to comply. After a third order, Eggers filed, on November 4, 2011, a document that was 102 pages long and listed 1,581 "issues," each in the form of a question. Attached as an appendix to that document was a *pro se* brief, which stated 10 "issues." For example, Eggers asked the following questions in his list of *pro se* issues: "Was Eggers the focus of an investigation by the United States & the San Bernardino County Sheriff's Department in 1985?" (Issue 2); "Was Eggers & his family pursued by thousands of conspirators across the United States from California to Texas in January of 1987?" (Issue 73); "Did Eggers previously live in motels while hiding from the Mexican Mafia in Campbellsville, KY, Gallatin, TN, & Fresno, CA, earning $1200.00 each week plus $350.00 per diem?" (Issue 187). The ACCA ultimately affirmed the circuit court's dismissal of Eggers's Rule 32 petition on April 20, 2012, writing that it had reviewed the entire

list of Eggers's *pro se* issues and concluded that the issues had no merit and that it had further reviewed the entire record and found no issue warranting an appeal.

On July 5, 2012, Eggers filed his petition for writ of certiorari to the Alabama Supreme Court. The Court denied the writ on September 20, 2013.

### C.    Federal Habeas Proceedings

Eggers had already filed a *pro se* habeas petition pursuant to § 2254 in federal court on July 6, 2006. That action was styled *Eggers v. Alabama*, 6:06-cv-1315-LSC-HGD. This Court stayed that action on November 6, 2006, because Eggers had not exhausted his state post-conviction remedies at that time. On February 24, 2012, this Court dismissed that action without prejudice with leave to re-file because state post-conviction proceedings had still not concluded.

On August 5, 2013, Eggers initiated the present action by filing a *pro se* federal habeas petition pursuant to § 2254 and seeking the appointment of counsel. (Docs. 1 & 3.) At that time, the Alabama Supreme Court had not yet denied Eggers's petition for a writ of certiorari from the denial of Rule 32 post-conviction relief. On September 25, 2013, Eggers notified the Court that the Alabama Supreme Court had recently denied his petition for a writ of certiorari, asked the Court to move forward with his federal habeas proceeding, and again requested the appointment of counsel. (Doc. 11.) The Court referred the appointment of counsel

to a magistrate judge, who requested that experienced death-penalty litigation attorneys Alan Freedman and Steven Sears speak with Eggers about the possibility of representing him. However, after meeting with the attorneys, Eggers filed a notice with the Court complaining about the attorneys' strategy and advice. (Doc. 21.) The magistrate judge issued an order advising Eggers that while he was entitled to the appointment of counsel, he was not entitled to the counsel of his choosing. (Doc. 22.) The magistrate judge subsequently appointed attorneys with the Middle District of Alabama Federal Defender Program, Inc. to represent Eggers. (Doc. 27.) The Court then entered an order setting out deadlines governing the filing of the amended petition, briefs, and the state court record. (Doc. 41.)

Appointed counsel met with Eggers and filed an amended petition on his behalf. (Doc. 52.) However, in keeping with his long-standing complaints, Eggers filed several motions expressing disagreement with counsel's litigation strategy and seeking to have "successor counsel" appointed. The Court denied those motions. The Court advised Eggers that it would not release counsel from representation but would allow Eggers to file a document stating which grounds, if any, in the attorney-authored amended petition he wished to assert and alleging with specificity any additional grounds for relief he wished to raise that counsel did not raise in the amended petition. (Doc. 43.) Eggers did so, in a document styled

"Motion to Appoint Successor Counsel or Motion to Proceed *Pro Se*." (Doc. 60.) The Court required the State to respond not only to the attorney-authored amended petition but also to Eggers's amended petition, which it did. (*See* Doc. 77.) In the meantime, Eggers's counsel also filed a motion asking the Court to declare Eggers incompetent to proceed in this action or in the alternative, to conduct a competency hearing, arguing that Eggers's numerous *pro se* filings raised questions about his ability to make rational decisions about his case. In the Court's ruling on that motion, it noted that if a death penalty petitioner whose competency is in question wishes to dismiss his § 2254 petition in its entirety, the Court must first ensure that the petitioner is competent to make that decision, *see Lonchar v. Zant*, 978 F.2d 637, 640 (11th Cir. 1992). However, the Court denied the motion because Eggers had filed documents indicating that he did not wish to abandon his federal habeas petition but instead wished to proceed *pro se* or with different counsel. (Doc. 46.) Eggers's counsel also filed a reply brief on the merits of his claims (doc. 107), a motion for discovery (doc. 108), a motion for an evidentiary hearing (doc. 109), and a motion to supplement the record (doc. 110). Eggers's motion to supplement the record (doc. 110) is hereby **GRANTED**. For the reasons stated further in this opinion, Eggers's motions for discovery and for an evidentiary hearing are due to be denied.

11

## III.   STANDARDS OF FEDERAL HABEAS REVIEW

This action is governed by 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Guzman v. Sec'y, Dep't of Corr.*, 663 F.3d 1336, 1345 (11th Cir. 2011). Pursuant to § 2254(a), a federal district court is prohibited from entertaining a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court" unless the petition alleges "he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). In other words, this Court's review of habeas claims is limited to federal constitutional questions. Claims pertaining solely to "an alleged defect in a [state] collateral proceeding" or to a "state's interpretation of its own laws or rules" do not provide a basis for federal habeas corpus relief under § 2254. *Alston v. Dep't of Corr., Fla.*, 610 F.3d 1318, 1325-26 (11th Cir. 2010) (quotation marks and citations omitted).

### A.   Exhaustion of State Remedies and Procedural Default

Under § 2254(b) and (c), a federal court must limit its grant of habeas applications to cases where an applicant has exhausted all state remedies. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). This means that "'[s]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process,'

including review by the state's last court of last resort, even if review in that court is discretionary." *Pruitt v. Jones*, 348 F.3d 1355, 1358-59 (11th Cir. 2003) (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 119 S. Ct. 1728, 1732-33 (1999)). The purpose of this requirement is to ensure that state courts are afforded the first opportunity to correct federal questions affecting the validity of state court convictions. *See Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998); *see also Smith v. Newsome*, 876 F.2d 1461, 1463 (11th Cir. 1989) ("Federal courts are not forums in which to relitigate state trials.") (citation omitted)). Moreover, "to exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues. 'It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made.'" *Snowden*, 135 F.3d at 735 (quoting *Anderson v. Harless*, 459 U.S. 4, 5-6, 103 S. Ct. 276, 277 (1982)).

"[A]n issue is exhausted if 'the reasonable reader would understand the claim's particular legal basis and specific factual foundation' to be the same as it was presented in state court." *Pope v. Sec'y for Dep't of Corr.*, 680 F.3d 1271, 1286 (11th Cir. 2012) (quoting *Kelley v. Sec'y for Dep't of Corr.*, 377 F.3d 1317, 1344–45 (11th Cir. 2004)) (brackets in original omitted). If a petitioner fails to raise his federal claim to the state court at the time and in the manner dictated by the state's

procedural rules, the state court can decide the claim is not entitled to a review on the merits, i.e., "the petitioner will have procedurally defaulted on that claim." *Mason v. Allen*, 605 F.3d 1114, 1119 (11th Cir. 2010). Moreover, a "state court's rejection of a petitioner's constitutional claim on state procedural grounds will generally preclude any subsequent federal habeas review of that claim." *Ward v. Hall*, 592 F.3d 1144, 1156 (11th Cir. 2010) (quoting *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001)). "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803, 111 S. Ct. 2590, 2594 (1991). Yet as the Eleventh Circuit has noted, a claim will only be procedurally defaulted in the following circumstance:

> [A] state court's rejection of a federal constitutional claim on procedural grounds may only preclude federal review if the state procedural ruling rests upon "adequate and independent" state grounds. *Marek v. Singletary*, 62 F.3d 1295, 1301 (11th Cir. 1995) (citation omitted).
>
> We have "established a three-part test to enable us to determine when a state court's procedural ruling constitutes an independent and adequate state rule of decision." *Judd*, 250 F.3d at 1313. "First, the last state court rendering a judgment in the case must clearly and expressly state that it is relying on state procedural rules to resolve the federal claim without reaching the merits of that claim." *Id.* Second, the state court's decision must rest entirely on state law grounds and not be intertwined with an interpretation of federal law. *See id.* Third, the state procedural rule must be adequate, i.e., firmly established and

regularly followed and not applied "in an arbitrary or unprecedented fashion." *Id.*

*Ward*, 592 F.3d at 1156–57 (footnote omitted).

There are also instances where the doctrines of procedural default and exhaustion intertwine. For instance, if a petitioner's federal claim is unexhausted, a district court will traditionally dismiss it without prejudice or stay the cause of action to allow the petitioner to first avail himself of his state remedies. *See Rose v. Lundy*, 455 U.S. 509, 519-20, 102 S. Ct. 1198, 1204 (1982). But "if it is clear from state law that any future attempts at exhaustion [in state court] would be futile" under the state's own procedural rules, a court can simply find that the claim is "procedurally defaulted, even absent a state court determination to that effect." *Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999) (citation omitted).

## B.   Overcoming Procedural Default

"[A]n adequate and independent finding of procedural default will bar federal habeas review of the federal claim, unless the habeas petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 749–50, 111 S. Ct. 2546, 2564-65 (1991) (citations and internal quotation marks omitted).

15

The "cause and prejudice" exception is framed in the conjunctive, and a petitioner must prove both cause and prejudice. *Id.* at 750, 111 S. Ct. at 2565. To show cause, a petitioner must prove that "some objective factor external to the defense impeded counsel's efforts" to raise the claim previously. *Murray v. Carrier*, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645 (1986). Examples of such objective factors include:

> . . . interference by officials that makes compliance with the State's procedural rule impracticable, and a showing that the factual or legal basis for a claim was not reasonably available to counsel. In addition, constitutionally ineffective assistance of counsel . . . is cause. Attorney error short of ineffective assistance of counsel, however, does not constitute cause and will not excuse a procedural default.

*McCleskey v. Zant*, 499 U.S. 467, 494, 111 S. Ct. 1454, 1470 (1991) (internal quotation marks, brackets, and citations omitted). As for prejudice, a habeas petitioner must show "not merely that the errors . . . created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170, 102 S. Ct. 1584, 1596 (1982) (emphasis in original).

Finally, a petitioner may also escape a procedural default bar if he "can demonstrate a sufficient probability that [the court's] failure to review his federal claim will result in a fundamental miscarriage of justice." *Edwards v. Carpenter*, 529 U.S. 446, 451, 120 S. Ct. 1587, 1591 (2000). To make such a showing, a petitioner

must establish that either: (1) "a constitutional violation has probably resulted in the conviction of one who is actually innocent," *Smith v. Murray*, 477 U.S. 527, 537, 106 S. Ct. 2661, 2668 (1986) (quoting *Carrier*, 477 U.S. at 496, 106 S. Ct. at 2650), or (2) the petitioner shows "by *clear and convincing* evidence that but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." *Schlup v. Delo*, 513 U.S. 298, 323, 115 S. Ct. 851, 865 (1995) (emphasis in original) (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336, 112 S. Ct. 2514, 2517 (1992)).

### C.     AEDPA Review of State Court Decisions Under § 2254(d) and (e)

When a constitutional claim upon which a petitioner seeks relief under § 2254 is not procedurally defaulted but has instead been adjudicated on the merits in state courts, this Court is still restricted in its ability to grant relief on those claims by § 2254(d). The AEDPA "imposes a highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt." *Guzman*, 663 F.3d at 1345 (internal quotation marks and citation omitted). To grant habeas relief on a claim, this Court must not only find that the constitutional claims are meritorious, but also that the state court's resolution of those claims:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2); *see also Boyd v. Allen*, 592 F.3d 1274, 1292 (11th Cir. 2010) (quoting § 2254(d)). The burden of showing that an issue falls within § 2254(d)(1) or (d)(2) is upon the petitioner. *See Woodford v. Visciotti*, 537 U.S. 19, 25, 123 S. Ct. 357, 360 (2002). Section 2254(d)(1)'s "contrary to" and "unreasonable application of" clauses have independent meanings. *See Alderman v. Terry*, 468 F.3d 775, 791 (11th Cir. 2006) ("[T]he 'contrary to' and 'unreasonable application' clauses are interpreted as independent statutory modes of analysis.") (citation omitted). A state court's decision is contrary to "clearly established precedents [of the Supreme Court of the United States] if it applies a rule that contradicts the governing law set forth in [the Court's] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of th[e] Court but reaches a different result." *Brown v. Payton*, 544 U.S. 133, 141, 125 S. Ct. 1432, 1438 (2005) (citation omitted). On the other hand, to determine whether a state court's decision is an "unreasonable application" of clearly established federal law, the Supreme Court has stated:

> The pivotal question is whether the state court's application of the [relevant constitutional] standard was unreasonable . . . For purposes of § 2254(d)(1), an *unreasonable* application of federal law is different from an *incorrect* application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the [relevant constitutional] standard itself.
>
> A state court's determination that a claim lacks merits precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision. And as the [Supreme Court] has explained, evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.

*Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 785-86 (2011) (citation and quotation marks omitted) (emphasis in original); *see also Schriro v. Landrigan*, 550 U.S. 465, 473, 127 S. Ct. 1933, 1939 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."); *Guzman*, 663 F.3d at 1346 ("Ultimately, before a federal court may grant habeas relief under § 2254(d), 'a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'") (quoting *Harrington*, 131 S. Ct. at 786-87). As the Supreme Court has stated, "If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of

imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings." *Harrington*, 562 U.S. at 102, 131 S. Ct. at 786.

Moreover, a state court's factual determination is entitled to a presumption of correctness under § 2254(e)(1)). And commensurate with the deference accorded to a state court's factual findings, "the petitioner must rebut 'the presumption of correctness [of a state court's factual findings] by clear and convincing evidence.'" *Ward,* 592 F.3d at 1155-56 (alterations in original) (quoting § 2254(e)(1)).

### D.   The Burden of Proof and Heightened Pleading Requirements for Habeas Petitions

Additionally, because habeas corpus review is limited to review of errors of constitutional dimension, a habeas corpus petition "must meet [the] heightened pleading requirements [of] 28 U.S.C. § 2254 Rule 2(c)." *McFarland v. Scott*, 512 U.S. 849, 856, 114 S. Ct. 2568, 2572 (1994) (citation omitted). "[T]he petition must 'specify all the grounds for relief available to the petitioner' and 'state the facts supporting each ground.'" *Mayle v. Felix*, 545 U.S. 644, 655, 125 S. Ct. 2562, 2570 (2005) (quoting Rule 2(c) of the Rules Governing § 2254 Cases in the U.S. District Courts). The burden of proof is on the habeas petitioner "to establish his right to habeas relief and he must prove all facts necessary to show a constitutional violation." *Blankenship v. Hall*, 542 F.3d 1253, 1270 (11th Cir. 2008) (citation

omitted); *see also Smith v. Wainwright*, 777 F.2d 609, 616 (11th Cir. 1985) (holding that a general allegation of ineffective assistance of counsel is insufficient; a petition must allege specific errors in counsel's performance and facts showing prejudice).

### E.    The General Standard for Ineffective Assistance of Counsel Claims

In *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984), the Supreme Court established the following two-pronged standard for judging, under the Sixth Amendment, the effectiveness of attorneys who represent criminal defendants at trial or on direct appeal:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687, 104 S. Ct. at 2064 .

Because *Strickland*'s preceding two-part test is clearly framed in the conjunctive, a petitioner bears the burden of proving both "deficient performance" and "prejudice" by "a preponderance of competent evidence." *Chandler v. United*

*States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc); *see also Holladay v. Haley*,

209 F.3d 1243, 1248 (11th Cir. 2000) ("Because both parts of the test must be

satisfied in order to show a violation of the Sixth Amendment, the court need not

address the performance prong if the defendant cannot meet the prejudice prong, [

] or vice versa."). Further, when assessing ineffective assistance of counsel claims:

> [I]t is important to keep in mind that in addition to the deference to
> counsel's performance mandated by *Strickland*, the AEDPA adds
> another layer of deference—this one to a State court's decision—
> when we are considering whether to grant federal habeas relief from a
> State court's decision. Thus, [a petitioner] not only has to satisfy the
> elements of the *Strickland* standard, but he must also show that the
> State court applied *Strickland* to the facts of his case in an *objectively
> unreasonable manner*.

*Williams v. Allen*, 598 F.3d 778, 789 (11th Cir. 2010) (brackets in original omitted)

(citations and quotation marks omitted) (emphasis in original).

   In order to establish deficient performance, a habeas petitioner "must show

that counsel's representation fell below an objective standard of reasonableness."

*Strickland*, 466 U.S. at 688, 104 S. Ct. at 2064. That reasonableness is judged

against "prevailing professional norms." *Id.*, 104 S. Ct. at 2065. Moreover, under

*Strickland*, lower federal courts must be "highly deferential" in their scrutiny of

counsel's performance. *Id.* at 689, 104 S. Ct. at 2065. As the *Strickland* Court

outlined:

Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Id.*, 104 S. Ct. at 2065 (citations and quotation marks omitted).

Simply put, a habeas petitioner "must establish that no competent counsel would have taken the action that his counsel did take" to overcome the presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Chandler*, 218 F.3d at 1315. The reasonableness of counsel's performance is judged from the perspective of the attorney, at the time of the alleged error, and in light of all the circumstances. *See, e.g.*, *Newland v. Hall*, 527 F.3d 1162, 1184 (11th Cir. 2008) ("We review counsel's performance 'from counsel's perspective at the time,' to avoid 'the distorting effects of hindsight.'") (quoting *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065).

To satisfy the prejudice prong, a habeas petition "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. Stated differently, "[a] finding of prejudice requires proof of unprofessional errors so egregious that the trial was rendered unfair and the verdict rendered suspect." *Johnson v. Alabama*, 256 F.3d 1156, 1177 (11th Cir. 2001) (citations and quotation marks omitted). Further, the fact that counsel's "errors had some conceivable effect on the outcome of the proceeding" is insufficient to show prejudice. *Strickland*, 466 U.S. at 693, 104 S. Ct. at 2067. Therefore, "when a petitioner challenges a death sentence, 'the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Stewart v. Sec'y, Dep't of Corr.*, 476 F.3d 1193, 1209 (11th Cir. 2007) (quoting *Strickland*, 466 U.S. at 695, 104 S. Ct. at 2069).

Because *Strickland* and § 2254(d) both mandate standards that are "'highly deferential'", "when the two apply in tandem, review is 'doubly' so." *Harrington*, 131 S. Ct. at 788 (citations omitted). The inquiry is not then "whether counsel's actions were reasonable," but is instead "whether there is any reasonable argument

that counsel satisfied *Strickland*'s deferential standard." *Id.* The court must determine "whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Id.* at 785. This "[d]ouble deference is doubly difficult for a petitioner to overcome, and it will be a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding." *Evans v. Sec'y, Fla. Dep't of Corr.*, 699 F.3d 1249, 1268 (11th Cir. 2012).

Finally, "[s]tate court findings of historical facts made in the course of evaluating an ineffectiveness claim are subject to a presumption of correctness under 28 U.S.C. § 2254(d)." *Thompson v. Haley*, 255 F.3d 1292, 1297 (11th Cir. 2001).

## IV.   EGGERS'S ATTORNEY-AUTHORED GROUNDS FOR RELIEF

### 1.   The claim that Eggers was tried while mentally incompetent in violation of *Dusky v. United States*, 362 U.S. 402, 80 S. Ct. 788 (1960), and the request that this Court order an evidentiary hearing to determine whether Eggers was competent at trial

Eggers presented this claim for the first time in his *pro se* amended Rule 32 petition, asserting in Claim 20 that he was "incompetent to stand trial." [C.R. Vol.

15 at 133].[2] The circuit court interpreted Eggers's claim a bit differently: characterizing it as contending that "the trial court erroneously determined that he was competent to stand trial." [C.R. Vol. 22 at 80-82.] The circuit court dismissed Eggers's claim pursuant to Rule 32.2(a)(2) of the Alabama Rules of Criminal Procedure because it was raised and addressed at trial, among other reasons. The court found that it was raised and addressed at trial because Eggers's defense counsel filed a motion for an independent mental evaluation which was granted by the trial court, and that during trial, a psychologist, Dr. Alan Shealy, testified concerning the mental evaluation he conducted of Eggers.

A defendant may make a procedural due process competency claim by alleging that the trial court failed to hold a competency hearing after his mental competence was put at issue. *Pate v. Robinson*, 383 U.S. 375, 385, 86 S. Ct. 836, 842 (1966). On the other hand, a defendant may make a *substantive* due process competency claim by alleging that he was, in fact, tried and convicted while mentally incompetent, regardless of what the court did or did not do at the time. *Dusky*, 362 U.S. at 402, 80 S. Ct. at 788. The circuit court's treatment of Eggers's

---

[2]    References to the state court record are designated "C.R."  The Court will strive to list any page number associated with the court records by reference to the numbers located on the document, if those numbers are the most readily discoverable for purposes of expedient examination of that part of the record.

claim indicates that it characterized it as a *Pate* procedural competency claim rather than a substantive competency claim under *Dusky*.

However, it ultimately does not matter whether Eggers presented his *Dusky* claim to the state courts before raising it in a federal habeas proceeding, because he need not have. *See Lawrence v. Sec'y, Fla. Dept. of Corrs.*, 700 F.3d 464, 481 (11th Cir. 2012) (stating that "[w]e have both pre–and post-AEDPA precedent . . . holding that substantive competency claims generally cannot be procedurally defaulted" and citing cases). Accordingly, this Court must and will review Eggers's *Dusky* claim on its merits "without any § 2254(d)(1) deference, because there is no state court decision on the merits to which [the Court] may defer." *Id.* (internal quotation marks omitted).

The trial of an incompetent defendant violates his substantive due process rights under the Sixth and Fourteenth Amendments. *Dusky*, 362 U.S. at 402, 80 S. Ct. at 788. The Supreme Court set forth a two-part standard for determining legal competency to stand trial: "whether [a defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Id.* (internal quotation marks omitted). "[N]ot every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence must

indicate a present inability to assist counsel or understand the charges." *Medina v. Singletary*, 59 F.3d 1095, 1107 (11th Cir. 1995) (quotation marks omitted).

Eggers "is entitled to no presumption of incompetency and must demonstrate his . . . incompetency by a preponderance of the evidence." *Lawrence*, 700 F.3d at 481 (quoting *James v. Singletary*, 957 F.2d 1562, 1571 (11th Cir. 1992)). In order to be entitled to an evidentiary hearing on a substantive competency claim, which Eggers seeks here, Eggers must present "'clear and convincing evidence' that creates a 'real, substantial, and legitimate doubt' as to his competence." *Id.* (quoting *James*, 957 F.2d at 1573). "[T]he standard of proof is high. The facts must 'positively, unequivocally, and clearly generate' the legitimate doubt." *Card v. Singletary*, 981 F.2d 481, 484 (11th Cir. 1992) (quoting *Adams v. Wainwright*, 764 F.2d 1356, 1360 (11th Cir. 1985)).

Eggers alleges that the requisite "doubt" is created by evidence that he suffered from paranoid schizophrenia at the time of his trial. In support, he proffers a detailed chronology of events tracing back to when he was seventeen years old that he says are indicative of his history of mental illness. He also offers a retrospective psychological evaluation conducted by a mental health professional who was hired by Eggers's counsel in this proceeding to evaluate him. Additionally, he refers to his behavior in the months leading up to trial, during trial, and at

sentencing, and he identifies what he says are deficiencies in the trial experts' mental health evaluations which declared him competent.

Addressing each category of evidence in turn, the Court starts with the chronology of life events set out in Eggers's amended petition. Without restating them all here, suffice it to say that Eggers has at times in his life exhibited paranoid behavior, which appears to have originated from his earliest interactions with law enforcement agents when he was living in California in 1985. When Eggers was seventeen, law enforcement agents forced him and his then-girlfriend, Nikkii Garrison (Eggers), to work as confidential drug informants in San Bernardino County, California. According to Nikkii's declaration, which Eggers's counsel filed as an exhibit to Eggers's amended petition (*see* doc. 52 ex. A), law enforcement was interested in information that Nikkii could offer about her step-father, Ed Fitzgerald. Fitzgerald was a notorious figure in San Bernardino County, known for his connection to the Monks Motorcycle Club and its criminal activities, including drug-dealing, weapons offenses and murder. As a result of information Nikkii provided, Fitzgerald and others were arrested. Later, Eggers became convinced that Fitzgerald and others knew that he was a confidential informant, and he made regular complaints to the San Bernardino Sheriff's Department and the California Highway Patrol about being retaliated against by the Mexican Mafia and the Monks

Motorcycle Club. Eggers often imagined he saw people watching or following him, and he heard threats intended for him during otherwise innocuous conversations. He told people, including Nikkii, who later became his wife, that the Monks had attempted to kill him several times. Then, in 1987, Eggers was hospitalized in a psychiatric ward in Thomason General Hospital in El Paso, Texas, on an emergency seven-day hold. The hospitalization was the culmination of a methamphetamine-fueled cross country road trip Eggers embarked on with Nikkii, their infant son, and David, Eggers's elder brother, who suffers from schizophrenia and is currently hospitalized in California. During the trip, police responded to a complaint involving the brothers. When police arrived, Eggers and David reported to police that "they were being followed by unknown subjects." The officers noted that "both subjects did not appear to be mentally stable." While hospitalized, Eggers "began seeing conspirators voluntarily commit themselves into [the] ward for purposes of intimidating [him]," and reported to Nikkii that mental health care providers were in cahoots with conspirators who were trying to kill him. Nikkii stated that in the years following and leading up to his commission of the murder of Mrs. Murray, Eggers continued to see and hear things that others did not.

Eggers has also submitted the opinion of Dr. Kenneth Benedict, Ph.D, a neuropsychologist who evaluated Eggers in May and August 2014 for these

proceedings at the request of Eggers's counsel, which states that Eggers has long suffered from chronic schizophrenia, marked by symptoms such as delusions, hallucinations, and negative symptoms. (*See* doc. 52 ex. B). Dr. Benedict also stated that Eggers's schizophrenia was not drug induced, and that even if drugs contributed to the particular psychotic break in 1987, they would not have continued to be the cause of his continuing psychosis.

However, despite Eggers's history of paranoid behavior and Dr. Benedict's diagnosis, the Court finds that Eggers has still not met the heavy burden of providing facts that "positively, unequivocally, and clearly generate the legitimate doubt" that he was incompetent at his trial. *Card*, 981 F.2d at 484. This is because a diagnosis of paranoid schizophrenia alone is not enough to create doubt as to whether a defendant was competent to stand trial. In *Lawrence v. Secretary, Florida Department of Corrections*, the Eleventh Circuit looked to a previous decision to so hold, as follows:

> In addressing *de novo* the merits of a substantive competency claim, the panel in *Wright* determined that a diagnosis of chronic schizophrenia, on its own, was "not enough to create a real, substantial, and legitimate doubt as to whether [the petitioner] was competent to stand trial." *Id.* at 1259. The panel in *Wright* reiterated the law of this Circuit that "'[n]ot every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence must indicate a present inability to assist counsel or understand the charges.'" *Id.* (quoting *Medina*, 59 F.3d at 1107 (emphasis added)); accord *Medina*, 59 F.3d at 1107 ("[N]either low intelligence, mental

deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial."). Thus, while the district court in this case recognized that "credible medical evidence was presented that Petitioner probably suffers from schizophrenia," its conclusion that "this diagnosis alone is not enough to convince this court that Petitioner was incompetent at the time that he entered his plea" was fully consonant with our precedent and was supported by the record as a whole. In short, there is no basis on this record to conclude that the district court's finding that Lawrence was competent was clearly erroneous. Thus, Lawrence is not entitled to relief on the merits of his substantive competency claim.

700 F.3d at 482.

In W*right v. Secretary for Department of Corrections*, referred to in *Lawrence*, the Eleventh Circuit had held that "[t]he fact that [the petitioner] suffers from chronic schizophrenia the effects of which have come and gone over the years is not enough to create a real, substantial, and legitimate doubt as to whether he was competent to stand trial." 278 F.3d 1245, 1259 (11th Cir. 2002). The court found relevant, but not dispositive, the fact that the petitioner had been deemed incompetent to stand trial seven and eight months after his trial, as well as seventeen years prior to his trial. *Id.* However, the court stated that such instances did not counter the best evidence of what his mental condition was at the time of trial, i.e., the evidence of his behavior around that time, including how he related to and communicated with others then. *Id.* Because there was unrebutted evidence in *Wright* that the petitioner behaved in a "perfectly normal fashion" leading up to

trial and during trial, the court held that his substantive competency claim failed on the merits. *Id.*

Thus, Dr. Benedict's opinion that Eggers is a paranoid schizophrenic is not sufficient to create a "real, substantial, and legitimate doubt" as to Eggers's competence to stand trial in 2002. Dr. Benedict's opinion is also less than persuasive because his evaluation was not made contemporaneous to trial:

> Although such after-the-fact evidence is relevant to competency determinations, "[t]he critical question is whether the evidence relied upon for determining a defendant's competence at an earlier time of trial was evidence derived from knowledge contemporaneous to trial." *Bowers v. Battles*, 568 F.2d 1, 4 (6th Cir. 1977) (internal quotation marks omitted). Psychiatric opinions offered years after a habeas petitioner's trial are therefore not nearly as relevant as those issued at the time of trial. *Harries v. Bell*, 417 F.3d 631, 636 (6th Cir. 2005).

*Black v. Bell*, 664 F.3d 81, 102 (6th Cir. 2011). In determining whether a legitimate doubt as to competency exists, this Court will look instead to evaluations performed at the time of trial, as well as Eggers's behavior during trial in 2002. *See Wright*, 278 F.3d at 1259.

As Eggers concedes, he was evaluated for competency to stand trial prior to his trial and during his trial. The relevant facts are as follows. Eggers's trial counsel entered an insanity plea at his arraignment. During a June 5, 2002, pretrial hearing, his counsel made an oral motion that he be examined for competency. The trial court indicated that it would have a "regular mental health person" make a

"preliminary" evaluation by the Department of Mental Health and Mental Retardation in Walker County. [C.R. Vol. 4 at 65.] The court then indicated that if the results of the preliminary evaluation suggested that a more comprehensive evaluation at the Taylor Hardin Secure Medical Facility in Tuscaloosa, Alabama, was necessary, it would then order the further evaluation. Though the record is silent as the results of that pre-trial evaluation, Eggers admitted that it occurred: he stated that a competency evaluation was performed by an employee of the Walker County Department of Mental Health at the Walker County Jail. The fact that Eggers was not sent to Taylor Hardin and allowed to be tried suggests that no suspicion of incompetence was raised.

Trial began on August 19, 2002. Counsel reaffirmed Eggers's insanity plea to the jury. The record reflects that, during the lunch recess on the fourth day of the trial proceedings, Eggers's counsel requested that he be evaluated over the upcoming weekend to determine his mental state at the time of the crime as well as his ability to comprehend the nature of the charges against him and rationally to aid in the conduct of his defense. The trial court granted the request and also ordered that Eggers undergo a separate mental health examination by a psychologist or psychiatrist under contract with or employed by the Alabama Department of Health and Mental Retardation to determine his mental state at the time of the

alleged offense. As such, Eggers was evaluated over the weekend recess by Dr. Alan Shealy, a clinical and forensic psychologist. In response to that evaluation, the State had Eggers evaluated on Monday, August 26, 2002, after the trial had recessed for the day, by James F. Hooper, director of psychiatric services at Taylor Hardin Secure Medical Facility. The State rested its case-in-chief on Tuesday, August 27, 2002, and the defense presented the testimony of Dr. Shealy that day. The following day, the defense rested, and the State then presented the testimony of Dr. Hooper in rebuttal. During direct and cross-examination of both Dr. Shealy and Dr. Hooper, the jury was made aware that Dr. Shealy had evaluated Eggers over the weekend recess and that Dr. Hooper had evaluated Eggers on Monday evening.

Dr. Shealy's and Dr. Hooper's testimony bore out the following facts. In preparation to evaluate Eggers, Dr. Shealy read the victim's autopsy report, the police record, and listened to the tape of Eggers's confession. Dr. Shealy interviewed Eggers for about six and one half hours, and he also spoke with Eggers's half brother and sister by phone. Dr. Shealy knew about Eggers's "history of one episode of psychotic delusional paranoid [sic] at age twenty, lasting for weeks to a few months, most likely a result of significant amphetamine abuse combined with a predisposition to mental disorder." He knew that David Eggers,

his brother, was currently institutionalized for schizophrenia. Through Eggers's brother and sister, Dr. Shealy was also informed of instances of terrible violence perpetrated on Eggers by his father during childhood, and he knew that Eggers had one episode of rage related violence in the ninth grade. Dr. Shealy conducted two psychological tests on Eggers—an abbreviated IQ test (Wechsler Scale) and the Minnesota Multi-Phase Personality Inventory-II ("MMPI"). Eggers is of average verbal intelligence as indicated by a pro rated verbal IQ of 97. Eggers's valid profile on the MMPI suggested that Eggers was "psychotic with a paranoid schizophrenia or paranoid psychosis," and that Eggers "ha[d] some thought disorder," which caused him to interpret events incorrectly. However, it was Dr. Shealy's conclusion that Eggers was neither psychotic nor seriously mentally ill. Rather, Dr. Shealy believed Eggers had paranoid personality disorder and intermittent explosive disorder. As Dr. Shealy described them, neither disorder was severe, exculpatory or mitigating. While Dr. Shealy opined that Eggers initially struck Mrs. Murray during an un-premeditated episode of uncontrollable rage, he stated that Eggers's later violent acts in ensuring that Mrs. Murray was dead were deliberate. Importantly to this claim, Dr. Shealy testified that Eggers was "clearly competent to stand trial." [C.R. Vol. 9 at 1177.]

As noted, Dr. Hooper evaluated Eggers after Dr. Shealy did. In preparation, Dr. Hooper reviewed Eggers's statement, the victim's autopsy, crime scene photographs, and Dr. Shealy's report. Dr. Hooper also interviewed Eggers, but he did not perform any tests, like Dr. Shealy did. Dr. Hooper also found that Eggers was neither mentally ill nor incompetent. Instead, Dr. Hooper believed that Eggers had a personality disorder "with both antisocial and borderline traits." Dr. Hooper found no evidence that Eggers met diagnostic criteria for intermittent explosive disorder, as Dr. Shealy found. Dr. Hooper also opined that Eggers's valid profile on the MMPI, which "suggested a diagnosis of paranoia or paranoid schizphrenia," was not "definitive."

Dr. Shealy and Dr. Hooper's contemporaneous evaluations are powerful evidence that Eggers was in fact competent to stand trial during his trial. Eggers contends that because his defense counsel did not call on Dr. Shealy to evaluate him until a week into trial, his opinion was hastily assembled. But Dr. Shealy testified that the "only thing" he might have added to his evaluation were additional third party observations of Eggers's past behavior to corroborate what the brother and sister said, and he stated, "I wouldn't have spent many more hours than this in any other evaluation." [C.R. Vol. 9 at 1166.]

When the competence of a defendant is called into question, the defendant is entitled, "at a minimum, . . . [to] access to a competent psychiatrist who will conduct an appropriate examination . . . ." *Ake v. Oklahoma*, 470 U.S. 68, 83, 105 S. Ct. 1087, 1096 (1985). This is simply not a case in which no inquiry was ever made into whether Eggers was competent to stand trial. Unlike the petitioner in *Wright*, who was actually found incompetent to stand trial seventeen years before his trial and seven and eight months after his trial, the unrefuted expert testimony given at Eggers's trial was that he was "clearly" competent to be tried. Dr. Benedict's evaluation, conducted over ten years later, does little to cast doubt on those evaluations.

Nor does Eggers's behavior during trial suffice to leave doubt in the Court's mind as to his competency. Eggers points to several instances leading up to and during trial where he says he behaved bizarrely, but a review of the entire trial record reveals that these are discrete instances that are few and far between. First, Eggers states that Walker County Jail records show that he reported racing thoughts, sleeplessness, and anxiety to jail mental health providers in the months before trial, and that he was prescribed Elavil, an anti-depressant, and Klonopin, an anti-anxiety medication, which he was taking during trial. However, "[t]he fact that

a defendant has been treated with anti-psychotic drugs does not *per se* render him incompetent to stand trial." *Medina*, 59 F.3d at 1107.[3]

Moreover, only indicia of arguably paranoid behavior that Eggers can point to during his trial occurred during a mid-trial hearing about whether his minor son, Michael Jr., should be brought from Nevada to testify in Eggers's defense. Eggers asserted that he did not want his son involved, even though his counsel advised him to agree, and the following colloquy occurred:

| | |
|---|---|
| The Court: | We were talking about getting your son here and we've got everything to go tomorrow and I'm told that you do not want him here to testify, is that right? |
| The Defendant: | Yes, sir, that's correct. You know, I still feel like he's a minor and his life has already been messed up enough through all of this. |
| The Court: | Okay. I have appointed him a lawyer and the juvenile people are going after him, he's not gonna be – |
| The Defendant: | Excuse me? |
| The Court: | The Juvenile Court people are going after him. And he has a lawyer appointed as a guardian and she will not let him say anything out of line and I guarantee you that. |

---

[3]     And no claim is made that the dosage given to Eggers adversely affected his ability to consult with his lawyer and to have a rational understanding of the proceedings against him. *Cf. Fallada v. Duggar*, 819 F.2d 1564, 1569 (11th Cir. 1987).

| The Defendant: | Well, you know, I've actually had a lot of concerns in that also. |
|---|---|
| The Court: | Uh-huh. |
| The Defendant: | You know, my father was murdered in my viewpoint back in December 30th. And, you know, just – you never know when something like this is gonna end. Next year, they'll do someone else. Year after that – |
| The Court: | That's living on this planet. |
| The Defendant: | Yeah. |

[C.R. Vol. 6 at 541-42.] Eggers's defense counsel later explained that exactly one year after the death of Mrs. Murray, Eggers's father died either from an attack or from suicide. Eggers told his counsel that he felt the timing indicated a revenge killing for his crime, and indicated his belief that the unknown person who he believed killed his father would harm his son if he testified. Apart from this one isolated  statement, the Court has reviewed the entire trial record and it reveals no evidence of paranoid thinking on Eggers's part. To the contrary, Eggers responded appropriately to the court's and both counsels' questions and behaved appropriately during much of the trial. For instance, although Eggers chose not to testify during his case in chief, during the suppression hearing on the first morning of trial, Eggers testified coherently and rationally on his own behalf. [C.R. Vol. 5 at 342-69.]

Nor do the several instances of "bizarre" behavior Eggers mentions during his penalty phase serve to raise any red flags as to his competence. Eggers read a self-authored statement during the penalty phase in which he expressed remorse for the murder and asked the jury to sentence him to death. [C.R. Vol. 11 at 1486-1488.] His statement described his lack of belief in the judicial system, likened his proceedings to "a side show of a circus, where lawyers and officers specialize in the art of deception," and further stated, "Just like sawing a person in half, I climb into the box and the District Attorney dazzles you with deception." [C.R. Vol. 11 at 1486.] While parts of the statement were strange, Eggers was asked on cross examination about what he meant, during which time he explained that "if you say something and you word it incorrectly its used against you . . . they choose later to just pick the things that you say apart and use those things against you . . . ." [C.R. Vol. 11 at 1495.] Eggers's disillusionment with the judicial process is hardly surprising given he was on trial for murder. And while he stated at one point that he thought law enforcement had manipulated him, when asked whether it was law enforcement's fault that he was in the position he was in, he replied, "On the contrary, sir, I believe I stated there plainly and evidently that it's nobody's fault but my own. I do not blame the law enforcement officers and I stated I do not blame you." [C.R. Vol. 11 at 1496.] Such statements do not evince any kind of psychosis,

but rather, they indicate Eggers's understanding of the charges and proceedings against him.

In support of his claim, Eggers also points to the following exchange on cross examination during the penalty phase:

> Prosecutor:     You kicked her with those steel toed boots intending to kill her, didn't you?
>
> Eggers:     Why do we have to ask these questions again? Have they not already been asked and answered? Has the jury already not come back with a verdict? Sir Charles, you are the Great Knight, you're the White Knight, you have slain the dragon.

[C.R. Vol. 11 at 1508.] Again, the context of Eggers's statement belies the suggestion that it was made in the midst of a psychotic delusion, as Eggers would have the Court believe. Eggers called the prosecutor the "Great Knight" after a heated exchange wherein Eggers repeatedly asserted that the prosecutor was asking questions that he had already answered and accused the prosecutor of "grandstanding." [*Id.*] Eggers's response is indicative of anger and sarcasm rather than delusional thinking.

Finally, without explaining how it is relative to his competence to stand trial, Eggers points out that after the jury recommended a death sentence by an 11-1 verdict, he asked the judge about expediting the delay for judicial sentencing:

> The Court:          . . . Yes, sir.

| | |
|---|---|
| The Defendant: | We was just looking at waiving the time. |
| The Court: | Uh-huh. |
| The Defendant: | As far as instead of having a hearing or the sentencing date – |
| The Court: Okay. | The law requires that I have a report done and that I set a sentencing hearing and I'm afraid I'm stuck with that. |
| | Are ya'll familiar with any waiver on that? |
| Ms. Umstead: | No, sir. I don't believe it can be waived, but he's wanting to know if we could expedite. I think thirty days is the minimum, it has to be thirty days after the – |
| The Court: | We'll get it done as soon as we can. |

[C.R. Vol. 11 at 1561-62.] Even assuming Eggers wanted the trial judge to render an immediate death sentence, such a fact is simply not the clear and convincing evidence necessary to generate doubt as to his competence at the time. While the foregoing instances demonstrate that Eggers misbehaved at times during his trial, they do not mean that Eggers had a problem understanding the charges against him or communicating with his counsel. *Accord Medina*, 59 F.3d at 1107 ("[N]either low intelligence, mental deficiency, *nor bizarre, volatile, and irrational behavior* can be equated with mental incompetence to stand trial.") (emphasis added). Certainly,

Eggers demonstrated his understanding of the proceedings against him, as he repeatedly expressed remorse for murdering Mrs. Murray at the penalty phase.

In sum, the evidence Eggers offers fails to meet the high standard required for an evidentiary hearing on the post-conviction claim of incompetence in that it does not "positively, unequivocally, and clearly" generate doubt as to Eggers's competence to stand trial. *Card*, 981 F.2d at 484. The anecdotal evidence of Eggers's struggles in his past, including one short-lived involuntary hospitalization many years before the murder and trial, do little to counter the expert opinions during trial which found him competent to be tried. And while credible medical evidence has been presented that Eggers probably suffers from schizophrenia, not only does a diagnosis alone not suffice, but this particular diagnosis reflects upon his mental state years after trial, which is not necessarily indicative, much less dispositive, of his competency at trial. Indeed, Eggers's behavior leading up to and during his trial, i.e., "the best evidence of what his mental condition was at the only time that counts," *Wright*, 278 F.3d at 1259, was largely rational and certainly does not indicate that he did not understand the charges or was unable to aid in his defense. Eggers is not entitled to an evidentiary hearing, and his substantive competency claim is without merit.

**2.    The claim that, based on indicia of Eggers's mental incompetence during the trial, the trial court should have *sua sponte* held a**

> **competency hearing, and its failure to do so violated *Pate v. Robinson*, 383 U.S. 375, 86 S. Ct. 836 (1966)**

Eggers presented this claim for the first time as Claims 24-30 in his *pro se* amended Rule 32 petition. [C.R. Vol. 15 at 147-49.][4] The circuit court ruled that these claims were procedurally barred under Ala. R. Crim P. 32.2(a)(3) and 32.2(a)(5) because they could have been but were not raised at trial or direct appeal and in the alternative, they did not satisfy the specificity and full factual pleading requirements of Ala. R. Crim. P. 32.3 and 32.6(b). As to the lack of specificity, the court noted that Eggers "provides only bare allegations without any specific factual allegations to support the claims." [C.R. Vol. 22 at 30.] The ACCA summarily affirmed the trial court's ruling without analysis.

By ruling in the alternative that this claim failed under Ala. R. Crim. P. 32.3 and 32.6(b), the circuit court, which entered the last reasoned decision,[5] issued a

---

[4]     Specifically, Eggers alleged that the trial court violated his constitutional rights in denying him a competency evaluation (claim 24); failing to provide a judicial finding as to competence (claim 25); failing to provide the defense with adequate time to move for a competency hearing (claim 26); failing to provide the defense with adequate time to move for a jury trial on competency (claim 27); failing to provide Eggers with a Walker County psychiatrist's competency report (claim 28); failing to determine the issue of sanity before trial (claim 29); and failing to assure that mental health experts received necessary evidence (claim 30). He also incorporated by reference some facts contained in Claim 20, which comprised Eggers's allegation that he was not "mentally competent to stand trial," into these claims. [C.R. Vol. 15 at 147, incorporating by reference pages 132-45.]

[5]     *See Ylst*, 501 U.S. at 804, 111 S. Ct. at 2594 ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground.").

ruling on the merits of the claims. *See Ward*, 592 F.3d at 1156–57 (holding that there is no default unless "the last state court rendering a judgment in the case [] clearly and expressly state[s] that it is relying on state procedural rules to resolve the federal claim without reaching the merits of that claim"); *Borden v. Allen*, 646 F.3d 785, 812-13 (11th Cir. 2011) ("A ruling by an Alabama court under Rule 32.6(b) is also a ruling on the merits. Here, the Alabama Court of Criminal Appeals, in disposing of claims in the Amended Petition under Rule 32.6(b) necessarily considered the sufficiency of such claims, focusing in on the factors for determining whether the petition presented a case sufficient to warrant relief under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed.2d 674 (1984)."). Thus, this Court must conduct the deferential merits review under § 2254(d), in which this Court's only question is whether the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law," or whether it "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented."

The clearly established federal law on this issue, as determined by the Supreme Court, is set out in *Pate v. Robinson*, 383 U.S. 375, 86 S. Ct. 836 (1966) and *Drope v. Missouri*, 420 U.S. 162, 95 S. Ct. 896 (1975). "Under *Drope* and *Pate* the standard for determining whether a trial court violates the Due Process Clause by

failing to conduct an inquiry into a defendant's competency to stand trial, where no inquiry is requested, is whether the objective facts known to the trial court at the time create a bona fide doubt as to mental competency." *Wright*, 278 F.3d at 1256 (citing *Drope*, 420 U.S. at 180, 95 S. Ct. at 908; *Pate*, 383 U.S. at 385, 86 S. Ct. at 842 ("Where the evidence raises a '*bona fide* doubt' as to a defendant's competence to stand trial, the [trial] judge on his own motion must impanel a jury and conduct a sanity hearing . . . ."). And the standard for mental competency to stand trial is the *Dusky* standard: "whether [a defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." 362 U.S. at 402, 80 S. Ct. at 789 (internal quotation marks omitted). "Relevant information may include evidence of a defendant's irrational behavior, demeanor at trial, or prior medical opinion; but '[t]here are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed.'" *Watts v. Singletary*, 87 F.3d 1282, 1287 (11th Cir. 1996) (citing *Drope*, 420 U.S. at 180, 95 S. Ct. at 908). It bears repeating that this Court's analysis of this claim is circumscribed by § 2254(d):

> In determining whether the state court's decision is an unreasonable application of the law set out in those three Supreme Court decisions [*Pate, Drope,* and *Dusky*], we need not decide whether we would have reached the same result as the state court if we had been deciding the

issue in the first instance. Instead, we decide only whether the state court's decision of the issue is objectively unreasonable. *See Williams v. Taylor*, 529 U.S. 362, 411, 120 S. Ct. 1495, 1522, 146 L.Ed.2d 389 (2000) ("Under § 2254(d)(1)'s 'unreasonable application' clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable."); *Brown v. Head*, 272 F.3d 1308, (11th Cir. 2001) ("It is the objective reasonableness, not the correctness per se, of the state court decision that we are to decide.").

*Wright*, 278 F.3d at 1256.

The state court decision rejecting Eggers's procedural due process claim is not contrary to *Pate* or *Drope* as there was nothing that occurred that should have instilled doubt in the trial judge's mind as to Eggers's competency. The facts known to the trial judge before the trial were that Eggers entered an insanity plea at his arraignment; that he has a "history of mental illness," came from a family that has a history of mental illness, and that he allegedly was "suffering from mental illness" when he was questioned by police (these facts were set forth by Eggers's defense counsel in the motion to suppress Eggers's confessions to police); that Eggers had previously been institutionalized in January 1987 in El Paso, Texas, for what were either mental issues or drug-related issues; and that his brother David was currently institutionalized in a California mental health facility. This information is exactly why the trial judge ordered a mental evaluation of Eggers

prior to trial. The initial evaluation was to determine whether further testing would be needed at Taylor-Hardin secure medical facility:

> THE COURT:        Well, I'm going to have a regular Mental Health person, it might be a Master's Degree, it may not even be a Master's Degree go and make a –
>
> MS. UMSTEAD:   An initial evaluation.
>
> THE COURT:        --- preliminary --- yeah. And if they tell me, yes, he needs to be evaluated by Taylor Hardin, he'll go to Taylor Hardin.

[C.R. Vol. 4 at 65.] That initial evaluation took place, according to Eggers, but there is no record that it produced any suspicion of incompetence. To the contrary, during trial, the trial judge heard both defense and State mental health experts who agreed, based on evaluations of Eggers, that he was "clearly" competent to stand trial. It is also important to note that competence to stand trial raises different issues from an insanity defense, see *Drope*, 420 U.S. at 175–76, 95 S. Ct. at 905-06, so that the mere fact that an insanity defense is presented does not mean the defendant is incompetent to stand trial.

Moreover, Eggers did not exhibit the type of bizarre behavior during trial that should have raised doubt. Eggers again refers the Court to his request mid-trial that his son not testify for fear that he would be retaliated against, as evidence that should have put the trial judge on notice that Eggers was incompetent to stand trial.

However, there is no indication that the trial judge knew at the time that Eggers believed that his father's death was a revenge killing for his own crime. Eggers provides his defense counsel's response to a complaint he made against her before the Alabama State Bar Disciplinary Committee in 2006 in which she stated that Eggers believed as much. (Doc. 20-14 at 1 ("One year from the death of Mr. Eggers victim, Mr. Eggers father died either from an attack or from suicide. Mr. Eggers felt the timing indicated a revenge killing for his crime.")).[6] There is no evidence the trial court had this information before it at the time of the trial. But even if the judge knew, such an isolated fact is not enough to create a *bona fide* doubt as to Eggers's competency.

Eggers also argues that the statement he read asking the jury to sentence him to death and his exchange with the prosecutor during the penalty phase, as well as his request to waive the delay for judicial sentencing so that the judge could render an immediate sentence, were all red flags that should have alerted the trial court as to his incompetency. For the reasons stated in the previous section, those discrete instances of misbehavior or oddity during trial and sentencing are simply not sufficient for an incompetency claim. *But cf. Drope*, 420 U.S. at 180, 95 S. Ct. at 908 (defendant's attack on his wife the Sunday before his trial for assisting in her

---

[6]     Eggers submitted counsel's response to his disciplinary complaint as part of a "universal reference appendix" in support of his claims.

rape and his self-inflicted gunshot wound during trial were bizarre behaviors that should have triggered a *sua sponte* competency inquiry by the trial judge). The record reveals that Eggers exhibited a sane demeanor during the trial, responding appropriately to questions and even testifying rationally on his behalf during the suppression hearing. *See id.* (a sane demeanor may alone obviate the need for the court to inquire into a defendant's competence). The Eleventh Circuit has noted that the competency determination requires a case by case assessment, "because it looks to the capacity of a particular defendant to play a fact-specific role at trial . . . ." *Watts*, 87 F.3d at 1289. "Not surprisingly, then, the numerous opinions addressing defendants' competency from this and other circuits fail to establish a rigid standard of competency that could be applied uniformly across cases. Nor do cases presenting superficially similar facts necessarily dictate the same conclusions as to competency." *Id.* Nonetheless, Eggers displayed none of the aberrant behavior displayed by some defendants in cases where competency was found to be lacking:

> For example, in *Whitehead v. Wainwright*, 609 F.2d 223 (5th Cir. 1980), the court affirmed the district court's conclusion that the habeas petitioner, Whitehead, had been incompetent to stand trial. Whitehead had been agitated and nervous during the first day and the morning of the second day of his two-day murder trial, attempting to discharge his attorney several times and to take part in the cross-examination of witnesses. He was then given an antihistamine and two prescription tranquilizers (two doses of each within two hours). As a

result, during the afternoon of the second day of trial Whitehead "seemed drunk, sleepy, staggering, and glassy-eyed." He fell asleep in court, his speech was slurred, and later he could not remember making statements attributed to him in the transcript. *See Whitehead v. Wainwright*, 447 F. Supp. 898, 899-901 (M.D. Fla. 1978) (reciting facts).

*Id.* at 1289.

In sum, the Court is convinced that the trial judge afforded all the process due to make reasonably sure that Eggers was competent to stand trial. Clinical evaluation of Eggers in a formal *Pate* hearing simply was not necessary for the trial judge to make the functional determination that Eggers was competent. The state court's rejection of Eggers's procedural due process claim implicitly reflects a conclusion that all of the facts considered together were not sufficient to raise a bona fide doubt as to whether Eggers, at the time of his trial in August 2002, had "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he [had] a rational as well as factual understanding of the proceedings against him." *Dusky*, 362 U.S. at 402, 80 S. Ct. at 789 (internal quotation marks omitted). Because that conclusion is not unreasonable, habeas relief is not warranted on this claim.

### 3. The claim that appellate counsel rendered ineffective assistance in litigating ineffective assistance of trial counsel claims on appeal, in violation of Eggers's Sixth Amendment rights

Eggers claims that his appointed appellate counsel rendered ineffective assistance for two reasons. First, he argues that appellate counsel was constitutionally ineffective by failing to raise the ineffective assistance of trial counsel claims that Eggers now presents as claims 7 and 8 of his federal habeas petition, addressed *infra*. Grounds 7 and 8 contend that trial counsel rendered ineffective assistance with regard to the motion to suppress Eggers's statement to law enforcement and by conducting an inadequate investigation. Second, Eggers claims that appellate counsel was ineffective for failing to adequately argue and prove those instances of ineffectiveness of trial counsel that counsel did raise on appeal. The ineffective assistance of trial counsel claim that appellate counsel did raise on direct appeal consisted of four subsidiary claims: 1) the claim that trial counsel failed to properly present evidence of Eggers's mental state at the time of the crime; 2) the claim that trial counsel was constitutionally ineffective in pursuing the motion to suppress Eggers's statements to law enforcement; 3) the claim that trial counsel was constitutionally ineffective for failing to object to the introduction of certain autopsy photographs; and 4) the claim that trial counsel was constitutionally ineffective for failing to prevent the introduction of improper character evidence.

Eggers contends that this claim is exhausted because it was raised as claim 98

in his *pro se* amended Rule 32 petition. However, a plain reading of Eggers's claim

98 shows that it was not:

> Appellate counsel was ineffective, failing to marshall [sic] the facts of
> the issues presented on appeal with an incompetent defendant,
> providing issues prepared from a record & trial transcript analysis that
> was otherwise based on distorted & disputed facts from the States
> unlawful withholding of relevant critical records in the possession of
> the State of Alabama & the Federal Government that were favorable
> to the defense in violation of *Brady*, & discovery rules of the Alabama
> Rules of Criminal Procedure, violating the Defendants rights &
> constituting an assistance to [sic] counsel, due process, & equal
> protection violation under the 6th, & 14th Amendments to the U.S.
> Constitution.

[C.R. Vol. 15 at 178]. While this claim raises a bare claim of ineffectiveness and

seems to reference *Brady* violations, it does not assert that appellate counsel

rendered ineffective assistance by failing to raise Eggers's habeas grounds 7 and 8

on direct appeal. Nor does it assert that appellate counsel rendered ineffective

assistance by failing to "more effectively" argue the ineffective assistance of trial

counsel claims raised on direct appeal. Consequently, this claim is procedurally

defaulted from this Court's review because Eggers did not fairly present it as a

federal claim in state court. A federal habeas petitioner is required "to present the

state courts with the same claim he urges upon the federal courts." *Picard v.

Connor*, 404 U.S. 270, 276, 92 S. Ct. 509, 512 (1971). Regarding exhaustion, the

Eleventh Circuit has stated, "While we do not require a verbatim restatement of the claims brought in state court, we do require that a petitioner presented his claims to the state court "such that a reasonable reader would understand each claim's particular legal basis and specific factual foundation." *McNair v. Campbell*, 416 F.3d 1291, 1302 (11th Cir. 2005) (citations omitted.) "In other words, the ground relied upon must be presented face-up and squarely; the federal question must be plainly defined." *Hunt v. Comm'r, Alabama Dep't of Corr.*, 666 F.3d 708, 731 (11th Cir. 2012) (internal quotation marks omitted). Because he did not present this specific claim as a federal claim in state court, he did not give the state courts a fair opportunity to decide it. Dismissal of his habeas petition to allow Eggers to present this claim fairly as a federal claim in state court now would be futile because he would be barred from raising it in state court under Rule 32.2(c) of the Alabama Rules of Criminal Procedure (statute of limitations bar) and Rule 32.2(b) of the Alabama Rules of Criminal Procedure (successive petition bar). Thus, because any state remedy with respect to this claim is procedurally barred by the state procedural rules noted above, Eggers's claim is procedurally defaulted from habeas review, unless some exception applies.

Eggers makes three arguments as to why his failure to exhaust state remedies should be excused and this Court should consider his claim on the merits, but all

fail. First, Eggers contends that since he was a *pro se* litigant during Rule 32 proceedings and incompetent during direct appeal when the alleged default occurred, that this Court should declare his Rule 32 proceedings "presentation . . . enough to satisfy the jurisdictional requirements of § 2254" and interpret this claim liberally. [Reply brief, doc. 107 at 33 (citing *McBride v. Estelle*, 507 F.2d 903, 904 (5th Cir. 1975).] Thus, according to Eggers, the Court could conduct the deferential analysis of the Rule 32 court's opinion on this claim pursuant to § 2254(d). However, the case Eggers relies upon for this argument, *McBride*, is clearly distinguishable. In that case, the Fifth Circuit ruled that a petitioner's filing of a supplemental *pro se* brief in addition to the opening brief filed by his counsel was sufficient to satisfy the requirement that the petitioner present the same constitutional claims to the state courts as to the federal courts. 507 F.2d at 904. In stark contrast to here, the petitioner in *McBride* clearly articulated the same claim to the state courts as to the federal courts, albeit in a later-filed supplemental brief. *See id.* Eggers simply did not present the instant claim to the state courts. His status as a *pro se* litigant during Rule 32 proceedings does not excuse him from complying with procedural rules and exhausting all claims. Moreover, Eggers has not explained how the fact that he was allegedly incompetent during direct appeal has any bearing on his failure to exhaust state remedies during his Rule 32 proceedings.

Presumably he argues that had he not been incompetent during direct appeal, he would not have agreed with his counsel's strategy in determining which claims to raise and in what manner to raise them, and there thus would not have been the later need to challenge his appellate counsel's performance in post-conviction proceedings.

Assuming this is even an appropriate method of demonstrating cause and prejudice for failure to raise a Rule 32 claim, Eggers's claim that he was incompetent during the time that his direct appeal was proceeding lacks merit. As an initial matter, there is very little case law on the issue of the proper standard for assessing competence on direct appeal, especially when the defendant has counsel working on his behalf. The Eighth Circuit has stated, "Under certain narrowly limited circumstances, a petitioner might be able to show that, at the time of a previous filing, he had been suffering from a mental disorder so severe that it was impossible for him to understand the papers filed on his behalf or to make rational decisions about what claims to include in them." *Garrett v. Groose*, 99 F.3d 283, 285 (8th Cir. 1996). However, that court went on to reiterate that "a conclusive showing of incompetence is required before mental illness can constitute cause." *Id.* (internal alteration and quotation marks omitted). The Seventh Circuit has stated that the test for appellate or post-conviction competency should be identical

to the competency-to-stand-trial standard, i.e., "the test should be whether the defendant (petitioner, appellant, etc.) is competent to play whatever role in relation to his case is necessary to enable it to be adequately presented." *Holmes v. Buss*, 506 F.3d 576, 580 (7th Cir. 2007). That court further noted that "the presence or absence of counsel is a detail. If the petitioner doesn't have counsel, the issue is his competence to proceed without assistance of counsel. If he does have counsel, the issue is his competence to provide such assistance to counsel as is necessary to enable the claim [ ] to be prosecuted adequately by his counsel." *Id.* at 578. Additionally, although the procedural posture was not direct appeal, in deciding whether a petitioner was competent to proceed with his federal habeas claim, the Eleventh Circuit determined that the applicable standard was the *Dusky* standard: whether the petitioner has both "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "a rational as well as factual understanding of the proceedings against him." *Ferguson v. Sec'y for Dep't of Corr.*, 580 F.3d 1183, 1221 (11th Cir. 2009) (quoting *Moore v. Campbell*, 344 F.3d 1313, 1321 (11th Cir. 2003)). Given that direct appeal is one type of post-conviction proceeding, the Court will assume for purposes of this opinion that the applicable standard for determining an appellant's competency during direct appeal is likewise the *Dusky* standard.

Applying the foregoing standards to the facts at hand, Eggers has not shown that any alleged mental issues he suffered during direct appeal undermined his ability to understand the proceedings against him. Eggers points out that by the time of his direct appeal, he was in prison at Holman Correctional Facility, where he claimed that he was victimized by the Mexican Mafia, who had infiltrated the prison, in retaliation for his confidential informant work in 1985. He cut his wrists, experienced paranoid delusions, and reported hearing voices. Prison health providers diagnosed him with psychosis and paranoid schizophrenia, but later questioned that diagnosis. From October 2002 to May 2004, the prison treated Eggers with medications including Risperdal, Vistaril, Klonopin, and Prozac. As previously noted, however, neither a particular diagnosis nor the fact that an individual is prescribed particular medications is a *per se* indicator of incompetence to proceed in litigation. *See Lawrence*, 700 F.3d at 482; *Medina*, 59 F.3d at 1107. Rather, the dispositive inquiry is whether the individual can aid his counsel in litigating his case and understand the nature of his proceedings. To this end, Eggers states that in September 2003, during the pendency of his direct appeal, he filed a pro se letter to the clerk of the appellate court abandoning his appeals:

> My name is Michael Eggers and I am writing in regards to my case that is before you at this time. I am guilty as sin[.] I killed Mrs. Murray in cold-blooded murder. I confess to this and ask you to honor the verdict and judgment from the people of Walker County, Alabama.

> I am waiving all future appeals and ask you to carry out "JUSTICE" as swiftly as possible. Please do not hesitate to deny any of the arguments given in my brief.

This is the only evidence set forth by Eggers in support of his claim that he was incompetent during the time that his appointed direct appeal lawyer was litigating his claims before the ACCA. This one filing does not convince the Court that Eggers was incapable of understanding his direct appeal proceedings. Eggers's "confession" was not new: he had never disclaimed the fact that he murdered Mrs. Murray. Nor did he abandon his appeal after submitting this letter. Rather, he continued to litigate his appeal to the United States Supreme Court.[7]   In   sum, insofar as Eggers's competence during direct appeal is even relevant to his failure to raise an ineffective assistance of appellate counsel claim during Rule 32 proceedings, Eggers has not shown that any mental issues he suffered during direct

---

[7]     Eggers offers forth some other filings that he made while his appeal was on certiorari review before the United States Supreme Court, in support of his claim that he was incompetent during that time. For instance, he quarreled with the performance of his lawyers on certiorari review, who by that time were volunteer attorneys from Chicago, seeking to have them removed and replaced with new counsel. However, this obviously occurred after his direct appeal lawyer had decided which claims to raise before the ACCA. As such, the Court fails to see the relevance of these instances to Eggers instant theory, which is, after all, that had Eggers been competent while his direct appeal lawyer was filing his briefs, he would not have allowed him to waive certain ineffective assistance of trial counsel claims. *See Wright*, 278 F.3d at 1259 (noting that the best indicator of a defendant's competence at trial is his actions and behavior during that time, not some time afterwards).

appeal rendered him incapable of providing the level of input to his lawyers necessary to mount an adequate appeal.

Second, Eggers contends that he was also mentally incompetent during his pro se Rule 32 proceedings, a fact that he says establishes cause to excuse his procedural default such that this Court can decide his claim on the merits under a *de novo* standard. The Eleventh Circuit has *assumed* that "a *pro se* habeas petitioner who lacked the mental capacity to understand the nature and object of habeas proceedings and to present his case for habeas relief in a rational manner would have cause for omitting a claim in such proceedings." *Smith*, 876 F.2d at 1465 (but rejecting the petitioner's claim that his illiteracy and lack of ability to understand the state habeas proceedings constituted such a mental incapacity sufficient to constitute cause for his failure to exhaust state remedies). Other circuit courts have similarly held that mental illness during state habeas proceedings could conceivably constitute cause to overcome procedural default. *See, e.g., Holt v. Bowersox*, 191 F.3d 970, 974 (8th Cir. 1999) ("Our cases establish that, in order for mental illness to constitute cause and prejudice to excuse procedural default, there must be a conclusive showing that mental illness interfered with a petitioner's ability to appreciate his or her position and make rational decisions regarding his or her case at the time during which he or she should have pursued post-conviction relief.").

Thus, assuming that a petitioner's mental incapacity would constitute cause to excuse the procedural default of claims during Rule 32 proceedings, there is still no cause present here, as the record establishes that Eggers was able to appreciate his position during Rule 32 proceedings and make rational decisions regarding his case at the time. Eggers again points out that in the two years prior to his filing his Rule 32 petition, records from his incarceration at Holman Correctional Facility reflect several occasions on which he indicated that he was hearing voices, seeing things that were not there, and cut himself. During that time, prison mental health providers diagnosed him with paranoid schizophrenia and prescribed various psychoactive medications, including Klonopin and Prozac. Despite these difficulties, however, Eggers was able to file a timely *pro se* Rule 32 petition at the conclusion of his direct appeal, and he then filed numerous other pleadings with the court. Though the pleadings were voluminous and at times rambling, the many (98) constitutional claims Eggers intended to raise were each delineated and supported by facts that Eggers found relevant to each claim. Further, upon the State's request that the court appoint Eggers counsel because his Rule 32 pleadings were "difficult to discern," the court held a hearing for the purpose of determining whether Eggers was qualified to represent himself, where Eggers and an Assistant Attorney General appeared. During the hearing, Eggers made clear his

understanding that Rule 32 proceedings involved "a collateral rule issue, where I'm challenging the constitutionality, first of all, of the conviction along with the other issues in my petition." [C.R. Vol. 18 at 24.] And while he explained to the judge at the hearing, as he did in his pleadings, that his paranoia arose from his 1985 work as a confidential informant in California and that his mistrust of court-appointed counsel arose from his paranoid belief that the court, his attorneys, the FBI and the prosecutor had been involved in a conspiracy against him during trial, Eggers was also able to articulate the constitutional claims he wished to present in his petition, such as *Brady* and ineffective assistance of counsel claims. Eggers now argues that he was confused during the hearing, but the transcript reveals that he stated his desire to proceed without counsel, and he did not demonstrate confusion about the possibility that self-representation could lead to the default of future claims. As the State's counsel explained:

| Mr. Nunnelly: | You need to be aware that in declining a lawyer now, that if you fail to raise claims, you may not be able to raise them in the future. |
|---|---|
| The Defendant: | [sic] Right. I understand that. |

[C.R. Vol. 18 at 33.] Taking Eggers's comments in context, he was not exhibiting confusion about the Rule 32 proceedings or about the possibility of default. Rather, he was being cautious to avoid the possibility that he was waiving the right to an

attorney at a potential re-trial. [*See* C.R. Vol. 18 at 37-38.] As he explained, his desire for future counsel was "not in a Rule 32 proceeding, you're absolutely right. That right there is going to be if there's a trial." [*Id.* at 38.] To the extent that Eggers alleges that he suffered any mental health issues during this time, they did not rise to the level that would constitute cause for the procedural defaults at issue in this matter, as they don't appear to have interfered with his ability to understand the nature and object of his Rule 32 proceedings and litigate his claims. *See Smith*, 876 F.2d at 1465. Indeed, the Fourth Circuit has noted that a petitioner's mental illness must have actually *caused* the procedural default for it to constitute cause:

> We require nothing more than a showing that his mental illness actually caused his procedural defaults. It is not enough for a petitioner to show that there existed at the time of his procedural defaults certain conditions external to the defense; the petitioner must show that those external conditions actually "impeded [his] efforts to comply" with procedural requirements and thus caused his default. *Murray*, 477 U.S. at 488. Farabee has presented no evidence establishing, for instance, that his mental illness interfered with his ability to appreciate his litigation position or to make rational decisions concerning the litigation during the entirety of the relevant time periods, *see Holt v. Bowersox*, 191 F.3d 970, 974 (8th Cir. 1999), so that he was unable to consult with counsel, file pleadings, or otherwise comply with state procedural requirements, *see Malone v. Vasquez*, 138 F.3d 711, 719 (8th Cir. 1998); *see also Smith v. Newsome*, 876 F.2d 1461, 1465 (11th Cir. 1989) (assuming that "a pro se habeas petitioner who lacked the mental capacity to understand the nature and object of habeas proceedings and to present his case for habeas relief in a rational manner" could establish cause to excuse a procedural default). In the absence of such evidence, and considering the fact that Farabee was able, despite his mental illness, to comply with certain

> procedural requirements in habeas litigation, we cannot say that the district court erred when it ruled that Farabee had not demonstrated cause to excuse his several procedural defaults.

*Farabee v. Johnson*, 129 F. App'x 799, 804 (4th Cir. 2005) (unpublished per curiam decision). Eggers was able to litigate his Rule 32 proceedings to conclusion, despite evidence that he suffered from intermittent episodes of paranoia during the relevant time period. While Eggers's apparent belief that a conspiracy existed against him by the Monks Motorcycle Club and Mexican Mafia certainly made its appearance in his Rule 32 filings, it was because Eggers clearly found these facts relevant to certain of his constitutional claims, such as the claims that the State withheld certain exculpatory evidence from the defense and that his counsel failed to uncover certain evidence in support of his defense. Notably, several of these same claims are raised by Eggers's counsel in the instant federal motion.

Third, Eggers contends that even if mental incompetence does not establish cause for post-conviction default, the state court's failure to appoint Rule 32 counsel for him does (even though he stated that he wished to proceed without counsel during the aforementioned hearing during Rule 32 proceedings). Eggers relies on the Supreme Court's decision in *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), which he interprets to mean that the fact that he had no post-conviction counsel to raise this particular ineffective-assistance-of-appellate-counsel claim in his Rule 32

petition constitutes cause and prejudice to excuse the default of this claim. By way

of background, the Eleventh Circuit has explained the *Martinez* decision as follows:

> Under the procedural default doctrine, if a state prisoner "defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law . . . ." FN27 *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S. Ct. 2546, 2565, 115 L. Ed. 2d 640 (1991). In general, lack of an attorney and attorney error in state post-conviction proceedings do not establish cause to excuse a procedural default. *Id*. at 757, 111 S. Ct. at 2568.
>
>> FN27. The procedural default doctrine is a judge-made creation of the Supreme Court. *See McQuiggin v. Perkins*, 569 U.S. ----, ----, 133 S. Ct. 1924, 1937, 185 L. Ed. 2d 1019 (2013) (Scalia, J. dissenting); *see also Dretke v. Haley*, 541 U.S. 386, 392, 124 S. Ct. 1847, 1851, 158 L. Ed. 2d 659 (2004). "The rules for when a prisoner may establish cause to excuse a procedural default are elaborated in the exercise of the Court's discretion." *Martinez*, 132 S. Ct. at 1318 (2012).
>
> In *Martinez*, the Supreme Court announced a narrow, equitable, and non-constitutional exception to *Coleman*'s holding (that ineffective assistance of collateral counsel cannot serve as cause to excuse a procedural default) in the limited circumstances where (1) a state requires a prisoner to raise ineffective-trial-counsel claims at an initial-review collateral proceeding; (2) the prisoner failed properly to raise ineffective-trial-counsel claims in his state initial-review collateral proceeding; (3) the prisoner did not have collateral counsel or his counsel was ineffective; and (4) failing to excuse the prisoner's procedural default would cause the prisoner to lose a "substantial" ineffective-trial-counsel claim. *See Arthur* [*v. Thomas*], 739 F.3d [611,] 629 (11th Cir. 2014) (citing *Martinez*, 132 S. Ct. at 1318). In such a case, the Supreme Court explained that there may be "cause" to excuse the procedural default of the ineffective-trial-counsel claim.

> *Martinez*, 132 S. Ct. at 1319. Subsequently, the U.S. Supreme Court
> extended *Martinez*'s rule to cases where state law technically permits
> ineffective-trial-counsel claims on direct appeal but state procedures
> make it "virtually impossible" to actually raise ineffective-trial-
> counsel claims on direct appeal. *See Trevino* [*v. Thaler*], 133 S. Ct.
> [1911,] 1915, 1918–21 [2013].

*Lambrix v. Sec'y, Fla. Dep't of Corr.*, 756 F.3d 1246, 1259-60 (11th Cir. 2014).

Eggers's reliance on *Martinez* in this context is misplaced, because *Martinez* specifically addressed claims of ineffective assistance of *trial* counsel which were not raised in the initial post-conviction proceeding, not claims of ineffective assistance of *appellate* counsel. Indeed, the Supreme Court has repeatedly emphasized the narrowness of *Martinez*'s holding. *See Martinez*, 132 S. Ct. at 1320 ("The rule of *Coleman* governs in all but the limited circumstances recognized here. The holding in this case does not concern attorney errors in other kinds of proceedings . . . ."); *Trevino*, 133 S. Ct. at 1921 (applying *Martinez*'s "narrow exception" to *Coleman*'s general rule). To the extent Eggers suggests that his ineffective assistance of appellate counsel claim should also be considered under *Martinez*, this Court declines to do so. The Eleventh Circuit has not published an opinion on this issue, but the majority of the other circuits to have considered the issue have rejected a habeas petitioner's proposal to extend *Martinez* in the way that Eggers suggests here. *See Reed v. Stephens*, 739 F.3d 753, 778 n.16 (5th Cir. 2014); *In re Sepulvado*, 707 F.3d 550, 554 & n.8 (5th Cir. 2013) (noting that

*Martinez*, by its terms, applies only to ineffective-assistance-of-trial-counsel claims); *Hodges v. Colson*, 727 F.3d 517, 531 (6th Cir. 2013) ("Under *Martinez*'s unambiguous holding our previous understanding of *Coleman* in this regard is still the law—ineffective assistance of post-conviction counsel cannot supply cause for procedural default of a claim of ineffective assistance of appellate counsel."); *Banks v. Workman*, 692 F.3d 1133, 1148 (10th Cir. 2012) ("*Martinez* applies only to a prisoner's procedural default of a claim of ineffective assistance at trial, not to claims of deficient performance by appellate counsel.") (internal quotation marks and emphasis omitted); *but see Ha Van Nguyen v. Curry*, 736 F.3d 1287, 1296 (9th Cir. 2013) (holding that *Martinez* extends to Sixth Amendment ineffective-assistance-of-appellate-counsel claims). In sum, the fact that Eggers had no Rule 32 counsel to present this ineffective assistance of appellate counsel claim cannot serve as cause for the default.

The Court having found the absence of any circumstances that would constitute cause and prejudice for the procedural default of Eggers's ineffective assistance of appellate counsel claim, and Eggers having made no argument that a miscarriage of justice would result should the Court refuse to consider the claim on its merits, the claim is procedurally defaulted and will not be considered by this Court.

4.     **The claim that Eggers was mentally incompetent during Rule 32 proceedings**

As Eggers admits, this is not a claim for relief based on an independent constitutional violation. Rather, Eggers offers his alleged incompetence during Rule 32 proceedings to establish that cause exists to enable this Court to entertain any claims that would otherwise be procedurally defaulted due to Eggers's failure to raise them during those proceedings. Because the Court has already addressed this claim and determined that Eggers has not established that any mental issues he suffered from during Rule 32 proceedings caused his procedural defaults, *see* section IV. 3, *supra*, the Court will not reiterate the analysis here. Relief is not warranted on this claim.

5.     **The claim that trial counsel was constitutionally ineffective in litigating Eggers's insanity defense by waiting until mid-trial to retain an expert whose testimony did not establish that Eggers was insane at the time he committed the murder**

Eggers presented this claim on direct appeal, and the ACCA denied it on the merits, writing:

> Eggers contends that his trial counsel were ineffective for not requesting a psychological examination until after the trial began. Eggers maintains that trial counsel's failure to request a psychological examination before trial left counsel unprepared to present the defense that the kidnapping and robbery were mere afterthoughts because during voir dire, opening statements, and cross-examination of the State's witnesses counsel could not focus on his mental state. Eggers claims that, knowing that his psychological examination occurred over

the weekend recess halfway through the trial, the jury did not "give any credibility to the psychological evidence 'created' over the weekend." (Eggers's brief at p. 36.) According to Eggers, had trial counsel obtained the psychological evaluation before trial and properly prepared and presented that evidence to the jury, the jury would have found that the kidnapping and robbery were mere afterthoughts and would have found him guilty of intentional murder instead of capital murder.

The record reflects that, during the lunch recess on the fourth day of the trial proceedings, Thursday, August 22, 2002, Eggers's counsel requested that he be evaluated over the weekend to determine his mental state at the time of the crime.FN9 The trial court granted the request, and Eggers was evaluated over the weekend recess by Allen Shealy, a clinical and forensic psychologist. In response to that evaluation, the State had Eggers evaluated on Monday, August 26, 2002, after the trial had recessed for the day, by James F. Hooper, director of psychiatric services at Taylor Hardin Secure Medical Facility. The State rested its case-in-chief on Tuesday, August 27, 2002, and the defense presented the testimony of Dr. Shealy that day. The following day, the defense rested, and the State then presented the testimony of Dr. Hooper in rebuttal. During direct and cross-examination of both Dr. Shealy and Dr. Hooper, the jury was made aware that Dr. Shealy had evaluated Eggers over the weekend recess and that Dr. Hooper had evaluated Eggers Monday evening.

> FN9. We note that, at a pretrial hearing on June 5, 2002, over two months before the trial began on August 19, 2002, Eggers's counsel requested that Eggers be evaluated. The trial court granted counsel's oral request and ordered what the court termed a "preliminary" evaluation by the Department of Mental Health and Mental Retardation in Walker County. (R. 65.) The court then indicated that if the results of the preliminary evaluation suggested that a more comprehensive evaluation at the Taylor Hardin Secure Medical Facility was necessary, it would then order the further evaluation. Neither counsel nor the court indicated at that time

whether the evaluation was to determine Eggers's competency to stand trial and/or to determine Eggers's mental state at the time of the crime, and the record does not indicate whether a preliminary evaluation was ever performed, or, if so, what the results were. However, it appears from counsel's assertions later during the trial that the purpose of this preliminary evaluation was to determine Eggers's competency to stand trial, not to determine his mental state at the time of the crime.

Eggers's argument is nothing more than bare allegations and speculation. Eggers does not identify what he believes his counsel could have said or done during voir dire, during opening statements, or during cross-examination of the State's witnesses had counsel had the psychological evaluation performed before trial that would have influenced the jury in any way. In addition, it is nothing but pure speculation on Eggers's part that the jury did not believe Dr. Shealy's testimony because his evaluation was performed during the trial, FN10 but would have believed Dr. Shealy's testimony had the evaluation been done before trial. Therefore, Eggers failed to satisfy his burden of proof under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

> FN10. Based on the facts, the jury could have believed Dr. Shealy's testimony and still found Eggers guilty of capital murder. Although Dr. Shealy testified that Eggers's initial attack on Francis in the truck was the product of uncontrollable rage, he said that that rage episode ended when Francis became unconscious, and that Eggers's actions after that—driving Francis to a secluded dirt road, kicking and strangling Francis to make sure she was dead, dragging Francis into the woods where she could not be seen from the road, and taking Francis's truck—were not the product of uncontrollable rage. As noted in Part II of this opinion, if the underlying felonies and the murder were part of a continuous chain of events, the murder is a capital one. The jury could have believed Dr. Shealy's testimony that the initial attack was the

> product of uncontrollable rage and still found that the kidnapping, robbery, and murder were part of one continuous chain of events.

*Eggers*, 914 So. 2d at 912-13.

Because this claim was "adjudicated on the merits in state court proceedings," Eggers cannot obtain relief on this claim unless he can show that the denial of relief on this claim in state court "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." *See* 28 U.S.C. § 2254(d).

The clearly established federal law on this point is *Strickland*. It appears that the state court did not address the deficient performance prong but rested its denial of this claim on Eggers's failure to satisfy the prejudice prong—that but for counsel's performance, there is a reasonable probability the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 694, 104 S. Ct. 2052. This Court need not address the question of deficient performance because it cannot say that the state court's adjudication of *Strickland*'s prejudice prong was unreasonable. This is because Eggers has not shown how, had Dr. Shealy been retained prior to trial rather than during trial, he would have given different

testimony that would have prompted the jury to conclude that the death sentence was not warranted. *See Strickland*, 466 U.S. at 695, 104 S. Ct. at 2068 ("When a defendant challenges a death sentence . . ., the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."). While the prosecutor emphasized at closing that Dr. Shealy was retained at the "eleventh hour" [C.R. Vol. 10 at 1394], and Dr. Shealy did concede that had he had more time, he might have procured additional third party observations of Eggers's past behavior to corroborate what the brother and sister said, Dr. Shealy also told the jury that he would not have spent many more hours than he spent on Eggers in any other evaluation. [C.R. Vol. 9 at 1166.] Eggers has not explained specifically what his counsel would have said differently during voir dire or opening statements, had they had Dr. Shealy's evaluation before them prior to trial, that would have made any difference. Presumably they could have argued during opening statements that Eggers's paranoid schizophrenia prevented him from forming the intent to murder. But the jury would have then heard from Dr. Shealy and Dr. Hooper during trial, who presented opinions that although Eggers suffered from paranoid personality disorder and intermittent explosive disorder, he was not seriously mentally ill when he murdered Mrs. Murray. Indeed, although

Dr. Shealy testified that Eggers was in the midst of an uncontrollable rage when he levied the first blows against Mrs. Murray, he admitted on cross examination that Eggers's later acts in ensuring that she was dead, such as driving her body to another location and stepping on a tree branch placed on her neck until she stopped breathing, were not conducted during an uncontrollable rage-like state. Because this Court's analysis must be conducted through the lens of § 2254(d), its task is merely to determine whether the ACCA's application of the *Strickland* standard was reasonable. *See Evans*, 699 F.3d at 1268 ("The question is not how the district court [ ] would rule if presented with the issue for the first time and not whether [the Court] think[s] the state court decision is correct, but whether its decision is contrary to or an unreasonable application of clearly established federal law."). It was a reasonable application of *Strickland* for the ACCA to conclude as it did. Because the Court finds that the state court's conclusion that Eggers was not prejudiced by his counsel's failure to retain a mental health expert until mid-trial, it need not address the deficient performance prong, and habeas relief is not warranted on this claim.

Importantly, to the extent Eggers now argues that counsel was also ineffective for other reasons: for allowing Dr. Shealy to testify unhelpfully that Eggers was "not that mentally ill" [C.R. Vol. 9 at 1214]; for not collecting the

records from Eggers's involuntary commitment in El Paso, Texas to provide to Dr. Shealy (although in other portions of Eggers's petition he contends that the State unlawfully withheld those records from his counsel); and for not knowing that it was the defendant's burden to prove his insanity under Alabama law, Eggers never made these arguments before the state courts. Claims premised on these facts are thus procedurally defaulted. A federal habeas petitioner is required "to present the state courts with the same claim he urges upon the federal courts." *Picard*, 404 U.S. at 276, 92 S. Ct. at 512; *see also McNair*, 416 F.3d at 1302 ("While we do not require a verbatim restatement of the claims brought in state court, we do require that a petitioner presented his claims to the state court "such that a reasonable reader would understand each claim's particular legal basis and specific factual foundation.") Because he did not present these specific claims as federal claims in state court, he did not give the state courts a fair opportunity to decide them. Dismissal of his habeas petition to allow Eggers to present these claims fairly as a federal claim in state court now would be futile because he would be barred from raising them in state court under Rule 32.2(c) of the Alabama Rules of Criminal Procedure (statute of limitations bar) and Rule 32.2(b) of the Alabama Rules of Criminal Procedure (successive petition bar). Thus, because any state remedy with respect to these claims is procedurally barred by the state procedural rules noted

above, claims premised on these facts are procedurally defaulted from habeas review.

### 6.    The claim that trial counsel was constitutionally ineffective in litigating Eggers's incompetence to stand trial

Along with his claim of trial court error for not *sua sponte* holding a competency hearing, *see* section IV. 2 of this opinion, *supra*, Eggers also alleges that his trial counsel rendered ineffective assistance by failing to request a competency evaluation. Eggers raised this claim for the first time in his amended Rule 32 petition as claims 63, 65-70, 73-74, 77, and 80-83. The circuit court styled the claim "Eggers's Claim that Trial Counsel was Ineffective for Failing to Take Steps to Have Eggers Declared Incompetent to Stand Trial And/Or Prepare a Mitigation Case Based on his Mental Health." [C.R. Vol. 22 at 39.] The circuit court, which issued the last reasoned decision,[8] denied the claim because it was insufficiently pleaded, because it was contradicted by the record, because it failed to state a material issue of law or fact, and as procedurally barred because it was presented and rejected on direct appeal. [C.R. Vol. 22 at 39-43.] With regard to the denial as insufficiently pleaded, the circuit court ruled as follows:

> Collectively, all of these allegations attack trial counsel for failing to demonstrate that Eggers was incompetent to stand trial and/or for failing to convince the jury that Eggers's mental health was

---

[8]      *See Ylst*, 501 U.S. at 804, 111 S. Ct. at 2594.

a mitigating factor sufficient to alter the sentencing determination. However, the amended petition provides only the barest basis for evaluating any of these claims. At bottom, the amended petition fails to state any facts—known or unknown to trial counsel—that were not presented to the court and would have ultimately changed the opinion of any expert, the competency determination of the trial court, or the outcome of the sentencing determination. Eggers, therefore, has failed to plead with sufficient specificity to support a finding of deficient performance or prejudice.

Many of the specific allegations also suffer other pleading defects. Eggers does not plead facts demonstrating that he was entitled to pretrial institutionalization or funds for independent evaluations, and therefore cannot show that the motions would have been granted. He also fails to allege with specificity what information a background investigation or earlier evaluations FN4 would have been likely to generate, or to state how much information would have been presented to the court. The amended petition similarly fails to disclose what unknown facts trial counsel would have learned from post-evaluation conversations with Eggers. Eggers also fails to plead facts which, if true, would demonstrate that trial counsel performed deficiently given counsel's unsuccessful efforts to have Eggers declared incompetent and in light of contrary expert's opinions. Eggers has failed to plead sufficient facts that, even if true, would prove deficient performance or prejudice under *Strickland*. *See* Ala. R. Crim. P. 32.3, 32.6(b). Therefore, these claims are dismissed. Ala. R. Crim. P. 32.7(d).

> FN. 4 The trial court did eventually grant Eggers's request for funds to be evaluated by Dr. Shealy, and therefore the issue is whether earlier evaluation would have produced a different result.

Eggers's claims concerning his competence are also dismissed because they are also largely contradicted by the record. Indeed, Dr. Shealy, the defense expert, testified before the jury that his own investigation indicated that Eggers's account of his life history was "largely" accurate, except that Eggers had understated the degree of

childhood abuse he had suffered. (R. 1139.) Shealy also testified that he had interviewed Eggers's brother, who had confirmed that Eggers spent time in a mental facility in El Paso. (R. 1141.)

Furthermore, these claims are dismissed because Eggers has failed to state a material issue of law or fact. Ala. R. Crim. P. 32.7(d). Eggers has failed to plead any facts that, if proven true, would establish that he was indeed incompetent. Instead, Eggers's bare allegations consist of nothing but pure speculation. By failing to plead facts which if true would actually establish that he was incompetent, Eggers has failed to plead a claim upon which relief can be granted and these claims are dismissed. Ala. R. Crim. P. 32.7(d).

[C.R. Vol. 22 at 40-42.]

A Rule 32 dismissal for lack of specificity is a merits ruling in this circuit. *See Borden*, 646 F.3d at 812-13. As such, this Court conducts the deferential AEDPA review of the state court's decision pursuant to 28 U.S.C. § 2254(d), and Eggers cannot obtain relief on this claim unless he can show that the denial of relief on this claim in state court "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The clearly established federal law on this point is again *Strickland* as it interacts with *Dusky, Pate* and *Drope*, *supra*. A defendant is legally incompetent to stand trial if he lacks "sufficient present ability to consult with his lawyer with a

reasonable degree of rational understanding—and . . . a rational as well as factual understanding of the proceedings against him." *Dusky*, 362 U.S. at 402, 80 S. Ct. at 788 (internal quotation marks omitted). Due Process requires the trial court to inquire *sua sponte* as to the defendant's competence in every case in which there is a reason to doubt the defendant's competence to stand trial. *Drope*, 420 U.S. at 173, 95 S. Ct. 896; *Pate*, 383 U.S. at 385, 86 S. Ct. 836 (stating that failure to hold competency hearing violated due process where state statute required trial court to order hearing where there was "reason to doubt" defendant's competency, and the evidence was sufficient to put the trial court on notice of potential problem). It follows from *Strickland* and its progeny that defense counsel has a duty to investigate a defendant's competency to stand trial, and could be found to be ineffective either by failing to make a reasonable investigation or by failing to make a reasonable decision that such investigation was unnecessary. *See Futch v. Duggar*, 847 F.2d 1483, 1487 (11th Cir. 1989) (in a pre-AEDPA case, holding that an evidentiary hearing was required when counsel knew that a prison psychologist evaluated petitioner and declared him incompetent but failed to obtain the evaluation or interview the psychologist, because if these allegations were true, petitioner had met his burden of showing that his counsel was ineffective and a reasonable probability that a psychological evaluation would have revealed he was

incompetent to stand trial); *Jermyn v. Horn*, 266 F.3d 257, 283-84 (3d Cir. 2001) ("[C]ounsel's failure to request the trial court to order a hearing or evaluation on the issue of the defendant's competency [] could violate the defendant's right to effective assistance of counsel provided there are sufficient indicia of incompetence to give objectively reasonable counsel reason to doubt the defendant's competency, and there is a reasonable probability that the defendant would have been found incompetent to stand trial had the issue been raised and fully considered.") (internal citation omitted). Indeed, "[b]ecause legal competency is primarily a function of defendant's role in assisting counsel in conducting the defense, the defendant's attorney is in the best position to determine whether the defendant's competency is suspect." *Watts*, 87 F.3d at 1288.

The state court decision rejecting Eggers's claim is not an objectively unreasonable application of this precedent. First, as the state court noted, Eggers has not demonstrated deficient performance. Eggers's counsel knew that Eggers had been institutionalized in January 1987 in El Paso, Texas on what could have been mental issues or drug-related issues, that his brother was currently institutionalized in a California mental health facility, and that he had a history of paranoid tendencies that led him to distrust his attorneys and believe the prosecution was part of an ongoing government-led conspiracy against him. But

rather than ignore this information, defense counsel asked the trial judge to order a mental evaluation of Eggers several months prior to trial. As previously noted, results from this evaluation are not in the record, but Eggers concedes that it happened. Counsel then obtained the testimony of Dr. Shealy, who testified that there was no doubt that Eggers was competent to stand trial. [C.R. Vol. 9 at 1177 ("Q. . . . Now, I note in your report also that you say he is clearly competent to stand trial. A. Yes. Q. There's no issue about that? A. Right.").] This is simply not a case where counsel ignored red flags and conducted no investigation, so the Rule 32 court's decision, based on the record before it, that counsel's performance was not deficient, was not unreasonable.

Eggers likewise fails to show resulting prejudice. "In order to demonstrate prejudice from counsel's failure to investigate his competency, [a] petitioner has to show that there exists 'at least a reasonable probability that a psychological evaluation would have revealed that he was incompetent to stand trial.'" *Futch*, 874 F.2d at 1487 (quoting *Alexander v. Dugger* 841 F.2d 371, 375 (11th Cir. 1988)). As discussed in sections IV. 1 and 2, *supra*, Eggers was evaluated by two mental health experts, Dr. Shealy and Dr. Hooper, and found competent to proceed by both. Not only that, but Eggers's conduct during trial did not raise red flags. Eggers has not presented evidence establishing that, if counsel had moved for a

competency hearing, the state trial court judge would have granted the motion and would have found Eggers incompetent to proceed. *See Pate*, 383 U.S. at 385–86, 86 S. Ct. at 842 (a trial judge must conduct a *sua sponte* sanity hearing only when the defendant's conduct and the evidence raises a "bona fide doubt" regarding the defendant's competence to stand trial). Since Eggers has failed to establish both deficient performance and prejudice resulting from trial counsel's failure to move for a competency hearing, the state court's decision was not an unreasonable application of *Strickand* or *Pate*, and that fact precludes habeas relief on this claim.

> **7.   The claim that trial counsel was constitutionally ineffective in failing to investigate and argue in support of Eggers's motion to suppress his confessions that he was mentally ill when he confessed, thus making them involuntary**

Eggers presented this ground for the first time in his amended Rule 32 petition as claims 43-47. The circuit court, which issued the last reasoned decision, denied the claim as insufficiently specific under Ala. R. Crim. P. 32.3 and 32.6(b); because it failed to state a claim; because it failed to state a material issue of law or fact under Ala. R. Crim. P. 32.7(d); and because it was procedurally barred under Ala. R. Crim. P. 32.2(a)(4) as it had already been raised and addressed on direct appeal. [C.R. Vol. 22 at 88-92.] With regard to the denial for insufficient pleading, the circuit court wrote:

Eggers's claims are nothing but bare allegations. Eggers utterly fails to plead what specific records or reports should have been 'marshaled' by his defense counsel. Nor does Eggers plead the names of the witnesses who should have been interviewed or called by his counsel during the suppression hearing. Moreover, Eggers fails to specifically plead what information these unnamed witnesses possessed that would have been relevant to his arrest or interrogation during the suppression hearing.

Additionally, these claims are insufficiently pleaded because Eggers has entirely failed to plead facts which, if true, would establish prejudice under *Strickland*. Eggers has utterly failed to plead any facts concerning what evidence his trial counsel would have presented during the suppression hearing had his counsel compiled the records and talked with the witnesses Eggers contends should have been acquired and interviewed. Eggers has completely failed to plead facts which, if true, would establish that the outcome of his trial would have been different had his counsel conducted the investigation of his arrest and interrogation in the way Eggers suggests.

This claim is also dismissed because it fails to state a material issue of law or fact. Ala. R. Crim. P. 32.7(d). . . . [T]he Court of Criminal Appeals provided a detailed analysis concerning Eggers's statements to law enforcement and found that his statements were given voluntarily. [*Eggers*, 904 So. 2d] at 897-906. Eggers has failed to plead what additional, specific facts his counsel could have presented that, if true, would call that court's holding into question. Accordingly, this claim is dismissed pursuant to Ala. R. Crim. P. 32.7(d) for failure to state a claim upon which relief may be granted.

[C.R. Vol. 16 at 33.]

A Rule 32 dismissal for lack of specificity is a merits ruling in this circuit.

*Borden*, 646 F.3d at 812-13. As such, this Court conducts the deferential AEDPA

review of the state court's decision pursuant to 28 U.S.C. § 2254(d), and Eggers

cannot obtain relief on this claim unless he can show that the denial of relief on this claim in state court "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." *See* 28 U.S.C. § 2254(d).

The facts that are relevant to this claim are as follows. After being arrested in Florida on January 9, 2001, Eggers waived his Fifth Amendment rights, and between January 10 and 11 he repeatedly confessed to having killed Mrs. Murray and led police to her remains. Eggers's counsel later filed a motion to suppress his confessions. The motion asserted that Eggers was not advised of his constitutional rights immediately prior to making the statements, that Eggers did not knowingly, intelligently, or voluntarily waive his rights, and that Eggers's statements were involuntary because they were the product of his mental illness, inexperience with law enforcement, and threats and promises made by law enforcement officials. Counsel later filed a brief that again asserted the involuntariness of the confessions, but in which counsel did not mention Eggers's mental illness as a basis for suppression. The trial judge held the suppression hearing late in the afternoon on the first day of trial, August 20, 2002, after the jury had been struck, and continued

it the next morning, before opening statements began. Counsel did not present any evidence of Eggers's mental illness at the suppression hearing. However, the court did hear from law enforcement agents to whom Eggers confessed, the sheriff, a jail administrator, and Eggers himself. [C.R. Vol. 5 at 289-381.] The court orally denied the motion to suppress at the hearing.

Eggers now argues that counsel's failure to argue that his mental illness rendered his confessions involuntary was ineffective assistance, and he contends that he was prejudiced because, had the trial judge had evidence of his mental illness before him, his confessions would have been suppressed, and he would not have been found guilty of capital murder. The clearly established Supreme Court law on this point is *Strickland* and its progeny as related to counsel's litigation of motions to suppress. "To obtain relief where an ineffective assistance claim is based on trial counsel's failure to file a timely motion to suppress, a petitioner must prove (1) that counsel's representation fell below an objective standard of reasonableness, (2) that the Fourth Amendment claim is meritorious, and (3) that there is a reasonable probability that the verdict would have been different absent the excludable evidence." *Zakrzewski v. McDonough*, 455 F.3d 1254, 1260 (11th Cir. 2006) (citing *Kimmelman v. Morrison*, 477 U.S. 365, 375, 106 S. Ct. 2574, 2582-83 (1986)). Thus, the petitioner's underlying Fourth Amendment claim is one

element of his Sixth Amendment ineffectiveness claim. *Kimmelman*, 477 U.S. at 375, 106 S. Ct. at 2583. A confession to police is inadmissible unless "'it is made freely, voluntarily, and without compulsion or inducement of any sort.'" *Haynes v. Washington*, 373 U.S. 503, 513, 83 S. Ct. 1336, 1343 (1963) (quoting *Wilson v. United States*, 162 U.S. 613, 623, 16 S. Ct. 895, 899 (1896)). A defendant's mental state is relevant to the voluntariness inquiry. *Columbe v. Connecticut*, 367 U.S. 568, 602, 81 S. Ct. 1860, 1879 (1961).

For reasons explained below, it was reasonable for the circuit court to conclude that Eggers was not prejudiced by his counsel's failure to argue that he was mentally ill during his confessions because it is highly unlikely that the trial court would have granted Eggers's motion to suppress had counsel put forth the evidence that Eggers proffers. Eggers argued that his counsel should have raised at the suppression hearing the fact that he had been experiencing paranoia since 1985, that he had been institutionalized in 1987 in El Paso, Texas, following a psychotic episode, that he had a family history of mental illness, and that his brother was currently institutionalized for paranoid schizophrenia. The court is confident that this evidence, had the trial judge had it before him, would not have caused him to grant the motion to suppress. The standard in Alabama governing the admissibility of a confession given by a person who contends he was suffering from a mental

impairment when he gave his statement is whether the defendant could understand his *Miranda*[9] rights such that he could knowingly and intelligently waive them. *See Hines v. State*, 384 So. 2d 1171, 1180 (Ala. Crim. App. 1980). Evidence that a defendant suffered from a mental impairment at the time of a confession is but one of many circumstances considered in making the determination whether the confession was knowingly and intelligently given. *See id.* Under this standard, there is no reasonable probability that, but for Eggers's counsel's failure to offer the evidence at issue, the court would have suppressed Eggers's confession. This is because the facts before the trial court concerning Eggers's confessions, including the actual written and verbal confessions themselves, as well as the testimony given by officers and Eggers at the suppression hearing, do not support a finding in Eggers's favor under this standard. After being arrested, Eggers voluntarily came forward with his desire to make a statement, waived his *Miranda* rights, and repeatedly confessed over a period of several days. One confession was written, and two were verbal, of which one was recorded and one was not. Eggers also voluntarily offered to show law enforcement Mrs. Murray's body. In its opinion on direct appeal, the ACCA provided great detail on what the testimony from the suppression hearing showed regarding Eggers's arrest and confessions:

---

[9]     *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966).

As noted above, Agent Maldonado testified that when Eggers first came out of the tent, he initially identified himself as Clay, but that based on the description of Eggers they had received, he and the other law-enforcement officers believed that "Clay" was, in fact, Eggers, and Eggers subsequently admitted who he was and told the officers that his wallet, with all of his identification, was in the tent. Eggers was then arrested and transported to the Osceola County Sheriff's Department by a sheriff's deputy. Agent Maldonado testified that he could not remember which deputy transported Eggers to the sheriff's department and no one from the Osceola County Sheriff's Department testified at the suppression hearing or at trial; however, Agent Maldonado testified at the suppression hearing that he was never informed that Eggers had made any kind of statement while being transported to the Sheriff's Department, but that Eggers had been transported "from the tent city to the Sheriff's Office with no statement." (R. 326.)

Once at the sheriff's department, Agent Maldonado said, he advised Eggers of his *Miranda* rights, Eggers indicated that he wanted to make a statement, and Eggers then signed a waiver-of-rights form. Agent Maldonado testified that he then advised Eggers that he was being arrested on a warrant for unlawful flight to avoid prosecution and that Eggers "asked me if I wanted to know where the body was." (R. 457.) Eggers then orally confessed to murdering Francis, provided details about the murder, and agreed to take law-enforcement officers to the location of Francis's body. While Agent Maldonado was writing his notes about Eggers's oral confession, he asked Eggers if he would be willing to make a written statement and Eggers agreed. Eggers then handwrote a short statement, again admitting to murdering Francis. The following morning, January 10, 2001, Eggers was brought before a Florida circuit judge and waived extradition.

Agent Maldonado testified that, although he and the other law-enforcement officers had their guns drawn when they entered the tent city, they did not put their guns to Eggers's head or otherwise threaten Eggers when they arrested him. Agent Maldonado also testified that Eggers never asked for a lawyer at any time in his presence; that he never promised Eggers any reward for making a

statement; that he never threatened Eggers to get him to make a statement; that he did not tell Eggers that it would be better for him if he made a statement or worse for him if he did not make a statement. Agent Maldonado specifically denied threatening to get Eggers's son, girlfriend, or father involved in the situation if Eggers did not make a statement.

In contrast, Eggers testified at the suppression hearing that when he was discovered in the tent city and initially asked what his name was, he did not give a false name, but asked for a lawyer. Eggers said that the officers ignored his request for a lawyer and asked him what his name was again, and that he then identified himself and told the officers that his identification was in his wallet in the tent. While being transported to the Osceola County Sheriff's Department, Eggers said, he again requested a lawyer, and was told by the deputy that he "would have to take that up as soon as we got to the Sheriff's Office." (R. 347.) Eggers testified that when he arrived at the sheriff's department, Agent Maldonado did not advise him of his *Miranda* rights, but threatened him. According to Eggers, Agent Maldonado told him that he "had to answer some questions" and then said that if he did not answer the questions, he (Agent Maldonado) would get Eggers's girlfriend, father, and son involved. (R. 350.) Eggers said that it was only after Agent Maldonado threatened to involve his father and his son that he agreed to make a statement, and that only after he agreed to make a statement did Agent Maldonado advise him of his *Miranda* rights and did he sign the waiver-of-rights form. Eggers also testified that he waived extradition because he "had no choice," the "FBI was taking [my rights] away from me." (R. 354.)

After Eggers waived extradition, Joe Brzezinski, an investigator with the Alabama Bureau of Investigation, as well as other Alabama law-enforcement officers, flew to Kissimmee and transported Eggers back to Alabama. Upon arrival at the Walker County Airport in Jasper, Eggers took law-enforcement officers to the location of Francis's body. Inv. Brzezinski testified that when they got into the vehicles, he advised Eggers of his *Miranda* rights and asked Eggers if he was willing to continue cooperating, to which Eggers replied "that's what we're here for." (R. 293.) Eggers then led law-enforcement officers to the

location of Francis's body, during which time he again admitted to murdering Francis and explained the events surrounding the murder. Inv. Brzezinski stated that Eggers was not coerced or threatened; that Eggers was not promised anything for his cooperation; and that Eggers was never told that it would be better for him if he cooperated. After Francis's body was located, Eggers was taken to the Walker County jail.

The following day, on January 11, 2001, Inv. Brzezinski went to the Walker County jail and spoke with Eggers again. Inv. Brzezinski testified that, before speaking with Eggers, he advised Eggers of his *Miranda* rights; that Eggers indicated that he understood those rights; and that Eggers signed a waiver-of-rights form. Eggers then gave a third statement, again admitting to the murder of Francis and detailing the circumstances of that murder; that statement was audio taped. Inv. Brzezinski testified that Eggers was not threatened into making the statement; that Eggers was not promised anything for making the statement; and that no one told Eggers that it would be better for him to make the statement.

Eggers admitted at the suppression hearing that Inv. Brzezinski advised him of his *Miranda* rights before he took Inv. Brzezinski to where Francis's body was located and again before he gave his third statement to Inv. Brzezinski at the Walker County jail the next day, and that he was not threatened or coerced into making either of those statements. Eggers also admitted that he signed a waiver-of-rights form before he gave his third statement at the jail.

*Eggers*, 914 So. 2d at 896-98.

The trial court had the benefit of Eggers's testimony at the suppression hearing. Although Eggers disputed the testimony of law enforcement in several respects at the suppression hearing, he never indicated that he had a mental impairment that hindered the voluntariness of his confession. More importantly,

both Eggers's written and verbal (taped) confessions are lucid and organized. [C.R. Vol. 2 at 392-93 (Eggers's written statement); Vol. 2-3 at 396-454 (Eggers's recorded verbal statement)]. Eggers calmly explained what he did to law enforcement, never making any statements about delusions, paranoia, or seeing or hearing things that weren't there. In those statements, he never once indicated that he was incapable of understanding the charges against him and making informed decisions. He simply did not exhibit any bizarre behavior during his confessions that would indicate that he was suffering from a mental impairment at the time. Thus, given the totality of the circumstances surrounding Eggers's confessions, if counsel had also argued that Eggers was suffering from some kind of psychotic episode when he made those statements, that evidence would have been a mere part of the analysis, and the Court is certain that it would not have changed the judge's conclusion that the motion to suppress was due to be denied. Because the motion to suppress wouldn't have been granted, there is no reasonable probability that the outcome of the proceeding would have been different. Because there was no prejudice stemming from counsel's failure to argue that Eggers's mental illness rendered his confessions involuntary, the circuit court was certainly not unreasonable in so concluding, and habeas relief is not warranted on this claim.[10]

---

[10]     Eggers also argues that counsel's performance was deficient because it was not the sort of

8.    **The claims that 1) trial counsel was constitutionally ineffective in failing to investigate for the guilt phase of the trial by failing to identify witnesses and records with information about Eggers's mental illness that would have either supported a lesser included offense or have shown that he lacked the intent to commit capital murder, and 2) trial counsel was constitutionally ineffective in failing to conduct an adequate investigation in preparation for the penalty phase of the trial**

Eggers claims that he presented this ground for the first time in his amended

Rule 32 petition as claims 20, 48-50, 62, 91, and 95, but a plain reading of the claims

shows that this particular claim was not presented. Claim 20 alleged that Eggers

was incompetent to stand trial, and trial counsel was ineffective for not conducting

a competency evaluation prior to trial; claims 48-50 alleged that trial counsel failed

to seek various records, such as criminal and medical records; claim 62 alleged that

trial counsel failed to discover various facts about Eggers's background; claim 91

alleged that trial counsel failed to obtain a valid competency evaluation and provide

---

"strategic" decision that *Strickland* insulates from scrutiny because it was made in the absence of a reasonable investigation into Eggers's history of mental illness. *See Strickland*, 466 U.S. at 690-91, 104 S. Ct. at 2066 ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limits on investigation."). However, because the Court finds that the circuit court's determination that Eggers was not prejudiced by counsel's failure to litigate his mental illness in support of the motion to suppress was not contrary to clearly established federal law, it need not address the deficient performance prong of *Strickland*. Indeed, while the circuit court may have indicated that it was holding that counsel's performance was not deficient when it wrote that Eggers did not explain with specificity what counsel should have done to litigate the motion as Eggers wished, the court did not explicitly make a ruling that counsel's performance was not deficient. In any event, even if Eggers successfully persuaded a court that counsel's performance fell below an objective standard of reasonableness, for the reasons explained above, he has shown no prejudice flowing from it.

experts with necessary information and data; and claim 95 alleged that trial counsel failed to provide various facts to the experts. [C.R. Vol. 15 at 132-180.] The claims presented in Rule 32 proceedings made no specific mention of counsel being ineffective for not investigating evidence that Eggers lacked the specific intent to commit murder for the guilt phase. And, as Eggers concedes, they said nothing about counsel's ineffectiveness in failing to investigate for the penalty phase of the trial. Consequently, this claim is procedurally defaulted from this Court's review because Eggers did not fairly present it as a federal claim in state court. *See Picard*, 404 U.S. at 276, 92 S. Ct. at 512 (a federal habeas petitioner is required "to present the state courts with the same claim he urges upon the federal courts"). Because he did not present this specific claim as a federal claim in state court, he did not give the state courts a fair opportunity to decide it. Dismissal of his habeas petition to allow Eggers to present this claim fairly as a federal claim in state court now would be futile because he would be barred from raising it in state court under Rule 32.2(c) of the Alabama Rules of Criminal Procedure (statute of limitations bar) and Rule 32.2(b) of the Alabama Rules of Criminal Procedure (successive petition bar). Thus, because any state remedy with respect to this claim is procedurally barred by the state procedural rules noted above, Eggers's claim is procedurally defaulted from habeas review, unless some exception applies.

As he has with other claims, Eggers again argues that two sorts of cause are present to excuse the procedural default of this claim: his alleged mental illness during Rule 32 proceedings and his allegation that the state courts forced him to proceed as a *pro se* litigant during those proceedings. As already described in section IV. 3 of this opinion, *supra*, Eggers was not suffering from a mental illness that prohibited him from understanding the nature and object of his Rule 32 proceedings, so Eggers's first argument for "cause" fails.

With regard to Eggers's second argument for "cause," he again relies on *Martinez v. Ryan*, 132 S. Ct. 1309. As explained previously, in *Martinez*, the Supreme Court announced a "narrow exception" to *Coleman*'s procedural default rule in the limited circumstances where (1) a state requires a prisoner to raise ineffective-trial-counsel claims at the initial-review stage of a state collateral proceeding and precludes those claims during direct appeal; (2) the prisoner did not comply with state rules and failed to properly raise ineffective-trial-counsel claims in his state initial-review collateral proceeding; (3) the prisoner did not have counsel (or his appointed counsel was ineffective by not raising ineffective-trial-counsel claims) in that initial-review collateral proceeding; and (4) failing to excuse the prisoner's procedural default would cause the prisoner to lose a "substantial" ineffective-trial-counsel claim. 132 S. Ct. at 1318 (defining a substantial claim as one

with "some merit"). The *Martinez* Court said that the rule it was announcing effectively "permits a State to elect between appointing counsel in initial-review collateral proceedings or not asserting a procedural default and raising a defense on the merits in federal habeas proceedings." 132 S. Ct. at 1320. Subsequently, in *Trevino v. Thaler*, the Supreme Court extended *Martinez*, holding that where a State in theory grants permission to raise a claim of ineffective assistance of trial counsel on direct appeal but that State's "procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal, [the] holding of *Martinez* applies[.]" 133 S. Ct. at 1921.

Applying the foregoing principles to the present case, Eggers's procedural default occurred during the initial collateral review proceeding when he failed to raise this specific ineffective assistance of trial counsel issue at the state level. Eggers was not represented by counsel during the initial collateral proceeding. Thus, the reasoning of *Martinez*, acknowledging that "as an equitable matter, that a collateral proceeding, if undertaken with no counsel or ineffective counsel, may not have been sufficient to ensure that proper consideration was given to a substantial

claim," appears at first blush to apply here. *Martinez*, 132 S. Ct. at 1318.[11] However, there are several problems with the application of *Martinez* and *Trevino* to Eggers's case. First, on the State's motion—not Eggers's—the Rule 32 court conducted a hearing specifically to determine whether it should appoint counsel for Eggers during Rule 32 proceedings, at which time Eggers refused counsel, and the court ultimately concluded it would not force counsel on Eggers. *See* section IV. 3, *supra*. This is not a case where Eggers requested counsel for his collateral appeal and was denied by the state court. Second, Eggers could have raised this ineffective assistance of trial counsel claim on direct appeal. Alabama does not bar a defendant from raising ineffective assistance of counsel claims on direct appeal, and in this case Eggers was represented on appeal by a different lawyer than his trial counsel. Indeed, his direct appeal counsel did raise some ineffective assistance of trial counsel claims on appeal, just not this specific claim.[12] On the other hand, it could be said that raising an ineffective assistance of trial counsel claim in full is impracticable at the direct appeal stage, because it requires counsel to conduct a full scale investigation with approval of discovery for records, which often takes

---

[11]      Recall that *Martinez* did not apply when Eggers sought to utilize it to establish cause and prejudice for his failure to raise an ineffective assistance of *appellate* counsel claim during Rule 32 proceedings, as discussed in section IV. 3, *supra*. The difference is that here, Eggers seeks to utilize it to establish cause for failure to raise an ineffective assistance of trial counsel claim.

[12]      In ground three of the amended petition, discussed in section IV. 3 of this opinion, *supra*, Eggers alleged that direct appeal counsel was ineffective for failing to raise this particular claim on direct appeal.

longer than the time afforded direct appeal briefs to be submitted. Ultimately, the Court need not determine whether Eggers's specific circumstances come within the purview of *Martinez* and *Trevino*, because even assuming they did, the Court would still have to find Eggers's substantive ineffective assistance of trial counsel claim to have "some merit." *See Martinez*, 132 S. Ct. at 1318 ("To overcome the default, a prisoner must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit."). Here, for the reasons explained below, the claim is without merit, so Eggers cannot demonstrate the requisite prejudice under *Martinez* to entitle him to relief.

It is well established with regard to ineffective assistance claims that defense counsel has "a duty to make reasonable investigations" of potential mitigating evidence or "to make a reasonable decision that makes particular investigations unnecessary." *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S. Ct. 2527, 2535 (2003) (quoting *Strickland*, 466 U.S. at 691, 104 S. Ct. at 2066). In any ineffectiveness case, an attorney's "decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 521-22, 123 S. Ct. at 2535 (quoting *Strickland*, 466 U.S. at 691, 104 S. Ct. at 2066). However, counsel's duty to investigate "does not

necessarily require counsel to investigate every evidentiary lead." *Williams v. Allen*, 542 F.3d 1326, 1337 (11th Cir.2008). "Under *Strickland*, strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* (quotation marks and citations omitted). *Compare Strickland*, 466 U.S. at 699, 104 S. Ct. at 2070 (stating that counsel's "decision not to seek more character or psychological evidence than was already in hand was . . . reasonable"), with *Porter v. McCollum*, 558 U.S. 30, 39-40, 130 S. Ct. 447, 453 (2009) (noting that counsel "failed to uncover and present any evidence of Porter's mental health or mental impairment, his family background, or his military service," and "[t]he decision not to investigate did not reflect reasonable professional judgment").

Eggers's first contention on this claim is that trial counsel failed to investigate certain witnesses and records for the guilt phase, and he faults counsel for only presenting Dr. Shealy's testimony to establish that Eggers lacked specific intent to commit capital murder. Eggers claims that had counsel thoroughly investigated for the guilt phase of his trial, they would have found that his mental illness began to manifest itself in early adulthood, sixteen years before the crime; that he often experienced visual hallucinations that people were watching or following him; that he told his wife that the Monks Motorcycle Club were

attempting to kill him; and that he was involuntarily committed in a psychiatric hospital for several days in El Paso, Texas, in 1987. Eggers also contends that had they investigated further, counsel would have learned that some of his family members had a history of mental illness: 1) his brother David has paranoid schizophrenia and was hospitalized in California; 2) Eggers's maternal grandmother had a "nervous breakdown," talked to the refrigerator, believing that it was communicating with her, once stopped a policeman to ask him whether he could talk through his police radio, confiding to him that she also heard people talking over her radio and that she was able to read people's minds, and once pulled a disabled woman from her wheelchair because she thought she was a Russian spy; 3) Eggers's great aunt Eva also had a nervous breakdown and was a hoarder and a recluse and wouldn't let anyone in her home, threw rocks at children, wrapped her feet in rags and wore them like shoes, and was once committed to a state mental hospital for two weeks; 4) Eggers's mother suffered from depression, for which she takes Valium, and 5) his other brother Carl suffers from paranoia, although not to the extent suffered by his brothers.

The Court cannot say that defense counsel's failure to investigate and put on this evidence failed to satisfy professional norms because all of the evidence is either repetitive or largely cumulative of evidence that was already before the jury.

As previously noted, before trial, at defense counsel's request, the trial court had a mental health evaluation conducted of Eggers. Then at trial, counsel raised an insanity defense, and had Eggers evaluated by Dr. Shealy, who provided a thorough report after spending over six hours with Eggers, speaking with his brother and sister by phone, and conducting various tests. Dr. Shealy testified that Eggers suffers from intermittent explosive disorder and paranoid personality disorder, was briefly hospitalized in 1987, most likely the result of significant amphetamine abuse combined with a predisposition to mental disorder, and that his brother suffers from paranoid schizophrenia and is currently institutionalized. Thus the jury already knew all of this information. The rest of the items of "new" evidence Eggers says counsel should have uncovered pertain to the sufferings of his family members, and not to him directly. While such evidence might indeed indicate that Eggers had a genetic predisposition to paranoid behavior, counsel already presented to the jury that Eggers exhibited such behavior, through the testimony of Dr. Shealy. The duty to conduct a substantial investigation simply does not demand that counsel uncover every shred of evidence in support of a defense. Trial counsel is of course limited by time and financial resources. *See Rogers v. Zant*, 13 F.3d 384, 387 (11th Cir. 1994) ("*Strickland* indicates clearly that the ineffectiveness question turns on whether the decision not to make a particular investigation was

reasonable. This correct approach toward investigation reflects the reality that lawyers do not enjoy the benefits of endless time, energy or financial resources.") (internal citation omitted); *Atkins v. Singletary*, 965 F.2d 952, 959-60 (11th Cir. 1992) ("At some point, a trial lawyer has done enough. . . . A lawyer can almost always do something more in every case."). With Dr. Shealy's testimony "in hand," which revealed that Eggers had a predisposition to paranoid behavior and a brother currently institutionalized, the Court cannot say that defense counsel was objectively unreasonable in not investigating all of Eggers's other family members to determine whether each one had a history of mental illness.

Eggers also contends that counsel was ineffective for allowing Dr. Shealy to testify during the guilt phase, because, he claims, Dr. Shealy's testimony undermined rather than supported the defense's theory that Eggers was not guilty by reason of insanity because he was incapable of forming the intent to murder. In support, Eggers points out that while Dr. Shealy testified that Eggers levied the first blows against Mrs. Murray during an explosive rage episode during which he did not understand the nature of his actions, the psychologist admitted on cross examination that when Eggers subsequently drove her body to another location, kicked her, and put a tree limb on her neck and stood on it to make sure she was dead, he intended to kill her and was no longer in an explosive rage:

Q. And its obvious from his statement and from your interview that, in fact, he wanted to make sure she was dead, didn't he?

A. Yes.

Q. And you testified on the intent for the defense he intended to kill her on that cemetery road, didn't he?

A. He intended yes, he intended for her to be dead.

[C.R. Vol. 9 at 1209.] Eggers's argument is essentially that, had counsel properly investigated by discovering what Dr. Shealy was going to say in preparation for trial, they would not have called him as an expert witness. According to Eggers, counsel's decision to call Dr. Shealy is thus not the type of strategic decision that *Strickland* insulates from scrutiny, because it was based on a less-than-complete investigation.

Eggers cites *Combs v. Coyle*, 205 F.3d 269 (6th Cir. 2000), in support of his claim that it is per se deficient performance for defense counsel to elicit evidence that disproves his own case. In *Combs*, the defendant pursued at the guilt phase the theory that "he was too intoxicated from alcohol and drugs to form the requisite intent to kill [the victims]." *Id.* at 273. The defendant's only expert witness, a psychologist, testified on cross-examination that while the defendant was intoxicated, he nevertheless acted with intent and purpose. *Id*. This was understandably damaging to his defense. The Sixth Circuit held that counsel's

performance was deficient because counsel had presented the psychologist's testimony without undertaking a full investigation. *Id.* at 288. The court stated, "Regardless of whether Combs's counsel should have known or instead actually knew [the expert's] opinion regarding Combs's intent, however, counsel's decision to put him on the stand was objectively unreasonable." *Id.* The court did not discuss the investigation or preparation undertaken by the defendant's counsel; neither did it discuss any preparation of the expert witness.

*Combs* is not binding on this Court and distinguishable in any event. First, the expert witness's testimony in *Combs* was particularly damaging because defense's sole strategy was showing that intoxication prevented the defendant from forming the requisite intent. *Id.* at 273. "[The expert witness's] testimony directly contradicted the sole defense theory that Combs lacked the requisite intent to commit murder." *Id.* at 288. In other words, Combs's counsel called the expert witness for one purpose and the witness failed them. *Id.* In contrast here, Eggers defense counsel repeatedly told the jury that Dr. Shealy's testimony was not only offered to show that Eggers was guilty of a "heat of passion" type slaying, but it was also offered to explain to the jury how Eggers "got to the point" that he committed this crime. [C.R. Vol. 10 at 1372, 1380.] Indeed, Dr. Shealy testified that Eggers had been a victim of verbal and physical abuse from his alcoholic father

during his childhood, that he had one prior episode of rage-related violence during the ninth grade, that he had abused drugs and alcohol in his past, that he suffered from paranoid personality disorder and intermittent rage disorder, that his brother has been mentally ill since childhood, and that he has a perception of himself as a victim of others who have betrayed or persecuted him and had a lifelong history of emotionally marginal relationships. It was Dr. Shealy's opinion that this combination of factors led Eggers to act in an episode of rage that was out of proportion with the circumstances. Indeed, the bulk of Dr. Shealy's testimony was helpful to the defense.

Second, it should be noted that Dr. Shealy's written report, which the record indicates counsel reviewed before he testified, stated that there was no premeditated aspect to Eggers's offense, which was consistent with Eggers's counsel's defense theory. It is thus difficult to conclude that counsel should be faulted for Dr. Shealy's surprise testimony to the contrary on cross-examination. Indeed, Dr. Shealy opined in his report:

> Because of the explosive rage episodes causing the victim's death, it is questionable as to whether the defendant understood the nature of his actions during the rage episode. He clearly knew immediately before and after the rage episode that his behavior was wrong. *As the precipitating cause of the rage was the mental disorder described as Intermittent Explosive Disorder, there is no support for the premise of premeditated intent.*

[C.R. Vol. 3 at 494 (emphasis added).] The record before this Court indicates that Eggers's counsel had reviewed Dr. Shealy's report prior to him giving his testimony. Although Eggers's failure to raise this particular claim during Rule 32 proceedings prevented the possibility of there being an evidentiary hearing on this claim wherein counsel perhaps would have testified about her investigation of Dr. Shealy, in a signed declaration that she submitted in 2006 in response to a complaint of misconduct Eggers filed against her with the Alabama State Bar Disciplinary Commission, she wrote:

> From my experience as a defense attorney, my contacts with Mr. Eggers, and my knowledge of the facts of the case I knew that we did not have a defense that met the standard of insanity in Alabama. . . . It was my opinion that a mental evaluation of Mr. Eggers was [sic] not be helpful and might even be harmful. Nevertheless, he continued to insist and so, erring on the side of caution, I had him evaluated by Dr. Alan Shealy, as well respected forensic psychologist. Dr. Shealy's examination showed that Mr. Eggers had been a victim of abuse in his childhood, had abuse [sic] drugs and alcohol in his past, and suffered from an intermittent rage disorder. This confirmed what I expected; Mrs. Eggers had some mental issues, but nothing that would rise to an insanity defense. The information was presented at trial in hopes of providing information to the jury that might bolster our assertion that Mr. Eggers was guilty of a "heat of passion" type slaying but not a capital murder.

[Doc. 20-13 at 25; 20-14 at 1.][13] Counsel's statement above suffices to convince this Court that she conducted an adequate investigation of Dr. Shealy before putting him on the stand. In this way, this case is similar to *Hamilton v. Workman*, 217 F. App'x 805 (10th Cir. 2007) (order denying certificate of appealability). There, the Tenth Circuit found no ineffective assistance of counsel where counsel called an expert witness who, to counsel's surprise, gave a forensic opinion regarding a blood splatter that contradicted one of the defense's theories. *Id.* at 809. When counsel elected to call the expert as a witness, he had no knowledge that the expert's testimony would be inconsistent with defense's theory, despite having conducted an adequate inquiry. *Id.* at 810. In finding no deficient performance, the court adopted the analysis of the magistrate judge below, as follows:

> The undersigned cannot conclude that utilizing a witness after asking the pertinent questions, conducting the necessary investigation, and receiving answers consistent with the theory of defense fell below an objective standard of reasonableness. . . . Because counsel's actions were not objectively unreasonable, Petitioner has failed to establish that the application of *Strickland* by the Oklahoma Court of Criminal Appeals was unreasonable. . . .

*Id.* The Tenth Circuit's conclusion comports with *Strickland*'s instruction to courts on how to address ineffective assistance of counsel claims in hindsight.

---

[13]   Counsel's response to Eggers's disciplinary complaint is not a part of the State court record but was submitted to the Court by Eggers as part of a "universal reference appendix" in support of his claims.

*Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065 (instructing courts to avoid second-guessing counsel's performance after it has proved unsuccessful and instead attempt to reconstruct the circumstances of counsel's challenged conduct, evaluating the conduct from counsel's perspective at the time). As in *Hamilton*, because Eggers's counsel conducted an adequate investigation of Dr. Shealy and his report appeared to be consistent with the theory of the defense that Eggers's murder was not premeditated, counsel's decision to use that witness cannot be considered deficient performance, despite Dr. Shealy's admission on cross-examination. *See Strickland*, 466 U.S. at 690, 104 S. Ct. at 2066 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."); *Hoxsie v. Kerby*, 108 F.3d 1239, 1246 (10th Cir. 1997) (stating that in the context of choosing to call a witness, "[f]or counsel's [decision] to rise to the level of constitutional ineffectiveness, the decision . . . must have been completely unreasonable, not merely wrong, so that it bears no relationship to a possible defense strategy") (internal quotation marks omitted). Bearing in mind that this Court's scrutiny of Eggers's counsel's performance must be highly deferential, it concludes that counsel's performance was not unconstitutionally deficient. The Court need not address the prejudice prong, and thus concludes that the ineffective assistance claim lacks the merit necessary to

enable Eggers to use the rule in *Martinez* as a vehicle for establishing cause and prejudice to excuse the procedural default of this claim.

The second part of this claim is Eggers's contention that his counsel failed to investigate and present certain mitigating evidence at sentencing, which prejudiced him. The background facts related to Eggers's sentencing are as follows. The State put on one witness: Mrs. Murray's husband, who gave a victim impact statement, describing how the death of his wife impacted him and his family members. Then, for mitigation purposes, Eggers's counsel asked jurors to recall certain aspects of Dr. Shealy's guilt-phase testimony about Eggers's chaotic upbringing. Dr. Shealy had testified that Eggers's father was "very violent, he would come home drunk and would beat the hell out of all of [them]," that his father once beat Eggers "fifty lashes with a leather belt," that his father burned the couch with cigarettes and threw an aquarium, and that their father had once tried to run their mother over with the car. [C.R. Vol. 9 at 1140.] He had also testified that he had been told "that the whole family had mental problems from the abuse because it was so severe," but that David Eggers was especially impacted because he had paranoid schizophrenia. [*Id.*] Further, he had stated that he had been told that Eggers "had always seemed strange, couldn't deal with people, was always scared that people he had 'narc'd on,' . . . were trying to kill him, and that [Eggers] had gone to or been

sent to a mental hospital." [*Id.* at 1141.] And from his testing, Dr. Shealy had concluded that Eggers had paranoid personality disorder and intermittent explosive disorder. Dr. Shealy's report was admitted into evidence for the jury to consider during sentencing.

Eggers then testified at his sentencing. He told the jury that he was born in 1967; that his father was in the military; he grew up in California; that his wife had divorced him while he awaited trial; and he had four children that he loved and took care of but that he was no longer a good role model for them. He testified that Dr. Shealy's testimony about his father's abuse during his childhood was mostly accurate, but despite his defense counsel's attempts to get him to elaborate on his traumatic upbringing, he declined to do so. Then Eggers, against the advice of his counsel, read a statement that he wrote in which he expressed remorse for his crime and asked the jury to sentence him to death. On cross examination, the prosecutor elicited information from Eggers such as that he had a gambling addiction, that he assaulted his eldest son in Fresno, California, that he had involved his eldest son in a flight from this crime, and that he had beaten the victim to death even after she befriended him and tried to help him. On redirect, Eggers testified that he had never been convicted of a serious crime.

Eggers's counsel then called Jean Parvin, a pen pal of Eggers's while he was in jail awaiting trial. She testified that Eggers was honest with her about the crime and had sent her hand-made drawings and artwork from jail. The final mitigation witness was the Sheriff of Walker County, who testified that Eggers had not been violent in jail, although he admitted on cross examination that it had been reported to him that Eggers was involved in an uprising at the jail where some property was damaged.

At the close of the evidence, the jury was instructed that they were to determine if any of the following aggravating circumstances existed: the fact that the murder was committed during the course of a robbery, committed during the course of a kidnaping, and that it was especially heinous atrocious and cruel. They were instructed that if they found one or more aggravating circumstance to exist, to weigh those against mitigating circumstances such as that Eggers had no significant history of prior criminal activity, that the capital felony was committed while he was under the influence of extreme emotional or mental distress, or any others it found to exist. The jury returned a recommendation of the death sentence by an 11-1 vote.

Eggers now argues for the first time in any proceeding that his counsel's failure to unearth and set forth the following details about Eggers's background at

sentencing was deficient performance. Eggers's mother quit school before finishing the eighth grade, left home because her parents were abusing her, got married at thirteen years old, had her first child at fourteen, and was beaten by her first husband. Eggers's father (Eggers's mother's second husband) drank heavily and beat his wife, causing her to repeatedly leave home with the children only to return to him later; he once tried to run over his wife with their car; he once tried to race another car during a game of chicken with his children in the car; he beat his children unmercifully; he often beat Eggers with a belt; once when Eggers damaged the furniture he refused to let Eggers sit on the furniture; and he acted in a sexually inappropriate manner with Eggers's sister such that she left the house at an early age. After Eggers's mother and father divorced, his mother became depressed and had her mentally-ill mother living with the family, the family was impoverished, and his mother dated men who mistreated her. She ended up marrying a third husband when Eggers was fourteen years old, and she and the husband both became alcoholics, fighting excessively. Her third husband also assaulted Eggers and fought with all of the children, and Eggers began cutting his wrists with a butcher knife out of stress. Eggers's brother David had attention deficient and hyperactivity disorder at eleven years old, had problems in school, was often beaten by gangs in school, and he was in and out of mental institutions as an adolescent

before finally being committed permanently for paranoid psychosis. Eggers was involved in the beatings and fights that his brother David got into.  Eggers himself earned failing grades in school, did not graduate, was victimized by gang violence in his neighborhood, and was suspended, charged with assault, put on two years of probation, and made to pay restitution when he broke another student's nose in the ninth grade. Eggers left home at fifteen and moved in with a thirty-year-old man who made one attempt to sexually assault him; but he also continued to work with the man at his auto center. Eggers later lived in a vacant house for a couple of weeks as a teenager, and this is when he first met Nikkii, his future wife. He had his first child with Nikkii at seventeen. As an adult Eggers tried to be a good husband and father to his four children, coaching his children's sports teams, but he also had trouble holding down jobs, drank heavily and developed a gambling addiction, and suffered from paranoia. He frequently saw things that Nikkii didn't and tried to convince her that she also saw them, such as if he saw a helicopter flying over their house, he thought that it had been sent specifically to watch him, and he often arrived first at his construction jobs and left last, searching the job site for conspirators. After believing that Nikkii was having an affair, Eggers abruptly moved from California to Nevada and then Georgia, taking his three young sons with him. He left his two youngest sons to be raised by his sister there. He then

bounced around Kentucky and Tennessee, working various jobs. On March 14, 2000, he was arrested in Fresno, for repeatedly striking his son, Michael Jr., in the face. The State ultimately released Michael, Jr. to his father's custody and they continued living together. By late 2000, he was working in the Omelet Shoppe, in Jasper, Alabama as a cook but was eventually fired for not showing up to work.

"In assessing the reasonableness of an attorney's investigation, . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527, 123 S. Ct. at 2538. Of course, "a complete failure to investigate may constitute deficient performance of counsel." *Parker v. Sec'y for Dep't of Corr.*, 331 F.3d 764, 787 (11th Cir. 2003); *see also Housel v. Head*, 238 F.3d 1289, 1294 (11th Cir. 2001) (explaining that "a failure to investigate can be deficient performance in a capital case when counsel totally fails to inquire into the defendant's past or present behavior or life history"). That said, "no absolute duty exists to investigate particular facts or a certain line of defense." *Chandler*, 218 F.3d at 1318. Instead, a court's assessment of an attorney's investigation hinges on whether that investigation—or the decision to limit it—was reasonable. *Strickland*, 466 U.S. at 691, 104 S. Ct. at 2066. Finally, "[a] decision to limit investigation is 'accorded a strong presumption of reasonableness,'" *Mills v. Singletary*, 63 F.3d

999, 1021 (11th Cir. 1995) (internal quotation marks omitted), and "to be effective a lawyer is not required to 'pursue every path until it bears fruit or until all hope withers.'" *Williams v. Head*, 185 F.3d 1223, 1237 (11th Cir. 1999) (quoting *Foster v. Dugger*, 823 F.2d 402, 405 (11th Cir.1987)).

With regard to assessing prejudice flowing from counsel's performance, courts are required to "evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—in re-weighing it against the evidence in aggravation." *Williams*, 529 U.S. at 397-98, 120 S. Ct. at 1515. "That same standard applies—and will necessarily require a court to 'speculate' as to the effect of the new evidence—regardless of how much or how little mitigation evidence was presented during the initial penalty phase." *Sears v. Upton*, 561 U.S. 945, 955, 130 S. Ct. 3259, 3266-67 (2010). Again, where a petitioner challenges a death sentence, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695, 104 S. Ct. at 2069.

Applying these standards here, Eggers's counsel already knew from their investigations (and the jury already heard) that Eggers had a predisposition for and exhibited paranoid behavior, had a brother currently institutionalized for paranoid

114

behavior, had a hard upbringing including a physically abusive father and an incident of assault when he was in the ninth grade, and had briefly been hospitalized for paranoid delusions in 1987. Eggers's counsel's failure to uncover these "new" details about his life was not unreasonable, because most of these facts would have done nothing more than simply amplify the themes about Eggers's life and background that were already raised at trial and sentencing. For example, while the jury and judge did not hear the story about Eggers's father beating him for damaging the furniture, they knew (from what Eggers's brother told Dr. Shealy) that Eggers's father would come home drunk and beat "the hell" out of all of the children, that he beat Eggers fifty lashes with a leather belt, that he would burn the coach with cigarettes, that he once threw an aquarium through the window, that his children were "scared to death" of him, and that he tried to run Egger's mother over with the car. [C.R. Vol. 9 at 1140.] Similarly, while the judge and jury did not hear that Eggers frequently saw things that Nikkii didn't and tried to convince her that she also saw them, such as if he saw a helicopter flying over the house, he thought that it had been sent specifically to watch him, and he often arrived first at his construction jobs and left last, searching the job site for conspirators, they already knew, from Dr. Shealy's testimony, that Eggers "was always scared that people he had 'narc'd on' . . . were trying to kill him." [C.R.

Vol. 9 at 1141.] In similar cases the Eleventh Circuit has found no prejudicial effect flowing from the fact that such cumulative evidence was not presented at sentencing. *See Marquard v. Sec'y for Dep't of Corr.*, 429 F.3d 1278, 1308 (11th Cir. 2005) ("There is no reason to believe that added details about Marquard's troubled childhood and substance abuse—which the sentencing court clearly recognized in imposing a death sentence—would have had any effect on the sentence."); *Robinson v. Moore*, 300 F.3d 1320, 1347 (11th Cir. 2002) ("While the additional mitigation witnesses procured by Robinson's [post-conviction] counsel could have presented the resentencing jury and trial judge with more details, or different examples, of these aspects of Robinson's life, these aspects of his life were nonetheless known to the resentencing jury and trial judge."); *Grayson v. Thompson*, 257 F.3d 1194, 1227-28 (11th Cir. 2001) ("Although the graphic picture of Grayson's home life painted at the state habeas proceedings was not presented at trial, the judge did not wholly disregard Grayson's unfortunate background in sentencing him to death. In light of the horrendous nature of this crime, we find no reasonable probability that the sentence would have been different if the judge and jury had possessed detailed information regarding Grayson's history."). And to the extent there are some "new" facts that were not presented at sentencing, such as that Eggers's step father also beat him, that his own father's physical abuse

continued into Eggers's adolescence, that he was once fondled by an older man with whom he was living, and that he cut his own wrists with a knife due to stress at home, they either continue the themes already presented in mitigation or simply don't rise to the level of evidence that would ultimately affected the aggravators and mitigators found by the jury and judge.

Eggers points out that in affirming the jury's recommendation to impose the death sentence of 11-1, the judge concluded that there were two statutory aggravating factors warranted by the conviction (murder during robbery and kidnaping) and two mitigating factors—Eggers's remorse, which was a non-statutory mitigating factor, and lack of prior criminal history, a statutory mitigating factor. The judge did not consider Eggers's mental illness or emotional disturbance during the commission of the crime to be a mitigating factor. [C.R. Vol. 3 at 545.] However, this does not mean that, had the jury and judge had these additional anecdotes from Eggers's life before them, they would have found the existence of any additional mitigating factors, much less that they would have then found the mitigating factors to outweigh the aggravating ones. First of all, none of the anecdotes detailed above establish any additional statutory mitigating circumstances not already found by the judge. Under Alabama law, the statutory mitigating circumstances are: (1) the defendant has no significant history of prior

criminal activity; (2) the capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance; (3) the victim was a participant in the defendant's conduct or consented to it; (4) the defendant was an accomplice in the capital offense committed by another person and his participation was relatively minor; (5) the defendant acted under extreme duress or under the substantial domination of another person; (6) the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired; and (7) the age of the defendant at the time of the crime. Ala. Code § 13A-5-51 (1975). None of the evidence concerning Eggers's background conclusively establishes that he committed the crime while he was under the influence of an extreme mental or emotional disturbance. Moreover, the trial testimony detailed a gruesome murder involving a robbery and kidnaping. Eggers beat the victim until she was unconscious and then drove her down a road, eventually pushing her out of the truck onto the road. He stated in his confession that she was not dead at the time he pushed her out of the truck and that she made some noises while in the road. He then choked her and kicked her with steel toed boots and dragged her off the road into a wooded area where she was not visible from the road and left her, but not before stomping on a four-foot-long tree branch placed on her neck to ensure that

she had stopped breathing. The victim died from multiple blunt-force trauma and strangulation, and the coroner's testimony established that the initial injuries to her face would have been very painful but were not fatal, and that she remained alive and suffering for several minutes after those injuries were inflicted. After murdering the victim, Eggers then used her bank card to withdraw hundreds of dollars for his use at a casino. This is not a case where the weight of the aggravating circumstances or the evidence supporting them was weak. There is no reasonable probability that the murder would have been mitigated to any appreciable extent had counsel uncovered this additional anecdotal evidence regarding Eggers's unfortunate upbringing. It can also not be ignored that Eggers asked the jury to sentence him to death at his sentencing, against his counsel's advice.

The Court's conclusion that Eggers was not prejudiced by his counsel's failure to put on this additional evidence at sentencing is also bolstered by the fact that all of the evidence presented at sentencing, plus the new evidence Eggers now presents, does not reveal the kind of abuse or deprivation inherent in other cases where *Strickland* prejudice actually has been found:

> [F]or example, in *Wiggins*, the medical, school, and social services records presented at the post-conviction proceedings revealed that the defendant suffered severe physical and sexual abuse at the hands of his alcoholic mother and various foster parents throughout his childhood, teenage years, and even into early adulthood. 539 U.S. at 516, 123 S. Ct. 2527. Wiggins' mother, a "chronic alcoholic," frequently left

Wiggins and his siblings home alone for days at a time, which forced them to "beg for food and to eat paint chips and garbage." *Id.* The mother routinely beat the children for breaking into the kitchen, which she often kept locked. *Id.* Wiggins's mother had sex with men while her children slept in the same bed. *Id.* And on one occasion, notably, Wiggins' mother forced the petitioner's hand against a hot stove burner, which resulted in an injury that required hospitalization. *Id.* Moreover, at the age of six, Wiggins was placed in foster care where he was physically abused by his first and second foster mothers, and his second foster father repeatedly molested and raped him. *Id.* To escape the abuse Wiggins ran away from a foster home at age sixteen but was returned to one where he was raped again and repeatedly by the foster mother's sons. *Id.* After leaving the foster care system, Wiggins entered a Job Corps program where he once again was sexually abused, this time by his supervisor. *Id.*

In *Williams v. Taylor*, juvenile records presented at the post-conviction proceedings indicated that the petitioner's home had excrement and urine on the floor; "[t]he children were all dirty and none of them had on under-pants"; the parents were intoxicated; and at one point "[t]he children had to be put in Winslow Hospital, as four of them, by that time, were definitely under the influence of whiskey." 529 U.S. at 395 n. 19, 120 S. Ct. 1495 (quoting the record). In addition, social services records revealed that Williams' parents were "imprisoned for the criminal neglect of Williams and his siblings, that Williams had been severely and repeatedly beaten by his father, that he had been committed to the custody of the social services bureau for two years during his parents' incarceration (including one stint in an abusive foster home), and then, after his parents were released from prison, had been returned to his parents' custody." *Id.* at 395, 120 S. Ct. 1495 (footnote omitted). There also was evidence that Williams was borderline mentally retarded, had suffered repeated head injuries, and "might have mental impairments organic in origin." *Id.* at 370-71, 120 S. Ct. 1495.

*Boyd*, 592 F.3d at 1299-300. In *Boyd*, the Eleventh Circuit found that the case before it did not contain the kinds of circumstances present in *Wiggins* and *Williams*, thus precluding a finding of *Strickland* prejudice for the attorney's failure to raise the additional evidence at sentencing. The same is true here. For example, as compared with those other cases, the record here contains one instance of attempted sexual misconduct against Eggers, but is otherwise devoid of evidence that he was repeatedly sexually abused or raped by parental figures, or anyone else. In short, although Eggers's background was undeniably harsh, it does not rise to the level at which prejudice has been found. *See, e.g., Grayson*, 257 F.3d at 1209, 1230 n. 20 (noting that "the mitigating evidence available in [*Williams*] was far more compelling than the evidence presented on behalf of Grayson in his state habeas proceedings" that, among other things, his family life had been "violent and chaotic"); *Windom v. Secy, Dept. of Corrs.*, 578 F.3d 1227, 1251 (11th Cir. 2009) (holding that a brain-damaged and mentally ill petitioner who had suffered a difficult and impoverished upbringing, during which he was physically abused by his father and bullied by his classmates, did not compare to the "'powerful mitigating narrative' told by the gruesome circumstances of Wiggins' background"). In sum, given the strength of the State's case against Eggers and the nature of the crime itself, there is no reasonable probability that the jury would

have recommended, or that the judge would have imposed, a non-death sentence even if they had been confronted with the mitigating evidence Eggers asserts his counsel should have discovered and introduced. As such, this portion of Eggers's ineffective assistance of trial counsel claim similarly lacks the merit necessary to enable him to use the rule in *Martinez* as a vehicle for establishing cause and prejudice to overcome his failure to raise the claim during Rule 32 proceedings. Habeas relief is not warranted on this claim.

> 9.  **The claim that the State withheld evidence related to Eggers's January 1987 arrest and subsequent 7-day involuntary commitment in a mental hospital in El Paso, Texas, in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963)**

Eggers raised this claim for the first time in his amended Rule 32 petition as claims 1-6. The circuit court, which entered the last reasoned decision, denied the claims as procedurally barred under Ala. R. Crim. P. 32.2(a)(3) and (5) because Eggers did not raise them in his motion for new trial or on direct appeal. However, the circuit court also denied the claims as insufficiently pleaded under Ala. R. Crim. P. 32.3 and 32.6(b) and as meritless on their face, writing:

> . . . Eggers has filed to specifically allege facts in his petition, even if true, that would constitute a *Brady* violation. Eggers has failed to allege what, if any, specific exculpatory information was contained in the El Paso Police Department or the Thomason General Hospital records. Indeed, he fails to even plead facts demonstrating that any such records were possessed by the State and not turned over to trial counsel.

Finally, this claim is meritless on its face. Eggers has failed to plead how his El Paso Police Department records or hospital records would exculpate him for a murder that occurred in 2000 in Alabama. Furthermore, this evidence simply is not *Brady* evidence because it was within the knowledge of and available to Eggers. Eggers was and is aware of his own criminal history, and nothing prevented him from independently seeking and receiving evidence of his prior criminal activity, to the extent such evidence would have aided his defense. Accordingly, this claim is dismissed pursuant to Ala. R. Crim. P.32. 7(d) for failure to state a claim upon which relief can be granted.

[C.R. Vol. 22, Rule 32 Order at 9-10.]

A Rule 32 dismissal for lack of specificity is a merits ruling in this circuit. *Borden*, 646 F.3d at 812-13. As such, this Court conducts the deferential AEDPA review of the state court's decision pursuant to 28 U.S.C. § 2254(d), and Eggers cannot obtain relief on this claim unless he can show that the denial of relief on this claim in state court "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." *See* 28 U.S.C. § 2254(d).

The circuit court's decision was not contrary to or an unreasonable application of *Brady* or based on an unreasonable determination of the facts before it. As explained by the Eleventh Circuit:

A *Brady* violation has three components: "[1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999). Evidence is not considered to have been suppressed if "the evidence itself . . . proves that [the petitioner] was aware of the existence of that evidence before trial." *Felker v. Thomas*, 52 F.3d 907, 910 (11th Cir. 1995). The prejudice or materiality requirement is satisfied if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985); *see also Kyles v. Whitley*, 514 U.S. 419, 433, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995). Materiality is determined by asking whether the government's evidentiary suppression undermines confidence in the guilty verdict. *See Kyles*, 514 U.S. at 434, 436–37 & n. 10, 115 S. Ct. 1555.

*Boyd v. Comm'r, Ala. Dept. of Corrs.*, 697 F.3d 1320, 1334-35 (11th Cir. 2012). In its opinion denying relief, the circuit court directly applied the second prong of the *Brady* analysis, finding that there was no suppression by the State because Eggers was aware of his own criminal history and hospitalization in 1987 and nothing prevented him from obtaining such records in aid of his defense. For purposes of a *Brady* claim, the State is under no duty to disclose information already known by the defendant or material that is available or accessible through the exercise of reasonable diligence. *See Maharaj v. Sec., Dep't of Corr.*, 432 F.3d 1292, 1315 (11th Cir. 2006) ("Our case law is clear that '[w]here defendants, prior to trial, had within their knowledge the information by which they could have ascertained the

alleged *Brady* material, there is no suppression by the government.'") (quoting *United States v. Griggs*, 713 F.2d 672, 674 (11th Cir. 1983)); accord *LeCroy v. Sec., Fla. Dept. of Corrs.*, 421 F.3d 1237, 1268 (11th Cir. 2005) (noting that there was no *Brady* violation because the defendant could have obtained the information had he used "reasonable diligence").

There is no doubt that Eggers knew about and could have obtained these records himself. At the June 5, 2002, pre-trial hearing, Eggers and his own counsel disclosed that he had been institutionalized in El Paso, Texas, sixteen years prior. The prosecutor stated that the State would look for the records from El Paso. Eggers agreed to sign a waiver to release the records to the State. Eggers now argues that because the prosecutor stated that he would look for the records, the State undertook an affirmative duty to obtain them, somehow absolving Eggers of the duty to marshal evidence in his own defense. But Eggers has not provided the Court with clearly established Federal law providing that such circumstances amount to a *Brady* violation. The case relied upon by Eggers, *Banks v. Dretke*, 540 U.S. 668, 124 S. Ct. 1256 (2004), concerned materially different facts. There, the prosecutors failed to disclose that a key witness was a paid police informant, and stood by as that witness affirmatively testified to the contrary. *Id.* at 694, 124 S. Ct. at 1274. The Court rejected the State's argument that the defendant could have

more diligently pursued the police officer involved, and in doing so might have discovered the witness's status. *Id.* at 695, 124 S. Ct. at 1274-75. The Court summarized the State's argument as one where "'the prosecution can lie and conceal and the prisoner still has the burden to . . . discover the evidence.'" *Id.* at 696, 124 S. Ct. at 1275 (citing the oral argument transcript) (alteration in original). In contrast here, Eggers has still not presented any evidence that the prosecution ever physically possessed these records, much less kept them from the defense; the prosecution merely stated that they would look for them. The prosecution made no false or misleading statements regarding what that evidence might show or where it might be found. Moreover, Eggers knew about the evidence.[14] When the defendant has "equal access" to the evidence, disclosure is not required.

The circuit court was also reasonable in its conclusion that the evidence was not exculpatory or favorable to Eggers, another prong of the *Brady* analysis. In describing why the records were not exculpatory, the circuit court observed that Eggers did not plead how his El Paso Police Department records or Thomason General Hospital records from 1987 would exculpate him for a murder that occurred in 2000 in Alabama. Eggers argues that they presumably would have corroborated a diagnosis of paranoid schizophrenia, which would have made the

---

[14]      Indeed, in her 2006 response to Eggers's disciplinary complaint, his counsel stated that she learned about the hospitalization from Eggers's family members, contacted authorities regarding records of the incident, but could not locate them. [Doc. 20-13 at 25.]

insanity defense a viable option. However, Eggers offers nothing more than an assumption that they would have corroborated a more dire diagnosis than what Drs. Shealy and Hooper reached. The records could have, on the other hand, shown nothing more than methamphetamine abuse on Eggers's part, a fact that would not have been exculpatory at all.

Finally, the circuit court was not unreasonable in its conclusion that the evidence was not material, or prejudicial.

> In deciding whether evidence was material for the purposes of a *Brady* violation, the question is not whether the conviction was "more likely" because the evidence was introduced or even whether the evidence "might have changed the outcome of the trial." *Strickler*, 527 U.S. at 289, 119 S. Ct. at 1952. Rather, Petitioner "must convince us that 'there is a reasonable probability' that the result of the trial would have been different if the suppressed documents had been disclosed to the defense." *Id.* "The word "reasonable" "is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434, 115 S. Ct. at 1566

*Maharaj*, 432 F.3d at 1316. For the same reasons already given, the Court cannot say that there is a reasonable probability that the outcome of the trial would have been different if these records had been disclosed to the defense. Indeed, the jury was already aware of the hospitalization because Dr. Shealy had been told that Eggers was briefly hospitalized in 1987 and testified as much at trial. He assumed

that the hospitalization was "most likely the result of significant amphetamine abuse combined with a predisposition to mental disorder." [C.R. Vol. 3 at 494.] Eggers now argues that the records were material because they would have made the insanity defense a viable option, but such an assumption is wholly conclusory and devoid of any basis in fact, since Eggers does nothing more than guess that the records would have indicated that he suffered from paranoid schizophrenia. The Court will not find prejudicial effect when the record is devoid of evidence as to what specific exculpatory information the allegedly suppressed evidence contained. For the foregoing reasons, the circuit court's application of *Brady* was not an unreasonable application or contrary to clearly established Federal law.

> **10.**   **The claim that the State violated *Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763 (1972), by causing Dr. Shealy, the defense expert, and Dr. Hooper, the State's expert, to present false testimony that Eggers was not insane due to the State's failure to disclose the 1987 El Paso hospitalization and arrest records to these experts**

Eggers raised this claim for the first time in his amended Rule 32 petition as claims 22-23 and 35. Claims 22 and 23 argued that the State withheld favorable evidence from expert witnesses. Claim 35 argued that the State made untruthful statements to the jury about Eggers's competency. The circuit court, which entered the last reasoned decision, ruled that the claims were procedurally barred under Ala. R. Crim. P. 32.2(a)(3) and (5) because they were not raised at trial or on

direct appeal and that they were not sufficiently specific under Ala. R. Crim. P. 32.3 and 32.6(b) because "Eggers does not specifically plead what evidence was withheld and which should have been provided to the expert witnesses." [C.R. Vol. 22 at 26, 27.]

A Rule 32 dismissal for lack of specificity is a merits ruling in this circuit. *Borden*, 646 F.3d at 812-13. As such, this Court conducts the deferential AEDPA review of the state court's decision pursuant to 28 U.S.C. § 2254(d), and Eggers cannot obtain relief on this claim unless he can show that the denial of relief on this claim in state court "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." *See* 28 U.S.C. § 2254(d).

The clearly established Federal law is contained in *Giglio v. United States*. As explained by the Eleventh Circuit:

> "*Giglio* error, a species of *Brady* error, occurs when 'the undisclosed evidence demonstrates that the prosecution's case included perjured testimony and that the prosecution knew, or should have known, of the perjury.'" *Davis v. Terry*, 465 F.3d 1249, 1253 (11th Cir. 2006) (quoting *Ventura v. Att'y Gen., Fla.*, 419 F.3d 1269, 1276-77 (11th Cir. 2005), cert. denied, --- U.S. ---, 127 S. Ct. 3010, 168 L. Ed. 2d 728 (2007)). To prevail on a *Giglio* claim, a petitioner must establish that "(1) the prosecutor knowingly used perjured testimony or failed to

> correct what he subsequently learned was false testimony; and (2)
> such use was material i.e., that there is 'any reasonable likelihood' that
> the false testimony 'could . . . have affected the judgment.'" *Id.* at
> 1253 (quoting *Giglio*, 405 U.S. at 154, 92 S. Ct. at 766). This standard
> of materiality is equivalent to the *Chapman v. California*, 386 U.S. 18,
> 24, 87 S. Ct. 824, 828, 17 L. Ed. 2d 705 (1967), "harmless beyond a
> reasonable doubt" standard. *Bagley*, 473 U.S. at 679 n. 9, 105 S. Ct. at
> 3382 n. 9.

*Ford v. Hall*, 546 F.3d 1326, 1331-32 (11th Cir. 2008). For *Giglio* violations, the

defendant is entitled to a new trial "if there is any reasonable likelihood that the

false testimony could have affected the judgment of the jury." *United States v.

Agurs*, 427 U.S. 97, 103, 96 S. Ct. 2392, 2397 (1976). "The could have standard

requires a new trial unless the prosecution persuades the court that the false

testimony was harmless beyond a reasonable doubt." *Smith v. Sec'y, Dept. of Corrs.*,

572 F.3d 1327, 1333–34 (11th Cir. 2009).

Simply put, this claim cannot survive where Eggers's *Brady* claim fails. *See*

section IV. 9, *supra.* Eggers states that the State collected, yet failed to disclose,

Eggers's 1987 Texas records respecting his commitment in Thomson General

Hospital, and then knowingly allowed Dr. Hooper to testify falsely that Eggers

"had no history of psychiatric treatment and no history of mental illness," [C.R.

Vol. 3 at 525] and allowed Dr. Shealy to testify that Eggers had no "significant"

history of treatment for mental illness. [C.R. Vol. 3 at 494.] However, because

Eggers presented nothing but a bare accusation that the State ever collected and

possessed these records, or what the records contained, it was not unreasonable for the state court to conclude that the State did not knowingly use perjured testimony. In any event, Dr. Shealy's statement that Eggers had no significant history of mental health treatment was not false: one brief hospitalization fourteen years prior to the murder could hardly be considered a "significant" history of treatment for mental illness. And even if it could be said that the State allowed Dr. Hooper to testify falsely when he said that Eggers had *never* been medically treated for psychiatric problems, given that Eggers had informed the State that he was committed in 1987, the falsehood was not material. The jury knew that Dr. Hooper did not personally evaluate Eggers, so his opinion would not have borne out the same facts as Dr. Shealy's, who met with Eggers and was told that he was hospitalized once in the past. The jury was aware that Eggers was briefly committed in 1987, and it was free to weigh this fact from Dr. Shealy's testimony against Dr. Hooper's and reach its conclusion about Eggers's insanity plea.

Given these circumstances, the Court cannot say that the circuit court's decision denying this claim violated *Giglio*. Habeas relief is not warranted on this claim.

**11.    The claim that Eggers was denied counsel during a custodial interrogation in violation of *Edwards v. Arizona*, 451 U.S. 477, 101 S. Ct. 1880 (1981)**

As Eggers concedes, this claim is unexhausted because, although Eggers raised it on direct appeal, and the ACCA denied it on its merits, his appellate counsel did not include it on petition for writ of certiorari in the Alabama Supreme Court. In order to exhaust state remedies, a habeas petitioner must present his claims through one full round of the State's trial and appellate review process, even to the state's court of last resort, even if that review is discretionary. *Pruitt*, 348 F.3d at 1359 (citing *O'Sullivan*, 526 U.S. at 845). Alabama's discretionary direct review procedures bring Alabama prisoner habeas petitions within the scope of this rule. *Id.* at 59. Dismissal of his habeas petition to allow Eggers to present this claim fairly as a federal claim in state court now would be futile because it is too late for him to return to state court to exhaust the claim by petitioning the Alabama Supreme Court for certiorari. Thus, because any state remedy with respect to this claim is procedurally barred by the state procedural rules noted above, Eggers's claim is procedurally defaulted from habeas review, unless some exception applies.

Eggers argues that his mental illness during direct appeal proceedings constitutes cause and prejudice to excuse the default. He argues had he not been incompetent during direct appeal, he would not have agreed with his counsel's decision to waive the claim before the Alabama Supreme Court. For the reasons stated in section IV. 3, *supra*, Eggers has not shown that he suffered any mental

issues that precluded him from making rational decisions about his case and aiding appellate counsel during the time that counsel was litigating his case in the Alabama appellate courts.

Regardless, even if the Court were to rule that cause and prejudice existed to excuse the procedural default of this claim, Eggers contends that such a ruling means that this Court must then review the ACCA's decision on his *Edwards* claim, which was the last state court opinion to consider the merits of the claim, pursuant to 28 U.S.C. § 2254(d). Thus assuming for the sake of argument that the Court could review the ACCA's decision for reasonableness, there is still no basis on which to find that it violated clearly established Federal law, for the following reasons. The thorough and well-reasoned portion of the ACCA's opinion addressing the *Edwards* claim on direct appeal is as follows:

> Eggers also contends that his statements were inadmissible because, he says, they were involuntary.

> As noted above, Agent Maldonado testified that when Eggers first came out of the tent, he initially identified himself as Clay, but that based on the description of Eggers they had received, he and the other law-enforcement officers believed that "Clay" was, in fact, Eggers, and Eggers subsequently admitted who he was and told the officers that his wallet, with all of his identification, was in the tent. Eggers was then arrested and transported to the Osceola County Sheriff's Department by a sheriff's deputy. Agent Maldonado testified that he could not remember which deputy transported Eggers to the sheriff's department and no one from the Osceola County Sheriff's Department testified at the suppression hearing or at trial; however,

Agent Maldonado testified at the suppression hearing that he was never informed that Eggers had made any kind of statement while being transported to the Sheriff's Department, but that Eggers had been transported "from the tent city to the Sheriff's Office with no statement." (R. 326.)

Once at the sheriff's department, Agent Maldonado said, he advised Eggers of his *Miranda* rights, Eggers indicated that he wanted to make a statement, and Eggers then signed a waiver-of-rights form. Agent Maldonado testified that he then advised Eggers that he was being arrested on a warrant for unlawful flight to avoid prosecution and that Eggers "asked me if I wanted to know where the body was." (R. 457.) Eggers then orally confessed to murdering Francis, provided details about the murder, and agreed to take law-enforcement officers to the location of Francis's body. While Agent Maldonado was writing his notes about Eggers's oral confession, he asked Eggers if he would be willing to make a written statement and Eggers agreed. Eggers then handwrote a short statement, again admitting to murdering Francis. The following morning, January 10, 2001, Eggers was brought before a Florida circuit judge and waived extradition.

Agent Maldonado testified that, although he and the other law-enforcement officers had their guns drawn when they entered the tent city, they did not put their guns to Eggers's head or otherwise threaten Eggers when they arrested him. Agent Maldonado also testified that Eggers never asked for a lawyer at any time in his presence; that he never promised Eggers any reward for making a statement; that he never threatened Eggers to get him to make a statement; and that he did not tell Eggers that it would be better for him if he made a statement or worse for him if he did not make a statement. Agent Maldonado specifically denied threatening to get Eggers's son, girlfriend, or father involved in the situation if Eggers did not make a statement.

In contrast, Eggers testified at the suppression hearing that when he was discovered in the tent city and initially asked what his name was, he did not give a false name, but asked for a lawyer. Eggers said that the officers ignored his request for a lawyer and asked him

what his name was again, and that he then identified himself and told the officers that his identification was in his wallet in the tent. While being transported to the Osceola County Sheriff's Department, Eggers said, he again requested a lawyer, and was told by the deputy that he "would have to take that up as soon as we got to the Sheriff's Office." (R. 347.) Eggers testified that when he arrived at the sheriff's department, Agent Maldonado did not advise him of his *Miranda* rights, but threatened him. According to Eggers, Agent Maldonado told him that he "had to answer some questions" and then said that if he did not answer the questions, he (Agent Maldonado) would get Eggers's girlfriend, father, and son involved. (R. 350.) Eggers said that it was only after Agent Maldonado threatened to involve his father and his son that he agreed to make a statement, and that only after he agreed to make a statement did Agent Maldonado advise him of his *Miranda* rights and did he sign the waiver-of-rights form. Eggers also testified that he waived extradition because he "had no choice," the "FBI was taking [my rights] away from me." (R. 354.)

After Eggers waived extradition, Joe Brzezinski, an investigator with the Alabama Bureau of Investigation, as well as other Alabama law-enforcement officers, flew to Kissimmee and transported Eggers back to Alabama. Upon arrival at the Walker County Airport in Jasper, Eggers took law-enforcement officers to the location of Francis's body. Inv. Brzezinski testified that when they got into the vehicles, he advised Eggers of his *Miranda* rights and asked Eggers if he was willing to continue cooperating, to which Eggers replied "that's what we're here for." (R. 293.) Eggers then led law-enforcement officers to the location of Francis's body, during which time he again admitted to murdering Francis and explained the events surrounding the murder. Inv. Brzezinski stated that Eggers was not coerced or threatened; that Eggers was not promised anything for his cooperation; and that Eggers was never told that it would be better for him if he cooperated. After Francis's body was located, Eggers was taken to the Walker County jail.

The following day, on January 11, 2001, Inv. Brzezinski went to the Walker County jail and spoke with Eggers again. Inv. Brzezinski testified that, before speaking with Eggers, he advised Eggers of his

*Miranda* rights; that Eggers indicated that he understood those rights; and that Eggers signed a waiver-of-rights form. Eggers then gave a third statement, again admitting to the murder of Francis and detailing the circumstances of that murder; that statement was audio taped. Inv. Brzezinski testified that Eggers was not threatened into making the statement; that Eggers was not promised anything for making the statement; and that no one told Eggers that it would be better for him to make the statement.

Eggers admitted at the suppression hearing that Inv. Brzezinski advised him of his *Miranda* rights before he took Inv. Brzezinski to where Francis's body was located and again before he gave his third statement to Inv. Brzezinski at the Walker County jail the next day, and that he was not threatened or coerced into making either of those statements. Eggers also admitted that he signed a waiver-of-rights form before he gave his third statement at the jail.

The general rule is that a confession or other inculpatory statement is prima facie involuntary and inadmissible and the burden is on the State to prove by a preponderance of the evidence that such a confession or statement is voluntary and admissible. *See, e.g., Ex parte Price*, 725 So. 2d 1063 (Ala. 1998). To prove voluntariness, the State must establish that the defendant "made an independent and informed choice of his own free will, that he possessed the capability to do so, and that his will was not overborne by pressures and circumstances swirling around him." *Lewis v. State*, 535 So. 2d 228, 235 (Ala. Crim. App. 1988). If the confession or inculpatory statement is the result of custodial interrogation, the State must also prove that the defendant was properly advised of, and that he voluntarily waived, his *Miranda* rights. *See Ex parte Johnson*, 620 So. 2d 709 (Ala. 1993), and *Waldrop v. State*, 859 So. 2d 1138 (Ala. Crim. App. 2000), aff'd, 859 So. 2d 1181 (Ala. 2002).

"'The question of whether a confession was voluntary is initially to be determined by the trial court.'" *Minor v. State*, 914 So. 2d 372, 388 (Ala. Crim. App. 2004), quoting *Jackson v. State*, 562 So. 2d 1373, 1381 (Ala. Crim. App. 1990). "[A]ny conflicts in the testimony or credibility of witnesses during a suppression hearing is a

matter for resolution by the trial court. Absent a gross abuse of discretion, a trial court's resolution of [such] conflict[s] should not be reversed on appeal." *Sheely v. State*, 629 So. 2d 23, 29 (Ala. Crim. App. 1993) (citations omitted). "[A] trial court's ruling based upon conflicting evidence given at a suppression hearing is binding on this Court, . . . and is not to be reversed absent a clear abuse of discretion." *Jackson v. State*, 589 So. 2d 781, 784 (Ala. Crim. App. 1991). "When there is conflicting evidence of the circumstances surrounding an incriminating statement or a confession, it is the duty of the trial judge to determine its admissibility, and if the trial judge decides it is admissible his decision will not be disturbed on appeal 'unless found to be manifestly contrary to the great weight of the evidence.'" *Ex parte Matthews*, 601 So. 2d 52, 53 (Ala. 1992), quoting *Williams v. State*, 456 So. 2d 852, 855 (Ala. Crim. App.1984). "'In reviewing the correctness of the trial court's ruling on a motion to suppress, this Court makes all the reasonable inferences and credibility choices supportive of the decision of the trial court.'" *Kennedy v. State*, 640 So. 2d 22, 26 (Ala. Crim. App. 1993), quoting *Bradley v. State*, 494 So. 2d 750, 761 (Ala. Crim. App. 1985), aff'd, 494 So. 2d 772 (Ala. 1986).

1.

Eggers contends that his statements were involuntary because, he says, he requested a lawyer on two occasions before he gave his first statement to Agent Maldonado, and those requests were denied.

In *Edwards v. Arizona*, 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981), the United States Supreme Court held:

> "[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. . . . [A]n accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself

> initiates further communication, exchanges, or conversations with the police."

451 U.S. at 484–85, 101 S. Ct. 1880 (footnote omitted). The purpose of this rule is to protect an accused in police custody from "'badger[ing]' or 'overreaching'—explicit or subtle, deliberate or unintentional—[that] might otherwise wear down the accused and persuade him to incriminate himself notwithstanding his earlier request for counsel's assistance." *Smith v. Illinois*, 469 U.S. 91, 98, 105 S. Ct. 490, 83 L. Ed. 2d 488 (1984), quoting *Oregon v. Bradshaw*, 462 U.S. 1039, 1044, 103 S. Ct. 2830, 77 L. Ed. 2d 405 (1983).

> "This 'rigid' prophylactic rule, *Fare v. Michael C.*, 442 U.S. 707, 719 (1979), embodies two distinct inquiries. First, courts must determine whether the accused actually invoked his right to counsel. *See, e.g., Edwards v. Arizona, supra*, 451 U.S. [477], at 484–485 [(1981)] (whether accused 'expressed his desire' for, or 'clearly asserted' his right to, the assistance of counsel); *Miranda v. Arizona*, 384 U.S. [436], at 444–445 [(1966)] (whether accused 'indicate[d] in any manner and at any stage of the process that he wish[ed] to consult with an attorney before speaking'). Second, if the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked. *Edwards v. Arizona, supra*, [451 U.S.,] at 485, 486, n. 9."

*Smith v. Illinois*, 469 U.S. at 95, 105 S. Ct. 490.

At the suppression hearing, Eggers testified that he requested a lawyer immediately upon his arrest in the tent city and again in the patrol car while being transported to the Osceola County Sheriff's Department. Agent Maldonado's testimony directly refuted Eggers's claim that he requested a lawyer immediately upon his arrest; Agent Maldonado specifically testified that Eggers never requested a lawyer when he was arrested at the tent city. Resolving this conflicting

evidence in favor of the trial court's ruling, as we must, we conclude that Eggers did not request a lawyer when he was arrested.

Whether Eggers requested a lawyer while in the patrol car being transported to the sheriff's department, however, is a closer question. The State did not call the Osceola County Sheriff's Deputy who transported Eggers to the Sheriff's Department to testify, but during redirect examination of Agent Maldonado at the suppression hearing, the following occurred:

> "[Prosecutor]:      And [defense counsel] has asked you about requests from other officers for attorneys, at any time during your interrogation, did he ever ask you for an attorney?

> "[Agent Maldonado]: No.

> "[Prosecutor]: Did he ever mention that he had asked for an attorney or wanted an attorney?

> "[Agent Maldonado]: No."[Prosecutor]: And did you ask him if he wanted an attorney when you gave him his Miranda rights?

> "[Agent Maldonado]: The right to—the reading of the *Miranda* rights and when they transported him, *I wasn't told he made a statement. He was transported from the jail to the—from the tent city to the Sheriff's Office with no statement.*"

(R. 325–26.) (Emphasis added.) We think a reasonable inference from the above-quoted portion of Agent Maldonado's testimony is that Agent Maldonado was informed by the deputy who transported Eggers to the sheriff's department that Eggers had not said anything in the patrol car during the transport, i.e., that Eggers did not request a lawyer. Although the trial court did not issue any findings of fact when denying Eggers's motion to suppress and, thus, we do not know the reason for the trial court's ruling, it would not have been an abuse of

discretion for the trial court to find, based on the above testimony of Agent Maldonado, that Eggers did not invoke his right to counsel while in the patrol car.

However, assuming that it could not be inferred from the above-quoted portion of Agent Maldonado's testimony that Eggers did not request a lawyer while in the patrol car being transported to the Sheriff's Department and, thus, that Eggers's testimony that he did make such a request in the patrol car is unrefuted, we still conclude that Eggers's subsequent statements were properly admitted into evidence.

Agent Maldonado testified that when they arrived at the sheriff's department, he advised Eggers of his *Miranda* rights; that Eggers indicated that he wanted to make a statement; and that Eggers signed a waiver-of-rights form. According to Agent Maldonado, after Eggers signed the form, he advised Eggers of the reason for his arrest and Eggers then "asked me if I wanted to know where the body was." (R. 457.) In response, Agent Maldonado said, "'Well, if you want to tell me about it.'" (R. 310.) At that point, Eggers gave his first confession. Agent Maldonado said that he was surprised by Eggers's statement regarding a body because he was not aware at that time that there had been a murder; he knew only that there was a fugitive warrant for Eggers's arrest for unlawful flight to avoid prosecution based on the theft of a truck and that there may have been a missing person involved. Although Eggers's version of the events at the sheriff's department was different than Agent Maldonado's, Agent Maldonado's testimony was sufficient to establish that Eggers was not subject to custodial interrogation until after he had initiated further conversation with Agent Maldonado and that he had voluntarily waived his previously invoked right to counsel.

In *Rhode Island v. Innis*, 446 U.S. 291, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980), the United States Supreme Court defined the term "interrogation" as "either express questioning or its functional equivalent," i.e., "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response

from the suspect." 446 U.S. at 300–01, 100 S. Ct. 1682 (footnotes omitted). In his opinion concurring in the result in *Edwards*, Justice Powell noted the difference between custodial interrogation and custodial communications:

> "Communications between police and a suspect in custody are commonplace. It is useful to contrast the circumstances of this case with typical, and permissible, custodial communications between police and a suspect who has asked for counsel. For example, police do not impermissibly 'initiate' renewed interrogation by engaging in routine conversations with suspects about unrelated matters. And police legitimately may inquire whether a suspect has changed his mind about speaking to them without an attorney. *E.g., State v. Turner*, 32 Or. App. 61, 65, 573 P.2d 326, 327 (1978); see *State v. Crisler*, 285 N.W.2d 679, 682 (Minn. 1979); *State v. Marcum*, 24 Wash. App. 441, 445–446, 601 P.2d 975, 978 (1979). It is not unusual for a person in custody who previously has expressed an unwillingness to talk or a desire to have a lawyer, to change his mind and even welcome an opportunity to talk. Nothing in the Constitution erects obstacles that preclude police from ascertaining whether a suspect has reconsidered his original decision. As Justice White has observed, this Court consistently has 'rejected any paternalistic rule protecting a defendant from his intelligent and voluntary decisions about his own criminal case.' *Michigan v. Mosley*, 423 U.S. 96, 109 (1975) (White, J., concurring in result)."

*Edwards*, 451 U.S. at 490–91, 101 S. Ct. 1880 (Powell, J., concurring in the result) (footnote omitted). Agent Maldonado's advising Eggers of his *Miranda* rights and of the reason for his arrest did not constitute interrogation or its functional equivalent, but was a routine incident of arrest. At most, Agent Maldonado's actions in advising Eggers of his *Miranda* rights and obtaining Eggers's waiver of those rights was a proper inquiry as to whether Eggers had changed his mind about wanting a lawyer. "Although interrogation may not continue [after an

accused has requested counsel], the police legitimately may inquire whether the suspect has changed his mind about speaking to them without an attorney." *McCall v. State*, 501 So. 2d 496, 500 (Ala. Crim. App. 1986). *See also Caldwell v. State*, 249 Ga. App. 885, 549 S.E.2d 449 (2001) (police officer's informing accused of the charges against him and informing accused that he could change his mind about his previous request for a lawyer and give a statement if he chose to do so did not constitute interrogation).

Moreover, there can be no doubt that by asking Agent Maldonado if he "wanted to know where the body was" Eggers initiated the conversation about the murder. "Initiation" is an inquiry that can "be fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation." *Oregon v. Bradshaw*, 462 U.S. 1039, 1045, 103 S. Ct. 2830, 77 L. Ed. 2d 405 (1983) (plurality opinion). Eggers's question was not a routine inquiry arising out of the incidents of custody, such as a request for a drink of water; it was a clear question relating directly to the murder, and it showed Eggers's willingness to speak with Agent Maldonado about the crime. *See, e.g., Living v. State*, 796 So.2d 1121 (Ala. Crim. App. 2000) (by making spontaneous and unsolicited statements about the crime after he had requested a lawyer, the accused initiated the conversation with the police); *Burgess v. State*, 827 So. 2d 134 (Ala. Crim. App.1998), aff'd, 827 So. 2d 193 (Ala. 2000) (by asking police officer what the charge against him was and what punishment he could be facing for that charge, the accused initiated the conversation with the police); *Buchannon v. State*, 652 So. 2d 799, 801 (Ala. Crim. App. 1994) (by asking police officer "'[W]hat, what robbery—what was constituting the robbery?'" after he had invoked his right to counsel, the accused initiated the conversation); *Seawright v. State*, 479 So. 2d 1362, 1366 (Ala. Crim. App.1985) (by stating "'I want to get it off my chest. I did it. It was self defense'" after he had invoked his right to counsel, the accused initiated the conversation with the police); and *Moulds v. State*, 429 So. 2d 1176, 1179 (Ala. Crim. App. 1983) ("The defendant's assertion that she was ready to make a statement, even if made in response to an officer's inquiry of whether she had 'changed her mind about speaking to them

without an attorney,' constitutes a communication initiated by the accused under *Edwards*.'").

Finally, for the reasons explained in Part I.B.3. of this opinion, we conclude that Eggers's waiver of his previously invoked right to counsel was knowingly and voluntarily made.

Therefore, even assuming that Eggers invoked his right to counsel while in the patrol car on the way to the Sheriff's Department, there was no violation of *Edwards* because Eggers was not subjected to custodial interrogation, but initiated the conversation about the murder with Agent Maldonado and knowingly and voluntarily waived his previously invoked right to counsel.

*Eggers*, 914 So. 2d at 896-902.

As seen from the above, the ACCA thus made three findings concerning Eggers's *Edwards* claim. First, it found that it was reasonable for the trial court to infer that Eggers did not make a request for counsel while being transported to the sheriff's department. Eggers argues that this finding was based on an unreasonable determination of the facts because it did not take into account all of Agent Maldonado's testimony. Eggers points out that on cross examination, Agent Maldonado stated that he did not know if the transporting deputy asked him if he wanted an attorney. [C.R. Vol. 5 at 324.] Eggers argues that this means that Eggers's testimony that he requested a lawyer during transport was unrefuted. But, as recounted by the ACCA, Agent Maldonado testified as follows on redirect examination:

[Prosecutor]:     And [defense counsel] has asked you about requests from other officers for attorneys, at any time during your interrogation, did he ever ask you for an attorney?

[Agent Maldonado]:     No.

[Prosecutor]:     Did he ever mention that he had asked for an attorney or wanted an attorney?

[Agent Maldonado]:     No.

[Prosecutor]:     And did you ask him if he wanted an attorney when you gave him his Miranda rights?

[Agent Maldonado]:     The right to—the reading of the Miranda rights and when they transported him, I wasn't told he made a statement. He was transported from the jail to the—from the tent city to the Sheriff's Office with no statement.

[C.R. Vol. 5 at 325–26.] The trial court, in denying the motion to suppress, implicitly resolved the conflicting evidence in favor of Agent Maldonado and against Eggers and concluded that Eggers did not request a lawyer at the tent city or during transport to the sheriff's department. The ACCA, on direct appeal, held that it was reasonable for the trial court to do so, given the inferences made from that portion of Agent Maldonado's testimony that he was informed by the deputy who transported Eggers to the sheriff's department that Eggers had not said anything in the patrol car during the transport, i.e., that Eggers did not request a

lawyer. The trial court was in the best position to weigh conflicting evidence and make credibility determinations at the suppression hearing, and the ACCA was entitled under the law to give deference to the trial court's decision on that point. *See Minor*, 914 So. 2d at 388; *Sheely*, 629 So. 2d at 29; *Jackson*, 589 So. 2d at 784; *Ex parte Matthews*, 601 So. 2d at 53. The state court's factual findings are presumed to be correct, and the petitioner can only rebut that presumption with "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). It is Eggers's burden to show that the state court's opinion was based on an unreasonable application of the facts in light of the evidence presented at the state court proceeding, 28 U.S.C. § 2254(d)(2), and he has not met that burden here. *See Wood v. Allen*, 558 U.S. 290, 293, 130 S. Ct. 841, 845 (2010) ("[A] state court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."). In any event, the ACCA previously addressed the very point Eggers's raises here, by its finding that even if one could argue that Eggers's testimony was unrefuted and he *did* request a lawyer during the car ride to the sheriff's department, his waiver of his right to a lawyer once at the sheriff's department was controlling. And as will be explained, the state court's reasoning on that point was not an unreasonable application of clearly established Federal law.

The ACCA's second finding was that even if Eggers did request counsel during transport, his later waiver was valid because it was the result of a custodial "communication" rather than interrogation; in other words, Agent Maldonado's act of advising Eggers of his *Miranda* rights once at the sheriff's department and explaining the reason for his arrest was a routine incident of arrest and not a custodial interrogation, so Eggers's subsequent confession was admissible. Eggers argues that this conclusion was an unreasonable application of *Edwards* because the ACCA relied on Justice Powell's concurring opinion in *Edwards*, rather than on the majority opinion, and the concurrence holds no precedential value. Eggers is correct that to be entitled to deference under § 2254(d)(1), a state court ruling must reasonably apply Supreme Court precedent, and precedent is defined as the holdings of the Supreme Court. *See White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) "[C]learly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions.") (internal quotation marks omitted); *Lockyer v. Andrade*, 538 U.S. 63, 71-72, 123 S. Ct. 1166, 1172 (2003) ("In other words, clearly established Federal law under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.") (internal quotation marks omitted). Eggers cites no binding authority holding that that precedent does not include analysis set

out in a concurring opinion. But assuming that concurring opinions do not constitute Supreme Court "holdings," Eggers overlooks the fact that the principle espoused by Justice Powell, while in a concurring opinion, was rooted in previous Supreme Court precedent. Justice Powell opined that there are "communications" that occur with a suspect after he invokes his right to counsel that do not rise to the level of interrogation and thus, do not violate the rule set out by the majority in *Edwards*, such as "engaging in routine conversations with suspects about unrelated matters," or inquiring whether a suspect has changed his mind about speaking to authorities without an attorney. *Edwards*, 451 U.S. at 490-91, 101 S. Ct. at 1880 (Powell, J., concurring). As noted by the ACCA, the Supreme Court had previously, in *Rhode Island v. Innis*, defined the term "interrogation" as "either express questioning or its functional equivalent," i.e., "any words or actions on the part of police (*other than those normally attendant to arrest and custody*) that the police should know are reasonably likely to elicit an incriminating response from the suspect." 446 U.S. at 300-01, 100 S. Ct. 1682 (emphasis added). In addressing what constitutes interrogation, the *Edwards* Court applied the standard previously set out in *Innis*. *See Edwards*, 451 U.S. at 487. As Justice Powell merely elucidated, before the rule in *Edwards* is violated, there must first be custodial "interrogation"

on the part of police, something that the majority in *Edwards* repeatedly acknowledged as well.

Agent Maldonado testified at the suppression hearing that before Eggers made his first oral confession at the sheriff's department, the agent did two things: he advised Eggers of his *Miranda* rights (and Eggers signed a waiver-of-rights form), and he advised Eggers that he was being arrested for unlawful flight to avoid prosecution. [C.R. Vol. 5 at 310.][15] Even if one were to take as true that Eggers had already asked for a lawyer while being transported to the sheriff's department, there is no question that Agent Maldonado's mere act of advising Eggers of the reason for his arrest was not custodial interrogation of the kind that the majority in *Edwards* held could not happen if the accused had already asked for a lawyer. Such a statement does not constitute an interrogation because it is not the kind of statement "that the police should know [is] reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 300-01, 100 S. Ct. at 1682. Rather, advising a suspect of the reason for his arrest is a mere communication "normally attendant to arrest and custody," that the Supreme Court excludes from the definition of "interrogation." *Id.* As such, the ACCA did

---

[15]     As the ACCA noted, Eggers's version of events at the sheriff's department differed, as he claimed he again requested a lawyer but Agent Maldonado denied that request and threatened him. However, Eggers does not now challenge the trial court's implicit decision to credit Agent Maldonado's testimony over Eggers's testimony as to what happened when Eggers arrived at the sheriff's department.

not "appl[y] a rule that contradicts the governing law set forth in [the Court's] cases . . . ," *Brown*, 544 U.S. at 141, 125 S. Ct. at 1438, when it so held.

It is a closer question whether Agent Maldonado's act of advising Eggers of his *Miranda* rights once they arrived at the sheriff's department constitutes a prohibited interrogation or a mere communication, but the Court finds that the ACCA did not unreasonably apply Supreme Court precedent when it held that this statement, too, was a mere communication attendant to arrest and custody. In *Edwards* itself, police officers conducting an interrogation of the accused stopped when he said he wanted to talk to a lawyer before making a deal. 451 U.S. at 479, 101 S. Ct. at 1882. The following day, police came back to retrieve him from his cell, said that they wanted to talk to him, and the detention officer told him that he "had to" talk to the officers. *Id.* The officers then informed the accused of his *Miranda* rights, and he said he was willing to talk, but he wanted to first hear the taped statement made by the alleged accomplice who had implicated him in the crime. *Id.* After listening to the tape for several minutes, the accused said that he would make a statement and then implicated himself in the crime. *Id.* The Court held that because the accused was subject to custodial interrogation at the instance of authorities, despite his earlier request for counsel, his statement was inadmissible. *Id.* at 487, 101 S. Ct. at 1886.

One way that Eggers may show that the ACCA's conclusion on direct appeal was an unreasonable application of Supreme Court precedent is by demonstrating that the ACCA "confronted a set of facts that is materially indistinguishable from a decision of th[e] Court but reached a different result." *Brown*, 544 U.S. at 141, 125 S. Ct. at 1438. Because there are crucial differences between *Edwards* and the case at bar, Eggers cannot make that showing. First, in *Edwards*, there was no question about whether the defendant had initially invoked his right to counsel. In contrast here, the ACCA found, based on a reasonable determination of the facts, that Eggers never invoked his right to counsel. Of course, if Eggers never invoked his right to counsel, there was nothing in federal law (in *Edwards* or otherwise) preventing Eggers from implicitly waiving his right to counsel simply by responding to police questioning and confessing. However, even if the Court is assuming for the purposes of analyzing Eggers's line of argument that Eggers *did* invoke his right to counsel during transport to the sheriff's department, there are still distinguishing facts between *Edwards* and Eggers's case. In *Edwards*, after interrogating the accused the day before, officers returned the next morning to retrieve the accused from his cell against his will (the detention officer told him that he "had to" talk to police when he expressed reluctance to do so), they informed him of his *Miranda* rights, and, at his request, they played him the taped

statement of his accomplice. This combination of events led the Court to determine that the accused was subject to custodial interrogation with no attorney present, despite his request for counsel.

A similar combination of events is not present in this case. Here, when one removes from the equation Agent Maldonado's advising Eggers of the reason for his arrest, which was no doubt a mere communication attendant to arrest and custody and not an interrogation, the only other communication Agent Maldonado made to Eggers was to advise him of his *Miranda* rights. Under the state court's determination of the facts that occurred at the sheriff's department, which Eggers does not challenge in this proceeding, no one at the sheriff's department told Eggers that he "had to" speak with authorities. Under these circumstances, Agent Maldonado' singular act of advising Eggers of his rights does not appear to be the type of communication that the agent should have known was likely to elicit an incriminating response. *See Innis*, 446 U.S. at 300-01, 100 S. Ct. at 1682.[16] In other

---

[16]     Of course, Justice Powell opined in his concurrence in *Edwards* that police may legitimately ask the accused whether he has changed his mind about speaking to them without an attorney, but he did not cite to any Supreme Court precedent stating that exact rule. *Edwards*, 451 U.S. at 490, 101 S. Ct. at 1888 (Powell, J., concurring). In any event, the Court is not convinced that Agent Maldonado's act of merely reading Eggers's his rights even equates to asking such a question. But to the extent that the reading of the rights may have possibly caused Eggers to change his mind about speaking with an attorney, this fact is not in and of itself sufficient to show interrogation. *See Arizona v. Mauro*, 481 U.S. 520, 529, 107 S. Ct. 1931, 1936 (1987) ("Officers do not interrogate a suspect simply by hoping he will incriminate himself."). The rights that Agent Maldonado read to Eggers, as recounted by the agent at the suppression hearing, are not coercive or threatening. *But see Montejo v. Louisiana*, 556 U.S. 778, 805, 129 S. Ct. 2079, 2096 (2009)

words, since there was no "interrogation," *Edwards* was not violated. In so holding, the Court is reminded that Eggers's burden on this claim is high: he must show that "the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 102, 131 S. Ct. at 786–87. The Court is of the opinion that Eggers has not made that showing, and the ACCA's opinion was not an unreasonable application of clearly established Federal law.

Nor did the ACCA unreasonably apply Federal law in its third alternative holding: that even if Eggers asked for an attorney during transport to the sheriff's department, his subsequent confessions were nonetheless admissible because Eggers initiated a conversation with Agent Maldonado by asking him if he wanted to know where Mrs. Murray's body was. It is by now axiomatic that if an accused, even after having expressed his desire for an attorney, subsequently initiates communication with authorities, his volunteered statements are admissible.

---

(Stevens, J., dissenting) (noting that *Edwards* was designed to prevent police from coercing suspects into revoking the request for counsel); *see also United States v. Stevenson*, 2015 WL 5737171 (A.F. Ct. Crim. App. Sept. 30, 2015) (officer telling a suspect to "think about it," regarding his earlier request for an attorney, in a non-confrontational tone, was not interrogation, for purposes of determining whether *Edwards* was violated); *United States v. Comosona*, 848 F.2d 1110, 1113 (10th Cir. 1988) (handing a suspect a business card and telling him to call the agent collect if he wanted to talk about an incident was not an interrogation, for purposes of determining whether *Edwards* was violated).

*Miranda*, 384 U.S. at 436, 86 S. Ct. at 1630 ("Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today."); *Edwards*, 451 U.S. at 484, 101 S. Ct. at 1885 ("We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication, exchanges, or conversations with the police.*") (emphasis added).

Eggers argues that the ACCA's conclusion on this point is based on an unreasonable determination of the facts because it is contradicted by the ACCA's own factual findings. According to Eggers, it was inconsistent for the ACCA to conclude that Eggers's initiation of a conversation with Agent Maldonado rendered his earlier request for counsel moot because the court found as fact that Eggers did not initiate the confession with Agent Maldonado until *after* he had already signed a waiver-of-rights form. Eggers is correct that the ACCA found as fact the following sequence of events: "Agent Maldonado testified that when they arrived at the sheriff's department, he advised Eggers of his *Miranda* rights; that Eggers indicated that he wanted to make a statement; and that Eggers signed a waiver of rights form. According to Agent Maldonado, after Eggers signed the form, he

advised Eggers of the reason for his arrest and Eggers then "asked me if I wanted to know where the body was.'" *Eggers*, 914 So. 2d at 897. Presumably Eggers means that if he had already signed the waiver of his right to counsel, his subsequent decision to confess to Agent Maldonado is beside the point, and cannot serve to render any previous request for counsel moot. That may or may not be so, depending on the circumstances. An accused could sign a waiver of rights form under duress, and still have a colorable claim that his subsequent confession is inadmissible.[17] In any event, contrary to Eggers's characterization of the ACCA's opinion, the ACCA never explicitly concluded that Eggers initiated his confession *before* signing the waiver. But if the ACCA's conclusion about the effect of Eggers's initiation of his confession about the murder contains an error of some kind, it is a harmless one, because the ACCA's conclusion on this final point was an alternative one: the ACCA did not need to rely on it in order to find Eggers's statement

---

[17]     Indeed, Eggers made such a claim on direct appeal, but it was rejected. Eggers's version of events at the suppression hearing was that he signed the waiver form under duress: it was only after Agent Maldonado threatened to involve his girlfriend, his father, and his son in the investigation that he signed the form. *Eggers*, 914 So. 2d at 904. Agent Maldonado's was quite different: he testified that he never threatened to involve Eggers's girlfriend, father, or son in the investigation, nor did he make any other type of threats; he did not coerce Eggers into making a statement; indeed he was surprised when he asked him if he wanted to know where the body was. *Id.* The trial court implicitly rejected Eggers's testimony in favor of Agent Maldonado's by denying the motion to suppress, and the ACCA found that the trial court did not abuse its discretion in so doing. *Id.* Thus, the ACCA assumed that even if Eggers had asked for an attorney during transport, he did not ask for one at the sheriff's department but instead decided to confess to Agent Maldonado there. Eggers does not challenge the facts found by the ACCA in this proceeding.

admissible, because it had already found as much through its first two conclusions. And because the Court has already determined that the ACCA's first two conclusions are reasonable, Eggers's claim fails.

In sum, Eggers did not exhaust state remedies with respect to this argument. His claim that his mental incompetence constitutes cause and prejudice to ignore that fact fails, but even assuming the Court could review the argument through the lens of § 2254(d), the ACCA, which entered the last reasoned opinion on this claim, did not render an unreasonable application of Federal law when it rejected the claim. Habeas relief is not warranted.

## V.    EGGERS'S *PRO SE* ASSERTED GROUNDS FOR RELIEF

Eggers's *pro se* amended petition for federal habeas relief, which he styles a "Motion to Appoint Successor Counsel or Motion to Proceed *Pro Se*" (doc. 60), appears to be, in its essence, an attempt by Eggers to set out points of disagreement with his appointed counsel in this proceeding. In pages 1-12, Eggers asserts that he "does not wish to assert any of the grounds for relief alleged in the Amended Petition" and, though he "wanted counsel to present these issues," he "cannot move forward with the amendment as is." (Doc. 60 at 1-12.) Eggers denies that he is incompetent and argues that appointed counsel's allegations are improperly

founded on false allegations by Nikkii Eggers Garrison, his ex-wife. Similarly, Eggers asserts that Dr. Benedict's evaluation is flawed.

In pages 13-22, Eggers summarizes the claims raised in his *pro se* Rule 32 petition and makes the bare assertion that they were fairly presented to the state courts. The Court will address each of Eggers's *pro se* claims.

Eggers's claims 1-5 describe the *Brady* claims that he raised in his amended Rule 32 petition. Appointed counsel presented Eggers's *Brady* claim as "Ground IX" in the Amended Petition, and it was addressed in section IV. 9 of this opinion, *supra*. To the extent that Eggers claims that the State suppressed evidence regarding his alleged hospitalization in Texas, habeas relief is not warranted on that claim for the reasons set forth in section IV. 9. To the extent Eggers's *pro se* claims identify allegedly suppressed material not identified in section IV. 9, *supra*, such as records from the FBI and the San Bernardino Sheriff's Department from 1985 and arrest records from nine other individuals who were supposedly detained near the time of his arrest in Florida, habeas relief is not warranted on this ground.

The Rule 32 court, which issued the last reasoned decision, denied these claims in part because they were insufficiently pleaded pursuant to Ala. R. Crim. P. 32.3 and 32.6(b). As to the 1985 law enforcement records, the court, citing *Brady*, stated that Eggers failed to allege what, if any, exculpatory information was

contained in the records, and also failed to plead facts demonstrating that any such records were possessed by the State and not turned over to trial counsel. As to the purported arrest records of other individuals in Florida, the court, citing *Brady*, stated that Eggers failed to allege what, if any, exculpatory information was contained in the "missing" arrest records and has failed to plead facts indicating that these records actually exist. The court further opined that Eggers's arrest was reviewed by the ACCA, which found that he was arrested pursuant to a valid arrest warrant, and if Eggers alleges the rights of other individuals were violated during his arrest, Eggers does not have standing to challenge these violations, and they do not taint his own arrest or subsequent conviction.

A Rule 32 dismissal for lack of specificity is a merits ruling in this circuit. *Borden*, 646 F.3d at 812-13. As such, this Court conducts the deferential AEDPA review of the state court's decision pursuant to 28 U.S.C. § 2254(d), and Eggers cannot obtain relief on this claim unless he can show that the denial of relief on this claim in state court "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." *See* 28 U.S.C. § 2254(d).

The Rule 32 court did not violate *Brady* in disposing of Eggers's claims. As he did then, Eggers still fails to explain what exculpatory information the 1985 law enforcement records or the arrest records from Florida contained, and any facts indicating that the State suppressed these materials. Absent this, the Court cannot determine whether the prosecution suppressed this evidence, whether it was favorable to Eggers, and whether it was material. Moreover, this evidence would have been known to the defense. The Rule 32 court did not unreasonably apply *Brady* in disposing of these claims.

To the extent Eggers has added additional factual information in his *pro se* petition that he did not raise in his Rule 32 petition, these claims are procedurally defaulted from habeas review because Eggers failed to fairly present them to the state courts. A federal habeas petitioner is required "to present the state courts with the same claim he urges upon the federal courts." *Picard*, 404 U.S. at 276, 92 S. Ct. at 512.

Eggers's claims 7-19 describe various claims from his amended Rule 32 petition that relate to his arrest, including his claim that he was arrested pursuant to an illegal search and seizure and that his three confessions to law enforcement were inadmissible because they were involuntary. He contends that the confessions were involuntary because he requested a lawyer on two occasions before he gave his first

statement and those requests were denied, he was threatened and coerced into giving his statements, and he did not knowingly and voluntarily waive his *Miranda* rights before making his statements. Eggers's appointed counsel in this proceeding raised the claim that *Edwards v. Arizona* was violated, but did not raise the other claims. Habeas relief is not warranted on the *Edwards* claim for the reasons set forth in section IV. 11, *supra*. To the extent Eggers raises additional claims related to his arrest, habeas relief is not warranted for the following reasons. While Eggers raised these claims on direct appeal, he abandoned them on petition for writ of certiorari in the Alabama Supreme Court. In order to exhaust state remedies, a habeas petitioner must present his claims through one full round of the State's trial and appellate review process, even to the state's court of last resort, even if that review is discretionary. *Pruitt*, 348 F.3d at 1359 (citing *O'Sullivan*, 526 U.S. at 845). Alabama's discretionary direct review procedures bring Alabama prisoner habeas petitions within the scope of this rule. *Id.* at 59. Dismissal of his habeas petition to allow Eggers to present this claim fairly as a federal claim in state court now would be futile because it is too late for him to return to state court to exhaust the claim by petitioning the Alabama Supreme Court for certiorari. Thus, because any state remedy with respect to this claim is procedurally barred by the state procedural rules noted above, Eggers's claim is procedurally defaulted from habeas review.

Eggers has not raised this argument, but the Court notes that it has already established that Eggers's alleged mental illness during direct appeal is not cause and prejudice to excuse the default of these claims, *see* sections IV. 3 and 11, *supra*.

To the extent Eggers has added additional factual information in his *pro se* petition that he did not raise in his Rule 32 petition, these claims are procedurally defaulted from habeas review because Eggers failed to fairly present them to the state courts. *Picard*, 404 U.S. at 276, 92 S. Ct. at 512.

Next, Eggers's claim 20 describes claim 20 from his amended Rule 32 petition, which alleged that Eggers was incompetent to stand trial. Eggers's appointed counsel presented that claim as Ground 1 in the instant action. For the reasons stated in section, IV. 1, *supra*, habeas relief is not warranted on that claim.

Eggers's claims 21-37 describe claims 21-37 from his amended Rule 32 petition. He alleges that he was denied psychiatric medical care prior to trial, that the State withheld favorable evidence of his mental illness from expert witnesses, and that the trial court denied him a competency evaluation, failed to provide a judicial finding as to competence, failed to provide the defense with adequate time to move for a competency hearing, failed to provide the defense with adequate time to move for a jury trial on competency, failed to determine the issue of sanity before trial, failed to assure that mental health experts received necessary evidence,

unlawfully silenced him through the use of an electric shock belt, failed to instruct the jury that Eggers was forced to wear an electric shock belt, failed to investigate the death of potential witnesses, and failed to depose a potentially intimidated witness.

In addition to denying all of these claims because Eggers did not raise them at trial, in his motion for new trial, or on direct appeal, the Rule 32 court, which issued the last reasoned decision, denied all of these claims because they were insufficiently pleaded pursuant to Ala. R. Crim. P. 32.3 and 32.6(b). With regard to the claim that Eggers was denied psychiatric medical care prior to trial, the court found that he failed to plead what medical attention he should have received, nor what constitutional violation occurred based on the failure to receive this unspecified medical attention. With regard to the claim that the State withheld favorable evidence from expert witnesses, the court found that Eggers failed to plead specifically what evidence was withheld and which should have been provided to expert witnesses. With regard to the remaining claims, the Rule 32 court found that Eggers provided only bare accusations without any specific factual allegations to support the claims.

A Rule 32 dismissal for lack of specificity is a merits ruling in this circuit. *Borden*, 646 F.3d at 812-13. As such, this Court conducts the deferential AEDPA

review of the state court's decision pursuant to 28 U.S.C. § 2254(d), and Eggers cannot obtain relief on this claim unless he can show that the denial of relief on this claim in state court "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." *See* 28 U.S.C. § 2254(d).

Eggers has not identified a ground for relief under 28 U.S.C. § 2254(d), and alleged the facts supporting his § 2254(d) claim. He has also not identified the relevant Supreme Court case that the state court's decision violated. The Eleventh Circuit has indicated that such a failure to do so precludes relief on a claim based on § 2254(d). *See Washington v. Crosby*, 324 F.3d 1263, 1265 (11th Cir. 2003) (affirming the denial of habeas relief because the petitioner failed to identify a relevant Supreme Court case). Additionally, to the extent Eggers has added additional factual information in his *pro se* petition that he did not raise in his Rule 32 petition, these claims are procedurally defaulted from habeas review because Eggers failed to fairly present them to the state courts. *Picard*, 404 U.S. at 276, 92 S. Ct. at 512.

Eggers's claims 38-97 make reference to claims 38-47 of his amended Rule 32 petition, which assert various ineffective assistance of trial counsel claims. Namely, he asserts that his counsel did not file an adequate written motion to suppress, did not interview witnesses to his arrest, did not collect arrest reports, provided a distorted version of the facts in a post-suppression hearing memorandum, did not adequately outline the facts regarding his interrogation, and did not interview two officers who were present during his interrogation. To the extent the claims Eggers intends to raise here do not duplicate the ineffective assistance of trial counsel claims raised in this proceeding by his appointed counsel, addressed in sections IV. 5, 6, 7, and 8, *supra*, they are due to be denied.

All of these claims were raised in Eggers's Rule 32 proceedings and were denied as in sufficiently pleaded. The court stated:

> Eggers's claims are nothing but bare allegations. Eggers utterly fails to plead what specific records or reports should have been 'marshaled' by his defense counsel. Nor does Eggers plead the names of the witnesses who should have been interviewed or called by his counsel during the suppression hearing. Moreover, Eggers fails to specifically plead what information these unnamed witnesses possessed that would have been relevant to his arrest or interrogation during the suppression hearing.

> Additionally, these claims are insufficiently pleaded because Eggers has entirely failed to plead facts which, if true, would establish prejudice under *Strickland*. Eggers has utterly failed to plead any facts concerning what evidence his trial counsel would have presented during the suppression hearing had his counsel compiled the records

and talked with the witnesses Eggers contends should have been acquired and interviewed. Eggers has completely failed to plead facts which, if true, would establish that the outcome of his trial would have been different had his counsel conducted the investigation of his arrest and interrogation in the way Eggers suggests.

This claim is also dismissed because it fails to state a material issue of law or fact. Ala. R. Crim. P. 32.7(d). . . . [T]he Court of Criminal Appeals provided a detailed analysis concerning Eggers's statements to law enforcement and found that his statements were given voluntarily. [*Eggers*, 904 So. 2d] at 897-906. Eggers has failed to plead what additional, specific facts his counsel could have presented that, if true, would call that court's holding into question. Accordingly, this claim is dismissed pursuant to Ala. R. Crim. P. 32.7(d) for failure to state a claim upon which relief may be granted.

[C.R. Vol. 16, Order Denying Rule 32 Relief, at 33.]

A Rule 32 dismissal for lack of specificity is a merits ruling in this circuit. *Borden*, 646 F.3d at 812-13. As such, this Court conducts the deferential AEDPA review of the state court's decision pursuant to 28 U.S.C. § 2254(d), and Eggers cannot obtain relief on this claim unless he can show that the denial of relief on this claim in state court "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." *See* 28 U.S.C. § 2254(d).

Eggers has not identified the relevant Supreme Court case, identified a ground for relief under 28 U.S.C. § 2254(d), and alleged the facts supporting his § 2254(d) claim. *See Washington*, 324 F.3d at 1265. In any event, the Rule 32 court did not unreasonably apply *Strickland* in holding as it did. Additionally, to the extent Eggers has added additional factual information in his pro se petition that he did not raise in his Rule 32 petition, these claims are procedurally defaulted from habeas review because Eggers failed to fairly present them to the state courts. *Picard*, 404 U.S. at 276, 92 S. Ct. at 512.

## VI.   EGGERS'S MOTIONS FOR DISCOVERY AND AN EVIDENTIARY HEARING

After filing his reply brief, Eggers filed motions seeking discovery under Rule 6 of the Rules Governing Habeas Corpus Cases and an evidentiary hearing. (Docs. 108 and 109.) For the following reasons, those motions are due to be denied.

"A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904, 117 S. Ct. 1793, 1796-97 (1997). Rather, pursuant to Rule 6 of the Rules Governing Section 2254 Cases in the United States District Courts, a petitioner must demonstrate "good cause" before a judge may authorize discovery. "Good cause" is shown where petitioner (1) makes credible allegations of a constitutional violation and (2) the requested discovery will enable the petitioner to investigate

and prove his claims. *See id.* at 908–909. Furthermore, a petitioner must demonstrate that he used "due diligence" in state courts to obtain the discovery that he is seeking in a federal habeas corpus proceeding. *See Isaacs v. Head*, 300 F.3d 1232, 1248–49 (11th Cir. 2002) (recognizing that the 28 U.S.C. § 2254(e)(2) due diligence requirement necessary for holding an evidentiary hearing applies equally to a claim for discovery). Due diligence means that "the prisoner made a reasonable attempt, in light of information available at the time, to investigate and pursue claims in state court." *Id*. Finally, to obtain discovery a petitioner must demonstrate that he can make a colorable claim showing that the underlying facts, if proven, constitute a constitutional violation. *Id.* "Before addressing whether [a] petitioner is entitled to discovery . . . to support his . . . claim, [a court] must first identify the 'essential elements' of that claim." *Bracy*, 520 U.S. at 904 (citing *United States v. Armstrong*, 517 U.S. 456, 468, 116 S. Ct. 1480, 1488 (1996)). The court then must "turn to the question whether petitioner has shown 'good cause' for appropriate discovery to prove his . . . claim." *Id.* at 905–06. Moreover, Rule 8(a) of the Habeas Rules states that "[i]f the petition is not dismissed, the judge must review the answer, any transcripts and records of state-court proceedings, and any material submitted under Rule 7 to determine whether an evidentiary

hearing is warranted." Rules Governing § 2254 Cases, Rule 8(a), 28 U.S.C. § 2254.

Having outlined the factual and legal elements supporting Eggers's claims in the rest of this opinion and finding those claims meritless, this court finds that Eggers has failed to establish good cause on the claims in his habeas petition to warrant discovery. Additionally, because this court finds Eggers's habeas petition is due to be dismissed, the court also finds Eggers's request for an evidentiary hearing is due to be denied.

## VII.  CONCLUSION

For all of the reasons set forth herein, Eggers's petition for writ of habeas corpus is due to be dismissed, or in the alternative denied.

Rule 11(a) of the Rules Governing Section 2254 Cases requires the district court to issue or deny a certificate of appealability when it enters a final order adverse to the applicant. This Court may issue a certificate of appealability "only if the applicant has a made a substantial showing of the denial of a constitutional right."   28 U.S.C. 2253(c)(2). To make such a showing, a "petitioner must demonstrate that reasonable jurist would find the district court's assessment of the constitutional claims debatable and wrong," *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S. Ct. 1595, 1604 (2000), or that "the issues presented were adequate to

deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336, 123 S. Ct. 1029, 1039 (2003) (internal quotations omitted).  This Court finds Eggers's claims do not satisfy either standard.  Accordingly, a motion for a certificate of appealability is due to be denied.

A separate order in accordance with this opinion will be issued.

**DONE** AND **ORDERED** ON NOVEMBER 25, 2015.

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE

160704